UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X

MEMORANDUM AND ORDER

In re NASSAU COUNTY STRIP                99-CV-2844(DRH)
SEARCH CASES

-------------------------------X
A P P E A R A N C E S:

For Plaintiffs:
     Giskan Solotaroff Anderson & Stewart LLP
     11 Broadway Suite 2150
     New York, New York 10004
       By: Robert L. Herbst, Esq.
           Oren Giskan, Esq.

     Beldock Levine & Hoffman LLP
     99 Park Avenue, Suite 1600
     New York, New York 10016
       By: Vera M. Scanlon, Esq.

     Emery Celli Brinckerhoff & Abady LLP
     75 Rockefeller Plaza, 20th Floor
     New York, New York 10019
       By: Matthew D. Brinckerhoff, Esq.
           Mariann Wang, Esq.

     Wolf Haldenstein Adler Freeman & Herz, LLP
     270 Madison Avenue
     New York, New York 10016
       By: Jeffrey G. Smith, Esq.
           Martin Restituyo, Esq.

For Defendants:
     John Ciampoli
     Nassau County Attorney
     One West Street
     Mineola, New York 11501
       By: Dennis J. Saffran, Esq.
           Liora Ben-Sorek, Esq.

 HURLEY, Senior District Judge

          The captioned case, a class action,[1] was tried before

-------------------------

          [1]  The class definition is "all persons arrested for
misdemeanors or non-criminal offenses in Nassau County who

me, non-jury, on the issue of general damages sustained by class members as a result of being unconstitutionally[2] strip searched at the Nassau County Correctional Center ("NCCC") following their arrests for non-criminal offenses and/or misdemeanors.

The purpose of this decision is to provide my Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52.

BACKGROUND

After extensive pretrial motion practice, including numerous unsuccessful efforts to achieve class certification, plaintiffs, proffering a reconfigured proposed class definition, requested certification pursuant to Fed. R. Civ. P. 23(b)(3) or, in the alternative, for partial certification as

_____

thereafter were strip searched at the Nassau County Correctional Center pursuant to defendants' blanket policy, practice and custom which required that all arrestees be strip-searched upon admission to the facility, from May 20, 1996 until and including June 1, 1999." (Jan. 16, 2007 Order at 2.)

[2] In 1999, the Hon. Leonard D. Wexler of the Eastern District of New York held that Nassau County's blanket policy of strip searching all newly admitted misdemeanor and non-criminal charged detainees at the NCCC violated clearly established Fourth Amendment law. Shain v. Ellison, 53 F. Supp. 2d 564 (E.D.N.Y. 1999), aff'd in part and remanded in part, 273 F.3d 56 (2d Cir. 2001). Following Judge Wexler's 1999 decision, Nassau County reported that it "had officially ended its blanket strip search policy." Shain v. Ellison, 356 F.3d 211, 214 (2d Cir. 2004). And, as explained in the text, infra, defendants in the present case have conceded liability as to subject strip searches leaving solely the issue of damages to be resolved.

to liability pursuant to then Fed. R. Civ. P. 23(c)(4)(A).
Defendants countered by conceding liability, acknowledging that
the strip searches of the class members for non-felony offenses
were conducted — with a few possible exceptions which were
never pursued – absent reasonable suspicion to believe that
such arrestees had contraband on their persons upon admissions
to the NCCC.

Based on defendants' concession, I deleted the
liability issue from the certification analysis and found that
the damages sustained by the various class members required
individual analysis, i.e. did not lend themselves to class
treatment.  My resulting orders denying the requested relief,
as well as reconsideration of that denial — dated September 23,
2003 and November 7, 2003 — were appealed by plaintiffs to the
Second Circuit Court of Appeals.  The Circuit, by decision
dated August 24, 2006, reversed those orders "to the extent
they denied certification as to the issue of liability," In re
Nassau County Strip Search Cases, 461 F.3d 219, 222 (2d Cir.
2006), and directed me "to certify a class on the issue of
liability pursuant to the definition set forth in the September
23 decision . . . [and] consider anew whether to certify a
class as to damages as well."  Id. at 231.  Accordingly, I
certified a class as to liability as directed, and also sought
input from counsel concerning the damages certification issue.

As a result of that process, the Court, as detailed in its March 27, 2008 Memorandum and Order, reported at 2008 WL 850268, concluded that the general damages sustained by each class member attributable to the affront to human dignity necessarily entailed in being illegally strip searched satisfied the predominance requirement of Fed. R. Civ. P. 23(b)(3) and thus extended class certification to include damages.

A jury trial was scheduled to begin on November 30, 2009 on the issue of general damages with the special injuries sustained by individual class members to be resolved in a subsequent damages phase or phases of the proceeding.  On November 26, 2009, counsel for plaintiffs and defendants contacted chambers indicating that their respective clients waived the right to a jury trial to the extent of placing the general damages determination in my hands.  The trial was held on November 30, December 1, 2, 3, 7, 8, 9, 10, 14, 15, and 16, 2009, with counsels' post-trial submissions being finalized via the filing of Defendants' Amended Reply to Plaintiffs' Proposed Findings of Fact on April 23, 2010.

Evidence at trial was presented in various forms including the testimony of multiple class members describing the strip searches to which they were subjected upon admission to NCCC, and of numerous correction officers detailing their

procedures in conducting, cumulatively thousands of such
searches during the class period, with the goal being to
provide me with an understanding of the steps involved in the
process as well as the surrounding circumstances.

Initially my Findings of Fact will be provided,
followed by Conclusions of Law including the general damages
awarded per strip search.

FINDINGS OF FACT

1.    Each class member was stripped searched by
a correction officer ("CO") upon admission to NCCC following
an arrest for a misdemeanor or non-criminal offense absent
reasonable suspicion to believe that he or she harbored
contraband;[3] some class members, due to more than one such
admission, were strip searched on more than one occasion.

2.    All strip searches of new admittees took
place in the operations area on the first floor of the D
Building at the NCCC in either the Male Clothing Room ("MCR")

---

[3]  All class members were necessarily strip searched given
the definition of the class.  However, the precise size of the
class has not yet been determined.  Although the parties agree
that the non-felony admittees during the class period, and
concomitant searches, total approximately 17,000 and 23,000
respectively, defendants contend that not all such admittees were
strip searched; some, as the result of the practice of "book and
bail," were released from the correctional facility after
admission but prior to a strip search being conducted due to bail
being posted on their behalf in the interim.  (See Trial
Transcript ("Tr.") 1911:1-1912:4.)  That issue is presently sub
judice.

or Female Clothing Room ("FCR") depending upon the gender of the new admittee. (Tr. at 784:19-25.)

3.   It is undisputed that a correction officer of the same gender as the inmate conducted each search.

4.   The parties agree that about 15% of the strip searched new admittees were female and 85% male. (Tr. at 1909:1-1911:9.)

5.   There was no written procedure or policy in effect at the NCCC governing the manner in which strip searches were to be conducted, nor was the topic a subject of in-house training. (See, e.g., Tr. at 943:7-944:19, 951:4-24, 1055:25-1057:3, 1058:12-15, 1186:6-9, 1187:6-9, 1301:10-12, 1803:11-14, 1873:20-25, 1876:22-25; Pound Dep. Tr. (Court Ex. 4) at 106:19-107:2.)

The Court is mindful that in some of the above cited testimonial references provided in support of these two factual findings, the CO witnesses — some of whom conducted hundreds of strip searches of new admittees during the relevant time frame (Tr. at 826:22-25, 967:17-19, 1142:11-14) — did not recall ever seeing a written document or having received in-service training on strip searches as distinct from denying their existence. However, the pervasiveness of the failure to recollect such institutional guidance being furnished, viewed in conjunction with the absence of convincing, countervailing

evidence causes me to conclude that neither was provided. Moreover, managerial oversight as to the manner in which strip searches were conducted appears to have been nonexistent. (Id. at 944:16-25.)

6.   Not only was there an absence of in-service training, none of the testifying COs recalled receiving training at the Police Academy on the subject. (See, e.g., Tr. at 1057:21-25, 1298:15-18, 1649:5-7.)  Some officers believed they learned the procedure from colleagues (id. at 1058:16-21, 1624:4-7, 1717:25-1718:3) and, in any event, all testified that they developed their own procedure over time which was in the main consistently followed subject to occasional modifications based primarily on such factors as the age and/or physique of the subject being searched. (See, e.g., id. at 827:5-12, 938:7-13 (Cpl. Keith Jorgensen: "Everyone has their own method of doing it"); id. at 942:7-25, 1240:11-13, 1414:24-1415:1.)

7.   Not surprisingly, given the absence of a written procedure or formal training, the manner in which the strip searches were conducted varied from class member to class member although there were common core elements.  For example, class member Mary P.[4] described the search to which she was subjected on February 16, 1998 thusly: she was directed to, and

---

[4]  Given the sensitivity of the subject matter, the Court has elected to refer to testifying class members by their first names and the first letter of their last names.

did remove her clothes (Tr. 61:16-62:3), and then, as ordered by the CO, she "lifted [her] arms" (id. at 63:8-21), "lifted and moved her breasts up and then side to side" (id. at 64:1), "r[a]n [her] fingers through [her] hair" (id. at 64:17-18), "squat[ted]," "cough[ed]," "wiggled her toes," "ben[t] over," "cough[ed again]," and "spread [her buttock] cheeks," as well as "st[u]ck out [her] tongue [and] move[d] it side to side." (Id. at 64:23-65:6.)  For class member Heidi K., parts of the search occurred while she was clothed, with the CO beginning the process by checking her hair (id. at 292:1-10) and visually examining her opened mouth (id. 292:14-16).  Heidi K. then, as directed, "undress[ed]," "st[ood] with [her] legs apart and lift[ed her] arms above [her] head," "turn[ed] around . . . ben[t] over and spread [her] buttocks."  (Id. at 292:18-293:18.)

The strip searches of male inmates again differed inter se (both as to the number of steps and, to a lesser extent, the sequence in which shared steps were performed), and from those experienced by their female counterparts primarily because of physiological differences. Thus, for example, class member Stuart S. detailed the steps of his strip search upon admission to NCCC as beginning with the instruction to "get completely undressed," followed by directions to "run [his] fingers through [his] hair," "flip

[his] ears over," "raise his hands straight up" and then "turn around, . . . bend over, and . . . spread [his] cheeks." (Tr. at 407:19-409:25.) Class member Gregg W. reported that, after removing all his clothing as directed, the CO "instructed [him] to go through a series of movements . . . [which he did starting with] run[ning his] fingers through [his] hair," "raising [his] arms above [his] head," "open[ing his] mouth, rais[ing his] tongue [and] run[ning] [his] fingers between [his] gum and . . . lips," and then "turn[ing] around . . . exposing the bottoms of [his] feet," and "grab[bing] . . . and spreading [his buttock] cheeks." (Id. at 550:16-552:1.) Class member Christopher W.'s strip search testimony partially parallels that of Greg W.'s but he, unlike Greg W., was asked to "squat," not bend over or "spread [his] butt cheeks."[5] (Id. at 1389:18-1390:21.)

Although the steps involved in the strip searches varied during the class period based on, inter alia, the inmate's gender, physique, and the identity of the officer conducting the search, each class member was made to endure the gross indignity of being required "to undertake certain movements while he [or she was] naked" (Tr. at 938:21-24), under the scrutiny of the searching officer to assure - as

---

[5] Christopher W., unlike the other class members who testified, was called to the stand by the defense as part of their case. (Tr. 1377:3-6.)

-9-

explained in footnote 10, <u>infra</u>, - that no contraband was secreted in any of the inmate's orifices or elsewhere.

        8.    There is no credible evidence that a CO ever touched a class member during the search process. In making that determination, I recognize that class members Heidi K. and Michael F. testified to the contrary with Heidi K. reporting that during her search on October 7, 1996, the officer "put her hands through my hair" (Tr. at 292:9-10), and Michael F. testifying vis-a-vis the search of his person on July 29, 1997 that the officer "fluffed [his] hair . . ., patted underneath [his] arms [a]nd . . . pushed . . . each of the ears forward" (<u>id.</u> at 653:1-15). Although that testimony dovetails with one of the steps in the 1997 Lesson Plan to be discussed <u>infra</u>,[6] given the absence of like testimony from any other search victims, and the credible testimony provided by the officers of having never touched an inmate during a search process (<u>see, e.g.</u>, <u>id.</u> at 831:20-25, 1007:14-18, 1631:7-19), I find it is far more probable than not that the recollections of class members Heidi K. and Michael F. of what transpired regarding those particulars over a decade before are

---

      [6]  The Court notes that while the lesson plan recites that the searching officer should run his fingers or a wide-tooth comb through an inmate's hair, CO Pound, the author of the lesson plan, testified at his deposition that he "would never do that. [He] would never put [his] hands on an inmate. The inmate would do that." (Pound Dep. (Court Ex. 4) at 73:7-13.)

incorrect.[7]

        9.    Strip searches were conducted during all three tours at the correctional facility, those being the morning, afternoon, and evening tours.  The "vast majority of . . . searches occurred on the 1430 to . . . 2300 tour," i.e. "the afternoon tour."  (Tr. at 1163:5-11.)  During that tour, it was not unusual in the MCR for two, or possibly on "extremely rare" occasions, three officers to be conducting strip searches of a like number of male inmates simultaneously or with a partial overlap in the procedures.  (Id. at 1170:2-11; see also id. at 996:6-12, 1807:1-5.)  It was far less likely that more than one search would be underway at any given time in the FCR (id. at 1370:23-1371:2), or that more than one CO would be present in the room during a search (id. at 1254:22-25).

        For both sexes, a CO only strip searched one inmate at a time.  (Tr. at 996:20-997:8, 1253:13-19, 1370:19-24.)

        10.  For males, Cpl. Jorgensen testified, and I

---

[7]  Neither the testifying class members nor COs were able to identify the other with respect to any particular search.  NCCC has essentially no records to fill that void by linking a particular officer to a strip searched inmate.  Accordingly, each officer testified based on the strip search procedure he or she used during the class period, with the class members relying on their memories to reconstruct the details of the subject searches.

so find, that the searches occurred while the inmate was located in a three sided stall, the rear of which was the search room wall, with the two side partitions being 5' 10" in height. (Tr. 807:15-18.)[8]  The searching officer stood in front of, and typically several feet from the stall opening during the search process (id. at 1005:20-22, 1388:4-14, 1630:15-21), thereby partially shielding the inmate from the view of others who may have been in the room during the search.

The situation for females was essentially the same as for the males as to the size of the stalls (Tr. at 808:4-7) and as to the searches being conducted while the inmate was in a stall.

11.  In reaching the conclusion that strip searches were conducted while the inmate was standing alone in a stall, I considered the contrary testimony given by some of plaintiffs' witnesses.  Although such class members as Heidi K. (Tr. at 291:21-25, 293:21-294:3, 295:12-16), Greg W. (id. at 564:15-17, 568:21-23), and Christopher W. (id. at 1386:14-17), testified that they were strip searched while in a stall — consistent with the testimony of all defense witnesses to whom the subject was broached — class member Kevin M. testified to having been searched while standing in front, not within a

---

[8]  Each stall was also 34" wide, with the entrance being 30" in width given a two inch lip on each side of the front opening; the depth of stalls were 48".  (Tr. at 807:9-14.)

stall.  (Id. at 173:8-174:22.)  At the time, according to Kevin

M., three or four other inmates were going through the same

process at the same location in his presence.  (Id. at 178:19-

22.)[9]  And class member Mary P. reported, on direct, that she

and a "Spanish woman" (id. at 55:9-11) were both directed

simultaneously, by the same correction officer (id. at 67:6-8),

to remove their clothing while both inmates were "right next to

each other" in "a very small stall" (id. at 62:9-25 (emphasis

added)).  To my inquiry as to whether she and the other woman

were in the "same stall," she responded in a somewhat

convoluted fashion thusly: "[w]e were right next to each other"

separated by "6 inches," coupled with the comment "[j]ust like

a board . . . [t]hat's all . . . [no] door."  (Id. at 67:21-

68:4.)

On cross examination, Mary P. explained that the

"board" was a partition separating two stalls (Tr. at 84:25-

85:4) and that she was not claiming — notwithstanding her

earlier testimony that "[w]e were in a stall, a very small

stall" (id. at 62:25) — that both women were searched in the

same stall.  In any event, given, inter alia, the lack of

clarity as to this critical part of her testimony, I do not

---

[9]  Parenthetically, class member Oscar A. - discussed infra
in text - testified that he did not see any stalls in the room
where he was strip searched (Tr. at 481:21-23), even though it is
uncontroverted that all male class members were strip searched in
the same room which room contained stalls.

accept as accurate her rendition as to what transpired when she was strip searched including where she was searched in relation to both the stalls in the FCR and to other women under discussion, or that one CO orchestrated both searches simultaneously.

Kevin M.'s testimony about himself and four others being stripped while positioned side by side in front of the stalls is similarly not convincing. It fails to dovetail with other evidence in the record I found to be credible, such as the testimony of Cpl. Weisdorfer and of Cpl. Jorgensen each of whom testified that he invariably used the stalls for their intended purpose, viz. to house an inmate during the strip search process. (See Tr. at 1003:1-10, 829:4-9.) To do otherwise would serve no constructive purpose,[10] and would raise the specter of a tense scenario becoming more so with a likely diminution of the officer's control of the situation.

In sum, I find that the subject strip searches occurred in MCR or FCR stalls, i.e. not in front of or

_____

[10] In so concluding, the Court has considered, and rejected as devoid of evidentiary support, the notion advanced by plaintiffs "that the primary purpose . . . of the strip search procedure was to inculcate submission to authority rather than seriously to search for contraband in the bodily orifices of those being strip searched." (Pls.' Comments on Defs.' Proposed Findings of Fact and Conclusions of Law ("Pls. Comments") at 19.) To the contrary, the purpose of the search was to see if an inmate was harboring contraband on his or her person. (See, e.g., Tr. at 997:3-5, 1120:24-1122:1, 1585:9-12.)

otherwise outside the stalls.

12.  Notwithstanding my finding that the
searches occurred within the stalls, I reject the notion
advanced by the defense that "the stall provided complete
privacy from everyone other than [the] C.O. conducting the
search."  (Defs.' Proposed Findings of Fact and Conclusions of
Law ("Defs.' Prop. Findings") at 3.)  From the evidence it is
more likely than not that other COs if in the room (as
certainly would not be unusual, for example, during a MCR
afternoon search), as well as inmate workers and/or other new
admittees upon entering or leaving the area, saw class members
in various states of undress.  That evidence includes not only
testimony of various witnesses concerning the layout of the
strip search areas and the usual locations of the strip search
participants, but also a number of the photographs in evidence
such as defendants' UU5 (Tr. at 1667:1-22, 1672:8-13), as
supplemented by my personal inspection, with counsel, of those
areas during the course of the trial.  Under the attendant
circumstances, surely some of the class members were viewed
while being strip searched by others besides the officer
conducting the search.  (See also, e.g., id. at 297:2-6 (given
that class member Heidi K. could see the CO at the desk during
the strip search presumably that officer could also see her);
id. at 1635:3-25 (CO Rogers testified that he has seen inmate

workers sitting at the desk in the MCR during the strip search process, i.e. being at the same vantage point as the CO referenced in Heidi K.'s testimony); id. at 1665:13-23, 1667:17-22.)

13. Although it is clear to me that class members were surely observed by individuals besides the searching COs for the reasons provided in the prior paragraph, I do not accept as credible the testimony of Oscar A. concerning that subject. His testimony was less than a model of clarity. Initially he seems to say that upon entering the MCR (Tr. at 467:4-5; see also id. at 486:6-9) he observed an "underdressed" inmate (id. at 467:10) in "the corner of the room" (id. at 486:11) and was told that the naked inmate was being punished, coupled with a warning that the same punishment would be inflicted on "whoever want[s] to be funny, you go, stand up naked in the corner of the room." (Id. at 495:4-14.) Later, Oscar A. explained that he saw the naked inmate before he, Oscar A., entered the room, while he was in the "frame of the door." (Id. at 492:5-6.) Oscar A. also explained that when he spotted the naked inmate in the corner, he saw another man, apparently at the end point of being strip searched, "five feet" from the first, so that the two were naked simultaneously. (Id. at 489:19-23.) As noted in footnote 9, supra, Oscar A. did not recall that the MCR had stalls, nor was

his recollection refreshed upon being shown photographs of the room.

The scenario portrayed by Oscar A. is devoid of any support elsewhere in the record, and is directly at odds with the credible testimony provided by CO Rogers (Tr. at 1638:8-10), who signed Oscar A.'s clothing card (id. at 1636:1-1637:3), and accordingly, may, but not necessarily, have been the searching officer or at least one of the officers on duty at the time. Simply put, having observed Oscar A.'s demeanor and viewing this portion of his testimony in the context of the total evidence, I find that plaintiffs have not established that this incident occurred or, incidently, that a strip search was ever conducted during the relevant time frame at NCCC to punish an inmate.

14. In addition to not accepting the above discussed portions of Oscar A.'s testimony, Mary P.'s testimony about her observing three men in the large room looking at her while she was undressed with respect to a later transportation search is not found to be credible.

Not only is the relevance of what may have occurred during a post-admission transportation search problematic with respect to the issue of general damages caused by class members being illegally strip searched upon their admission to NCCC, but, as noted earlier, I have significant

reservations as to this witness's credibility.

I find that no credible evidence has been presented to establish that one or more class members were likely to be, or were observed by a member of the opposite sex while being strip searched upon admission to NCCC.

15.  Several of the plaintiff class members objected to the language and/or tone of voice used by the COs during the strip search process.  (See, e.g., Tr. 179:22-180:1-20, 728:11-16.)

Class member Kevin M. testified that as he spread his buttock cheeks, as directed during his strip search on March 29, 1997, the CO conducting the search said "that the boys are going to love this" (Tr. at 179:22-180:1-13), to which Kevin M. responded "you must really love your job" (id. at 180:14-18).  The exchange ended with the CO supposedly saying: "Shut the F up and get dressed."  (Id. at 180:19-20.)  Kevin M. was arrested and strip searched again at NCCC on April 23, 1998.  (Id. at 199:17-200:12.)  The CO at that time, unlike his counterpart a year earlier, was reported by the witness to have conducted the strip search in a professional manner, free of rude comments or remarks.  (Id. at 272:25-273:5.)

As previously explained, I do not believe Kevin M.'s testimony as to having been strip searched together with other inmates while positioned in front of stalls in the MCR.

My reservations concerning his testimony as to that critical issue carries over to his testimony vis-a-vis the purported verbal exchange. Simply put, plaintiffs have not established by a fair preponderance of the credible evidence that the CO who conducted that search used the language ascribed to him by Kevin M.

As to the tone of voice employed by COs, the evidence fails to indicate that it was inappropriate given the context. Even Kevin M., while unconvincing complaining as to what was said, explained that the general tone of the CO's comments, i.e. "bark[ing] orders," was akin to the practice "in the military" of issuing "quick commands." (Tr. at 276:2-24.) That Mary Beth P. perceived the "demeanor or tone" of the female CO in her case as being "offensive" in the sense "she was talking down to [her]" is certainly understandable under the circumstances, that perception, while arguably germane to the special damages portion of her claim, is insufficient to suggest that the tone utilized by the COs was more authoritative than required and, thus, should be deemed an aggravating factor relevant for purposes of assessing general damages. To the contrary, I find based primarily on the credible evidence provided by the testifying COs, that the subject searches were conducted in a professional, business like manner. (See also id. at 350:11-25 (class member Heidi K.

acknowledges COs demeanor as being professional albeit "very authoritative and commanding"); id. at 426:9-25, 588:17-25; id. at 698:24-699:11 (class member Michael F. describes CO's "abrupt" demeanor as being a "no nonsense" approach).)

16.   Class member Michael F. testified that the CO who strip searched him utilized a flashlight "to look in [his] mouth and ears." (Tr. at 657:16-20, 700:19-701:1.) Although that testimony dovetails with one of the steps in the 1997 Lesson Plan to be discussed infra, none of the COs who testified said they were familiar with the 1997 Lesson Plan either as a result of his or her training at the Police Academy[11] or otherwise, and all the witnesses — both those searched (except Michael F.) and those conducting the searches — either did not mention or denied that an officer used a flashlight during a search.  Moreover, a review of the record listing Michael F.'s personal property at the time he was admitted to the facility includes a flashlight, suggesting he saw a flashlight that day but not in the hands of a CO.  (Id. at 887:3-7.)  That fact, coupled with, inter alia, his several earlier arrests and accompanying strip search or searches (id. at 686:16-25, 689:21-691:8), as well as the time lapse between the search now under discussion and the time of his testimony,

_____

[11]   Each of the testifying COs attended the Academy prior to 1997.

causes me not to accept this portion of what he had to say.

17.  Several male class members testified that they were required to lift their scrotums during the course of being strip searched.  (See, e.g., Tr. at 2017:10-13, 2051:15-21.)  None of the testifying COs testified that that step was included in his search procedure.  However, it will be recalled that none of the COs were able to definitively identify a particular class member that he searched.  The testifying class members similarly could not identify the CO who strip searched them.  There is no reason to believe that the testifying COs were the only officers who searched male new admittees to NCCC during the class period.  Although I have found that the COs who testified endeavored to accurately depict their respective search procedures, any lack of synchronization between their testimony and that of class members does not mean that either necessarily fabricated what transpired.  Based on the trial evidence, I conclude that although a requirement that a male inmate lift his scrotum during a strip search was not the standard practice, it did occur with some frequency.  In reaching that conclusion, I have considered the April 3, 2000 Declaration of Jerome P. Donahue, ("Donahue") a Deputy Undersheriff in the Nassau County Sheriff's Department.  Therein Donahue avers that  "[t]he strip search procedure for all inmates charged with misdemeanors or less consisted of the

inmate being asked by the Corrections Officer to run both
hands' fingers through his hair to dislodge any contraband, to
raise his arms exposing his arm pits, to grab his testicles,
lift them and squat down to ensure that no contraband is hidden
in his groin area and open his mouth and move his tongue."
(Donahue's Apr. 3, 2000 Decl. (Court Ex. 3) at ¶ 13.)  That
declaration was submitted "in opposition to plaintiffs' motion
to certify a class action."  (Id. at ¶ 1.)[12]

        In arguing that the Donahue Declaration should
not be accepted into evidence and, if accepted, should be
afforded little weight, defendants endeavor that supposedly
"Donahue did not himself conduct any strip searches of new
admits during the class period," that he "did not write or
draft the affidavit himself" and that during his trial
testimony he "acknowledge[d] that the reference to lifting
testicles was a mistake."  (Defs.' Prop. Findings at 15.)
However, during cross examination Donahue admitted that he had
"occasion to go . . . into the male clothing room as a
supervisor" and that he "saw strip searches being done . . .
but . . . didn't observe them being completed."  (Tr. at
2102:6-21.)  He further acknowledged that he recalled signing
each of the two declarations, viz. Court's exhibit 2 and 3,

_____

        [12]  Deputy Undersheriff Donahue submitted a like Declaration
fifteen months earlier in Shain, 53 F. Supp. 2d 564 in which the
above quoted language appears verbatim.  (Court Ex. 2, ¶ 9.)

that he read each of them for accuracy prior to signing them, that he understood the declarations made were made "under the penalty of perjury," and that his sworn statements were being submitted to advance defendants' position.  (Id. at 2103:17-2104:15.)  He also acknowledged that he met with counsel "with respect to the preparation of these documents [i.e. his Declaration in Shain and in the current case]."  (Id. at 2105:12-16.)  During an examination before trial he indicated that he "understood that the statement about the strip search procedure itself was based on [his] knowledge of how things were done."  (Id. at 2107:3-6.)  Under the circumstances, defendants' effort at trial and in their post-trial submissions to distance themselves from the witness's sworn declarations is unavailing.[13]

In sum, it appears that some class members were required to lift their scrotum as part of the strip search process.

18.  Among the plaintiffs' Proposed Findings of Fact is the following: "If a person refused to submit to a strip search upon admission, it would be met with a show of force in which officers would come into the strip search room

---

[13]  Cpl. Jorgensen testified at deposition that a direction that an inmate lift his scrotum was "optional" (Tr. at 941:4-942:2), which calls into question the legitimacy of defendants' apparent bright line denial that such a step, as testified to by several class members, was part of some strip searches.

and surround the person to ensure that the person submitted to the search." (Pls.' Proposed Findings of Fact and Conclusions of Law ("Pls.' Prop. Findings") at 23, ¶ 89.) Such episodes, however, may not legitimately be deemed part of the common or core experience of new admittees at the NCCC. CO Sutch, who provided the information about shows of force to plaintiffs' counsel during cross examination testified that he had only seen it happen three or four times during the class period. (Tr. at 1797:5-11.) But beyond that, the testifying COs provided the Court with their respective procedures for conducting strip searches without drawing a distinction between admittees that were charged with misdemeanor or lessor offenses and those facing felony charges. None of the class members called to the witness stand by plaintiffs' counsel testified of experiencing or witnessing a show of force, nor is there any other evidence supporting that a class member was subjected to a show of force.

19. Concerning the duration of the searches from beginning to end, the time varied depending on a number of factors including, inter alia, the amount of clothing worn by the inmate, the inmate's familiarity with the process, the speed with which the inmate complied with the directions given, and again, the number of steps involved in the particular CO's strip search procedure.

The thrust of the testimony of Cpl. Jorgensen
was that the whole process took more than a minute and could,
depending on the circumstances, take up to three minutes, and
possibly longer.  (Tr. 937:14-20.)  Indeed, on cross, he
acknowledged that it "could take up to ten or 15 minutes" (id.
at 937:24-25), if "[t]he inmate . . . [had] an infirmity, an
injury, [or was] an older person."  (Id. at 971:24-972:9.)  CO
Sutch estimated that "[f]rom the time [the inmate] started
getting undressed until the time [the strip search] was
completed [was] . . . [f]ive minutes."  (Id. at 1786:25-
1787:6.)  He, like Cpl. Jorgensen, acknowledged that the
process "could" extend to "fifteen minutes" depending on "how
much clothes he was wearing, [and] how slow the process was
going."  (Id. at 1787:7-10.)  The strip search process, in CO
Weisdorfer's view, "generally took between 2 and 3 minutes."
(Id. at 1100:8-10.)

In sum, I find that "the length of the strip
search procedure varied depending on 'a lot of variables,' and
generally ranged from three minutes to five minutes . . . ."
(Pls.' Prop. Findings at 20, ¶ 74.)

Defendants do not take issue with that estimated
time frame.  (Defs.' Amended Reply to Pls.' Proposed Findings
of Fact ("Defs.' Reply") at 17.)  Instead, their objection
targets the portion of plaintiffs' proffer that grafts onto the

five minute period the further claim that the strip search

procedure "'generally ranged . . . [up] to 15 minutes for some

new admittees who were older or moved more slowly.'" (Defs.'

Reply at 17, quoting from ¶ 74 of Pls.' Prop. Findings.)  As

aptly explained by defendants:

> No CO witness testified that the strip
> search procedure "generally" lasted 15
> minutes.  The testimony regarding "15
> minutes" was given in response to a
> question regarding the maximum time a strip
> search "could take" (Jorgenson [sic] and
> Sutch).  This hardly qualifies as the time
> a strip search "generally" took, and should
> not be construed as the timing of the
> typical new-admit search.  Additionally, it
> is clear that the estimates cited to by
> plaintiffs in this regard encompassed the
> whole process of undressing, being
> searched, and getting dressed again.  These
> estimates do not at all reflect the time
> that the inmate spent unclothed or
> performing the steps that comprised the
> actual strip search itself.

(Defs.' Reply at 17.)

This takes us to the single most important

finding of fact for present purposes, that being the period of

time an inmate generally stood naked before the CO conducting

the search while going through the various directed

contortions.[14]  Here, again, estimates vary.  (See, e.g., Tr.

---

[14]  The trial evidence on time of exposure was generally
limited to the time an inmate was totally naked.  Accordingly,
the estimates in the text are based on that evidence and not, for
example, to possible subsets of that condition such as how long a
female inmate's breasts were uncovered while other private parts
of her anatomy were clothed.

252:20-22 (class member Kevin M. — less than a minute); id. at
425:25-426:5 (class member Stuart S. acknowledged that "from
the time . . . that the officer came to stand in front of [his]
compartment and started giving [him] the instructions that [he]
described, until the time [he was] able to put [his] underwear
back on, no more than 20 seconds elapsed"); id. at 832:1-3
(Cpl. Jorgensen testified that generally an inmate he was strip
searching would be fully unclothed for 10 to 15 seconds); id.
at 1006:15-17 (CO Weisdorfer estimated that, pursuant to his
"routine," the inmate generally was "fully unclothed" for "less
than 5 seconds"); id. at 1396:8-11 (class member Christopher W.
- naked for approximately one minute); id. at 1631:20-24 (CO
Rogers estimates from the time "they took their underwear off
until time [he] handed it back to them [was, he] guess[es]
eight to ten seconds); id. at 1727:7-21 (CO Sutch testified
that typically an inmate familiar with the process would be
totally naked for "20 [to] 30 seconds" and for an inmate who
lacked that familiarity "30 seconds to a minute"); id. at
2074:12-14 (class member Jamar W. stated he was in "the state
of undress" for less than 45 seconds); id. at 2145:18-2146:5
(CO McGovern testified that inmates typically were fully naked
when strip searched by him for "probably . . . 10 to 12
seconds"; at his deposition he estimated the relevant time
frame to be "a minute or two" (id. at 2147:6-8), but at trial,

CO McGovern explained that he believed his answer at deposition was flawed and that "the fully naked portion of the strip search couldn't have been more than 10 to 20 seconds" (id. at 2150:9-23); see also id. at 2157:6-8 (CO Peletier said that typically an inmate would be fully disrobed for "30 [seconds], maybe a minute.").)

Based on the above testimony and other evidence adduced at trial, including the various steps that the individuals were required to perform while naked and the apparent time required to complete those steps, I find that the plaintiff class members were typically naked for approximately 30 to 45 seconds.

20. In reaching the conclusion regarding the period of time class members were typically naked, I considered, but ultimately rejected the testimony of class members Mary Beth P. and Michael F.

Mary Beth P. was strip searched on September 22, 1996. On direct, she stated that she was "fully naked" for "ten minutes. Maybe a little less." (Tr. 730:10-12.) However, on cross examination, she was asked to go through the steps of her strip search and to give an estimate of the time devoted to each of those steps. Upon completion of that line of inquiry, she conceded that the total time she was naked "might have been" less than ten minutes (id. at 740:10-12) and,

indeed, might have been a minute or less although she seemingly found that shorter period problematic, explaining that she "d[idn't] remember it being that short a period of time."  (Id. at 740:5-9.)  Given Mary Beth P.'s uncertainty as to the time she was totally naked, I attached little weight to this portion of her testimony.  Seemingly, plaintiffs' counsel did the same for her estimate as to this critical general damages element does not appear in their synopsis of her testimony (see Pls.' Prop. Findings at 14-15), and is likewise absent from the paragraph in their submission dealing with the time class members purportedly "stood fully naked in front of the officers."  (Id. at 20-21, ¶ 75.)

Michael F. was strip searched July 29, 1997, when he carried approximately "310 pounds" on his "[f]ive-seven" frame.  (Tr. at 644:1-9.)  He testified, and I accept, that there was no appropriately sized uniform readily available in the strip search room and, accordingly he was required to wait in a "separate room" for one to be produced from elsewhere in the correctional facility.  (Id. at 655:6-19.)  "[T]here were two inmate workers in [that] room" (id. at 655:20-22), where he remained for "[a]round a half hour" while "still naked" (id. at 656:1-13), at least until he was given his "underpants [which he] put on."  (Id. at 656:17-19.)

I cannot discern from the record when his

underpants were furnished, i.e. for how long he remained totally unclothed during the strip search process. Moreover, Michael F.'s experience represents an aberration from the typical strip search conducted of NCCC new admittees during the class period. As such, its sole relevance, if any, is tied to Michael F.'s claim for special damages, not to the issue of general damages. And here, again, it warrants mention that Michael F.'s situation, while detailed in plaintiffs' outline of his trial testimony, is not mentioned in their proposed Findings of Fact regarding the time period class members were naked during strip searches they were illegally required to endure. (<u>See</u> Pls.' Prop. Findings at 20-21, ¶ 75.)

21. Before proceeding to the Court's Conclusions of Law, one last issue remains to be addressed: the admissibility of the 1997 Lesson Plan, (Pls.' Ex. 1), which plaintiffs sought to introduce into evidence at the trial.[15] The Court reserved decision on that application after hearing arguments of counsel. (Tr. at 2137:19-2143:24.)

Some background is in order. The lesson plan was developed by CO Pound ("Pound") while an instructor for new recruits using an earlier lesson plan he was given. (Pound Dep. at 44:11-23, 58:6-60:7.) The lesson plan covered all

---

[15] The admissibility of the 1997 Lesson Plan implicates a mixed question of fact and law.

strip searches, not just strip searches of new admits.  (Id. at
70:13-22.)  It was not shown or distributed to the recruits.
(Id. at 117:23-118:7, 135:13-136:3.)  According to Pound, he
used the lesson plan as a "brief overview" (id. at 56:25-57:3,
82:8-83:4, 127:13-22), modifying the plan as he taught (id. at
96:20-98:3, 138:16-140:11, 143:22-144:10).  Pound never did a
new admit strip search (id. at 53:11-54:12); for the non-new
admit strip searches he did conduct, he often departed from the
strip search procedures set forth in the 1997 Lesson Plan.
(Id. at 72:21-77:6.)  It was Pound's "understanding" that the
COs conducting new admit strip searches "were using this
procedure one through seven" referring to the seven steps
listed in Phase III of the 1997 Lesson Plan.  (Id. at 72:2-16;
see also id. at 56:25-57:8.)  It is not clear whether Pound's
"understanding" was attributable to "personal knowledge," Fed.
R. Evid. 602, or otherwise.

        Plaintiffs maintain that "[t]he only writing in
existence on the procedure to be used to conduct a strip search
is the 1997 lesson plan authored by CO Pound[.]"  (Pls.' Prop.
Findings at 17.)  As such, plaintiffs seek its admission as a
basis for this Court to find that the searches conducted upon
class members comported in all material respects with the steps
set forth in the lesson plan.

        In opposing the introduction into evidence of

the 1997 Lesson Plan, the defendants have synopized their

position thusly:

> In seeking to introduce into evidence . . .
> the 1997 Lesson Plan, and then heavily
> relying on it in their proposed Findings of
> Fact, plaintiffs seek to draw the Court's
> attention away from evidence that
> demonstrates how the new-admit strip
> searches were actually conducted and
> experienced.  They essentially propose that
> the Court should ascribe more weight to
> that document as a description of the class
> experience than to testimony by correction
> officers who actually conducted the
> searches of new admits during the relevant
> time period — and they propose this despite
> the fact that not one of their own
> witnesses testified that the strip search
> he or she experienced matched the procedure
> set forth in that document.

(Defs.' Reply at 10.)

In plaintiffs' view, the 1997 Lesson Plan is

admissible as "an admission by the County as well as a business

record . . . ."  (Pls.' Letter dated Nov. 17, 2009, filed as

Dkt. No. 274, at 6.)  Proceeding in reverse order, the Court

will initially consider plaintiffs' proffer under Fed. R. of

Evid. 803(6) which is based on the following excerpt from

Pound's September 30, 2009 deposition:

> Q.  Let me try again.  I understand you
> were handed a document similar to this that
> had been prepared earlier and it was given
> to you by Sergeant Figliola?
>
> A.  Yes.
>
> Q.  But when you prepared this document
> from that document, did you do that

pursuant to your duties and
responsibilities at the jail?

A. Yes.

Q. Did you do it in the ordinary course
of your duties and responsibilities and
business at the jail?

A. Yes.

Q. Did you make and keep this document
in the course of your ordinary business at
the jail?

A. With the New York State Commission
of Corrections lesson plan, yes.

(Pound Dep. at 152:17-153:12 (referenced in Pls.' Prop.

Findings at 17, n.5).)

The answers given by Pound at his deposition are

insufficient to warrant the 1997 Lesson Plan's receipt into

evidence under Fed. R. Evid. 803(6). That the witness, at

deposition, answered the leading foundational questions asked

by counsel in the affirmative is not dispositive on the issue

of admissibility when the concomitant substantive evidence is

to the contrary. In such a situation, form is necessarily

trumped by substance lest the purpose of the rules of evidence

be perverted. See Fed. R. Evid. 102. Here, Pound prepared one

lesson plan during his multiple years of service. The mere

fact that the lesson plan was prepared while Pound was in the

County's employ does render his work product a business record.

The same is true of the predecessor plan upon which Pound's

plan was modeled, the origins and use of which stand largely undeveloped. The business records exception to the hearsay rule[16] rests on the "regularity" and the "routine" embodied in the preparation of the record sought to be introduced; the "record must [also] be made contemporaneously with what it records or reports." 4 Fed'l Evidence § 8:77 (3d ed.). Simply put, a juxtapositioning of the cited portions of the deposition testimony of Pound and, incidentally, of Sergeant Harrs as well,[17] with the rationale underlying the business records exception indicates a misfit. See Seattle-First Nat'l Bank v. Randall, 532 F.2d 1291, 1296 (9th Cir. 1976)(bank's loan procedure manual not admissible under the business records exception to the hearsay rule); Gonzalez v. City of Garden Grove, 2006 WL 5112757 (C.D.Cal. Dec. 4, 2006) (training manuals inadmissible hearsay); see also 4 Fed'l Evidence § 8:77 (3d Ed.) ("It seems that Fed. R. Evid. 803(6) does not embrace operating or procedural manuals . . . . Such documents simply do not fit the terms of the exception. They do not report or assess particular matters . . . and the contemporaneity

---

[16]  Fed. R. Evid. 801(d) indicates that an admission by a party-opponent is not deemed an "exception" to hearsay rule but rather as being "exempt" from the rule as non-hearsay.  Graham, Handbook on Evidence, § 801:15.

[17]  Plaintiffs also refer to Sergeant Harrs' deposition, Court Exhibit 5, as to the purported significance of the 1997 Lesson Plan.  (Pls.' Prop. Findings at 17-19.)

requirement has no ready application, and they are not materials that are prepared on a regular or recurrent basis."); 12A Fed. Proc., L. Ed. § 33:445 ("Although the scope of [Rule 803(6)] is broad, it is not unlimited; for example, it does not embrace operating or procedural manuals, which are not records of any act, transaction, occurrence, or event as required by the Rule."). Although <u>Hodgson v. Corning Glass Works</u>, 474 F.2d 226, 234 & n. 10 (2d Cir. 1973) may, at first blush, appear to be contrary, the "Job Evaluation Plan" held admissible as a business record in that case consisted of job descriptions prepared through observation of actual job performance over two years.

Plaintiffs present a more persuasive argument on their alternate ground for receiving the subject exhibit into evidence, viz. that the 1997 Lesson Plan constitutes an admission under Fed. R. Evid. 801(d)(2). <u>Cf.</u> <u>Hodgson</u>, 474 F.2d at 234 n.10. That argument rests primarily on Pound's testimony. Based on that testimony, although the matter is certainly not free from doubt given the possible Rule 602 problem, I have received plaintiffs' exhibit 1 into evidence.

The 1997 Lesson Plan has been considered mainly in evaluating the testimony of Michael F. (<u>see</u> Findings of Fact No. 16) and Heidi K. (<u>id.</u> at No. 8). But beyond that, the weight afforded to the lesson plan is de minimis given that the

pivotal issue is how were the new-admit strip searches actually conducted rather than the instructions on the subject that may have been provided at the academy.  The Court's findings as to that pivotal issue are detailed in Findings of Fact Nos. 7-17. From those factual findings, it is evident, and I so hold, that, contrary to the position advanced by plaintiffs, the strip searches conducted during the class period did not mirror or otherwise meaningfully comport with the steps set forth in the 1997 Lesson Plan.  Instead, each CO developed his or her strip search procedure independent of the lesson plan, which procedures understandably shared numerous common core elements, given the nature of the task being performed.

In sum, I have received plaintiffs' exhibit 1 in evidence but the weight it has been afforded, given the other evidence in the record, has been slight.

The above constitutes the Court's Findings of Fact.  Attention will now be turned to the concomitant Conclusions of Law.

<u>CONCLUSIONS OF LAW</u>

1.  Preliminarily, the Court will address plaintiffs' claim that defendants are collaterally estopped from asserting strip procedures different from those "found" in <u>Shain</u>, <u>see</u> 53 F. Supp. 2d at 565-66.  (Pls.' Comments at 4-5 & n.2.)

Collateral estoppel bars a party from
relitigating an issue when "(1) the identical issue was raised
in a previous proceeding; (2) the issue was actually litigated
and decided in the previous proceeding; (3) the party had a
full and fair opportunity to litigate the issue; and (4) the
resolution of the issue was necessary to support a valid and
final judgment on the merits." Bank of New York v. First
Millennium, Inc., 607 F.3d 905, 918 (2d Cir. 2010) (internal
quotations omitted).  As collateral estoppel only "prevents the
relitigation of an issue that was raised, litigated, and
actually decided by a judgment in a prior proceeding" "[i]f an
issue was not actually decided in a prior proceeding, or if its
decision was not necessary to the judgment, its litigation in a
subsequent proceeding is not barred by [the doctrine]." Jim
Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 734
(2d Cir. 1991).  Moreover, "[a] determination whether the first
action or proceeding genuinely provided a full and fair
opportunity requires consideration of the realities of the
prior litigation, including the context and other circumstances
which may have had the practical effect of discouraging or
deterring a party from fully litigating the determination which
is now asserted against him." Algonquin Power Income Fund v.
Christine Falls of New York, Inc., 362 Fed. Appx. 151, 2010 WL
177244, at *3 (2d Cir. Jan. 20, 2010)(Summary Order) (internal

quotations omitted).

Shain addressed whether that plaintiff "was entitled to summary judgment on the claim that the Nassau County strip search policy, which requires a strip/visual body cavity search [i.e. searches involving the removal of all clothes and a visual inspection of body cavities, not involving any touching of the person being stripped] of all prisoners remanded to custody of the NCCC [was] unconstitutional." 53 F. Supp. 2d at 565 & n.2. Although the Shain court set forth the strip search "procedures followed," the court's listing of those steps was not necessary for its decision. The focus of Shain was on the constitutionality of the County's policy of strip searching newly admitted inmates, not the particular procedures employed to accomplish that goal. Cf. id. at 566 (stating that disputes as the actual inspection time was not material ); id. at 566-68 (setting forth the institutional concerns offered by the defendants but noting that given the state of the law, court could not properly consider that evidence). Moreover, the realities of that prior litigation may have had the practical effect of discouraging the County from disputing the actual procedures employed. Given these circumstances, plaintiffs have failed to establish that defendants are collaterally estopped from contending that the strip search procedure employed during the class period

differed from those described in <u>Shain</u>.  <u>See</u> <u>Eurocrafters, Ltd.</u>
<u>v. Vicedomine</u>, 183 Fed. Appx. 70, 2006 WL 1476126, *2 (2d Cir.
May 25, 2006) (Summary Order).

2.    As conceded by defendants, each class
member was unconstitutionally strip searched upon admission to
NCCC following a non-felony arrest.

3.    Each class member suffered the same injury
to human dignity inherent in the loss of the right to determine
which individual or individuals may visually inspect that
members's naked body, particularly his or her sexual organs,
and under what circumstances.[18]  Accordingly, all members are
entitled to the same dollar amount per new admit strip search
by way of a general damages award, recognizing, of course, that
the same may not be said as to their individual claims for
associated special damages which will be addressed later in the
proceedings.[19]

---

[18]   The affront to human dignity occasioned by being
illegally strip searched occurs each time an individual is thus
victimized.  Accordingly, given that some class members were
subjected to more than one new admit strip search during the
class period, the general damages award shall be per strip
search, not per person.

[19]   <u>See</u> this Court's March 27, 2008 Memorandum and Order
regarding class certification for damage purposes (particularly
the portion entitled "The Issue of General Damages for Dignity
Harm Predominates") which is hereby incorporated by reference;
not cited in the March 27, 2008 Memorandum and Order, but
nonetheless relevant vis-a-vis the distinction between general

4.  As to the amount of general damages to be awarded per strip search, plaintiffs maintain it should be in the range of "five figures, at the very least."  (Pls.' Comments at 43.)  In their view, "[t]here appear to be only two 'precedents' similar enough to be at all useful" (id. at 50), those being (1) the defendants "willingness to settle [, as they did,] the cases of the 10 individual plaintiffs in these consolidated actions for $35,000 each, with absolutely no proof of, no inquiry into, and no discovery about, the emotional distress or psychiatric harm to any of those 10" (id. at 51), and (2) the "class action strip search trial held [earlier this year] in the Northen District of Illinois [Young v. County of Cook, CV-06-552 (N.D. Ill.)(Kennelly, J.)"] in which, counsel for plaintiffs reports "Judge Kennelly conducted three trials of eight of plaintiffs' claims to help the parties determine a possible range of damages [after liability had already been established]," resulting in verdicts, "not yet . . . entered upon the public record" but said to be by "plaintiffs' counsel in that case" all "in five figures, i.e. $10,000 or more" (id.

and special damages is Martinez v. Port Authority of New York and New Jersey, 445 F.3d 158, 161 (2d Cir. 2006).
        For the Court's analysis in applying established Second Circuit jurisprudence concerning the general damages brought about by the loss of liberty necessarily inherent in a proven false arrest claim to the current unconstitutional strip search scenario, and for doing so in a Fed. R. of Civ. P. 23 context, see Mar. 27, 2008 Memorandum and Order at 8-13.

at 51-52).

The subject under discussion represents largely unchartered territory. As a result, as counsel for the parties acknowledge, damage awards in other cases are a "dubious guide" to the task at hand. (Defs.' Prop. Findings at 23; Pls.' Comments at 50.) Consistent with that caveat, plaintiffs' proffered "two 'precedents'" share a common inadequacy for present purposes, to wit, neither involved a damages assessment made in a wholly general damages context. While plaintiffs suggest that a savings of time might be realized by blurring the distinction between general damages and the special damages claims of class members yet to be determined,[20] to do so would run afoul of the pretrial rulings which established separate guidelines for the two stages of the proceeding. In keeping with those guidelines, the testimony during the general damages stage was limited to descriptions from class members and COs regarding new admit strip searches at NCCC during the class period, with the goal being to provide the necessary information to the trier of fact so that a general damages award could be fashioned. (See, e.g., Mar. 27, 2008 Memorandum

_____

[20] "[I]f the Court's general damages verdict is substantial enough to provide reasonable compensation to the class, plaintiffs are considering foregoing the next stage of the compensatory damages case in an effort to move this case more expeditiously to a conclusion . . . ." (Pls.' Comments at 56-57 n.24.)

and Order, reported at 2009 WL 706252, at 7-13.) Specifically excluded from the general damages trial was "any information concerning the effect that the search had upon [individual class members]," (Mar. 16, 2009 Memorandum and Order at 6). "This line of demarcation as to the permissible testimony will not negatively effect any [class member at the general damages trial] because to the extent such individual did sustain humiliation, embarrassment or emotional distress . . . those items may be pursued during the special damages portion of the proceedings." (Id. at 7.)

Indeed, it would seem advisable – and I will solicit input from counsel at the appropriate time — that the special damages jury be instructed, to prevent possible double counting, of the general damages award made to each class member for the inherent injury and resulting damage to all class members caused by being illegally strip searched. Cf. Kerman v. City of New York, 374 F.3d 93, 125-26 (2004)("The damages recoverable for loss of liberty for the period spent in wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering [caused thereby]; even absent such other injuries, an award of several thousand dollars may be appropriate simply for several hours' loss of liberty. . . . The jury, however, was [improperly] not instructed that Kerman was entitled to

compensatory damages for his loss of liberty.")(internal citations omitted).

In sum, plaintiffs' value arguments premised on the settlements reached by the County with certain individual plaintiffs prior to class certification, and on what has transpired in <u>Young v. County of Cook</u> to date, are of marginal relevance.

Defendants' position regarding general damages is multifaceted, beginning with the observation that an award of general damages must be based solely on the dignity injury upon which class certification was based. (Defs.' Prop. Findings at 18.) That is followed by the argument that general damages must be awarded only for the common injury experienced by all class members and, thus, "outlier" testimony must be disregarded. (<u>Id.</u> at 20.) Next urged by defendants is that implicit in the very idea of a class action is the understanding that individual recovery is inherently lower than in an individual action. (<u>Id.</u> at 21.) Finally, defendants maintain that "the damages awarded in strip search cases have been minimal absent aggravating factors suggesting a gratuitous or malicious effort to demean, debase, or degrade." (<u>Id.</u> at 23 (capitalizations omitted).) These points will each be addressed in turn.

A.  General Damages Have Been Determined in This Case Based on the Affront to Human Dignity Necessarily Entailed in the Strip Searches to Which Class Members Were Subjected.

As noted by defendants, the Court certified a damage class based upon the theory that "plaintiffs have suffered an injury to human dignity," and "has regularly reaffirmed this basic law of the case since then."  (Defs.' Prop. Findings at 18.)  Defendants voice a concern, however, that I may have reconfigured the basis for the certification of the general damages class, citing my statement on October 20, 2009 that perhaps "we shouldn't use the word 'human dignity' in this case" (Oct. 20, 2009 Tr. at 83:12-13), and the text of the Proposed Preliminary Instruction to the Jury which I presented to counsel in November 2009.

The Court's October 20th comment was triggered by its receipt of a report of Adam Schulman ("Schulman"), who defendants sought to call as an expert pursuant to Rule 702 of the Federal Rules of Evidence.  Therein Schulman opined as follows:

> Human dignity is not injured or violated by
> conduct that is merely uncomfortable,
> intrusive or embarrassing.  Rather, modern
> thinking about human dignity — whether in
> Europe, where the concept plays an
> important role in the law, or in the United
> States, where it does not — has developed
> in response to grave atrocities and crimes
> against humanity, including genocide,
> slavery and unethical human medical

experimentation (especially in the Nazi
concentration camps but also, in the U.S.,
in the Tuskegee Syphilis Study).  Conduct
rises to the level of a violation of human
dignity only when there is a deliberate and
gratuitously malicious attempt to demean,
debase, humiliate, or deny the humanity of
the victim.  Moreover, for conduct to
constitute a <u>serious</u> violation of human
dignity, warranting more than minimal
damages, it must reflect a <u>widespread or
systematic practice of atrocities</u>
inflicting <u>grave humiliation</u> or <u>degradation</u>
on human beings.

(Expert Report of Schulman (Dkt. No. 175) at 2 (emphasis in

original).)

I denied defendants' request to call Schulman as

a witness.  In doing so, I gave the following explanation which

contains the snippet provided by defendants:

[W]hat I am concerned about on the
question of helping the jury and it being
relevant is basically the premise upon
which this learned individual report is
based.  This is based, as he has indicated,
basically it is on international law.  It
is on the issue of bioethics.  It is a very
broad presentation by him, and I'm sure it
is accurate as to the concept of human
dignity within the parameters that he has
discussed.

It may be that we shouldn't use the word
"human dignity" in this case.  But the
semantics doesn't change the substance.
And that's the problem.  It is basically
that the good doctor is talking about one
thing, and we are involved with something
different.

(Oct. 20, 2009 Tr. at 83:4-16.)

In sum, the statement quoted by defendants, in

the context in which it was uttered, should not be interpreted
as a step towards altering the "basic law of the case."
(Defs.' Prop. Findings at 18.)  Instead, it represents a
comment tethered to my determination that Schulman's
understanding of the concept of human dignity, based on
European law (e.g. does not apply in a meaningful way, as
indicated in his report, absent "a widespread or systematic
practice of atrocities") is out-of-sync with our law which
authorizes an award of general damages for certain wrongs, even
if isolated, committed against a single individual such as,
e.g., the arrestee in Kerman who was deprived of his liberty
for one day which the Second Circuit opined might be worth
"several thousand dollars" in and of itself.  Kerman, 374 F.3d
at 126.

          With respect to the text of the Proposed
Preliminary Instruction to the Jury, that being the second
reason fostering defendants' concern, I prepared that document
in an effort to assist the jury scheduled to be selected to
hear the case, and presented it to counsel for their input.  In
response, both counsel shared a concern that the proposed
instruction "deemphasi[zed] . . . the concept of a common
injury to human dignity" as being the appropriate predicate for
an award of general damages.  (Defs.' Nov. 23, 2009 Letter
(Dkt. No. 280) at 1-2.)  While the issue was sub judice,

counsel advised the Court that their clients waived the right to a jury trial on the general damages issue, thus rendering the objections to the Proposed Preliminary Jury Instruction moot. Nonetheless, the Court has considered the de-emphasis objections, and has fashioned its general damages determination consistent with the concept and terminology embodied in the damage class certification.

B.    The "Outlier" Testimony Referenced by Defendants has not Affected the General Damages Award.

COs testified at trial concerning the procedures that they have followed in strip searching thousands of new admits during the class period. Additionally, various class members detailed the strip searches to which they were subjected. Based on the COs' and class members' testimony, it became apparent that, although each officer developed his or her own procedure, all class members were subjected to many of the same steps and that all were ultimately subjected to a visual body cavity search.

Three of the class members as noted by defendants, namely Oscar A., Michael F., and Heidi K., reported some occurrences wholly out-of-sync with other testimony which I found to be credible. Oscar A.'s testimony has been rejected by the Court as not credible. Michael F.'s experience as to waiting for an extended period for a properly sized uniform to

be produced has not affected this Court's general damages award primarily because it is aberrant and, thus, properly prosecuted as part of his special damages claim. The other outlier portions of Michael F.'s testimony pertaining to a CO supposedly touching his ears, underarms, and hair were rejected by the Court for the reasons articulated earlier. Similarly rejected by the Court was Heidi K.'s testimony that the CO ran her fingers through Heidi K.'s hair rather than having Heidi K. perform that task herself. Simply put, no testimony that defendants have categorized as "outlier" in nature has influenced the Court's general damages award.

C. Each Aggrieved Party is Entitled to a Fair General Damages Award Absent a Downward Adjustment Simply Because He or She is a Member of a Class Action.

The caption to Part II, B, 3 of defendants' Proposed Findings of Fact and Conclusions of Law reads: "It is 'Implicit in the Very Idea of a Class Action' that Individual Recovery is Inherently Lower Than in an Individual Action." (Defs.' Prop. Findings at 21.)

A number of courts have noted that a class member's individual recovery is likely to be less than if that class member pursued his or her claim individually. See, e.g., In re Marcos Human Rights Litigation, 910 F. Supp. 1460, 1468 (D.C. Haw. 1995)("It is probable the judgment against the

ESTATE, had this Court allowed one-on-one trials, would be significantly more than the judgment the jury returned in the aggregate procedure."), aff'd sub nom. Hilao v. Estate of Marcus, 103 F.3d 767 (9th Cir. 1996).  This point has been underscored by defendants in apparent response to plaintiffs' reference to the $35,000 paid to each of the individual settling plaintiffs pre-class certification, and to lessen the likelihood of the Court fashioning a general damages award that, when totaled, would have a "potentially devastating impact" on the County.  (Defs.' Prop. Findings at 22 (citing Parker v. Time Warner Entm't Co., 331 F.3d 13, 22 (2d Cir. 2003).)

The Court earlier indicated that the sums paid to the settling plaintiffs pre-class certification are of limited value for present purposes.  As to the effect that the litigation's class status should have on the size of the general damages award per strip search, the following language from a case cited by defendants, Dellums v. Powell, 566 F.2d 167 (D.C. Cir. 1977), is instructive:

> Although the fact that damages are
> being sought on behalf of a large class
> does not mean that each member of the class
> should receive less than his due, it is a
> reason for care in the formulation of
> instructions.  In cases of this type, a
> distortion in the size of the award to the
> individual plaintiff may be magnified
> thousandfold.

566 F.2d at 209.

This Court certainly takes no issue with the unremarkable proposition in <u>Dellums</u> that an inflated per aggrieved party award is magnified in a class action setting, thereby calling for the trier of fact to exercise utmost scrutiny in making such awards. However, <u>Dellums</u> does not stand for the proposition that an aggrieved party's individual damage award should be reduced simply because he is a member of a class; in fact, in speaking of such an individual receiving "his due," the message seemingly conveyed is to the contrary.

Similarly absent from <u>Parker</u> is support for defendants' position which, if found to be the law, would require triers of fact in assessing damages to adjust the amount depending upon whether the person injured sought redress individually or as part of a class. Presumably, under that logic, the larger the class the lower the per class member award.

It may well be, as I suspect it is, that a comparison of individual and class action verdicts involving the same type of injury, demonstrates such an inverse correlation. But that does not mean, however, that what may often occur as a practical matter should become part of the applicable law, i.e. a requirement to be factored into the decision making process by triers of fact in endeavoring to

fashion an appropriate damages award.  Neither <u>Dellums</u> nor
<u>Parker</u>, or any other case to my knowledge indicate that it
should be and, accordingly, I decline to do so.

Finally, before moving on to defendants' next
point, I recognize that class action awards may implicate
possible due process concerns as mentioned in Judge Newman's
concurrence in <u>Parker</u>, a case involving 12 million Cablevision
subscribers each seeking $1,000 in damages for privacy
violations under the Cable Communications Policy Act.  However,
the specter of such a crushing verdict, and the concomitant
"devastating impact . . . on the defense" (Defs.' Prop.
Findings at 22), simply is not in play on the general damages
phase of the current litigation.

D.    Strip Search Awards in Non-Class Action
Cases.

Although numerous strip search class actions
have been settled, there are few instances in which a trier of
fact has determined the amount of damages in a class action
strip   search case.  As a result, counsel for the plaintiffs
and defendants have been required to look almost exclusively to
non - class action cases for guidance.  Using that prism,
defendants maintain that "even in individual actions, the
damages awarded in strip search cases have been minimal absent
aggravating factors suggesting a gratuitous or malicious effort

to demean, debase or degrade." (Defs.' Prop. Findings at 23
(capitalizations omitted).) Among the cases cited for that
proposition are Hunter v. Auger, 672 F.2d 668 (8th Cir. 1982);
Abshire v. Walls, 830 F.2d 1277 (4th Cir. 1987); McCabe v.
Mais, 580 F. Supp. 2d 815 (N.D. Iowa 2008), aff'd in part rev'd
in part sub nom. McCabe v. Parker, 608 F.3d 1068 (8th Cir.
2010); McBean v. City of New York, 233 F.R.D. 377 (S.D.N.Y.
2006); Cobb v. City of Columbia, 205 F. Supp. 2d 827 (S.D. Ohio
2001); Kelleher v. New York State Trooper Fearon, 90 F. Supp.
2d 354 (S.D.N.Y. 2000); and Smith v. Montgomery County,
Maryland, 643 F. Supp. 435 (D. Md. 1986).

   In Hunter v. Auger, the Eighth Circuit in 1982
held that a prison's policy of strip searching visitors to the
institution upon uncorroborated anonymous tips involving their
purported possession of contraband violated the Fourth
Amendment. 672 F.2d at 675. In overturning the district
court's determination to the contrary, and remanding the case,
the Circuit stated as to the issue of damages:

> Appellants have requested an award of
> reasonable damages. After carefully
> studying the record evidence, we find that
> there is no showing of facts justifying an
> award of more than nominal damages. We
> note that there is no evidence that
> appellants here were subjected to repeated
> incidents that intruded on fourth amendment
> protections. Each complaint is based on
> one episode. Moreover, we believe that
> appellants' fourth amendment rights are
> fully vindicated here by the grant of

```
          declaratory and injunctive relief.
          Accordingly, we direct the district court,
          on remand, to allow nominal damages.
```

<u>Id.</u> at 677.

          <u>Hunter</u> does not represent binding precedent in

this Circuit.  Moreover, the aggrieved parties in that case,

unlike here, had the option to "submit[] to a strip search or

[to] forego[] the [intended] visit."  <u>Id.</u> at 670.

          Prescinding from that pivotal distinction, and

to the extent <u>Hunter</u> may otherwise be viewed, as defendants

contend, as authority for the proposition that nominal damages

adequately compensate a person subjected to an illegal strip

search, that interpretation is, at the very least, difficult to

square with Second Circuit law.  (<u>See, e.g.</u>, Mar. 27, 2008

Memorandum and Order at 8-11.)  And, given that the Second

Circuit concluded in <u>Kerman</u> that plaintiff's one day loss of

liberty might well justify a general damages award in the

thousands, <u>see</u> 374 F.3d at 126, it is hard to believe that the

grievous affront to human dignity occasioned by being subjected

to an unlawful visual body cavity search would not warrant an

award considerably in excess of nominal damages.  But, in any

event, <u>Hunter</u> is of limited value since, to partially

reiterate, the visiting plaintiffs in that case had a choice,

or option, denied current plaintiffs.

          The Fourth Circuit in <u>Abshire v. Walls</u>,

defendants advise, "approved an award of $2,000 in compensatory damages and $5,000 in punitive damages to an arrestee who had been subjected to a strip search" under appalling circumstances. (Defs.' Prop. Findings at 27.) As synopsized by the Circuit:

> At the police station, Abshire was processed and then handcuffed to a railing. He testified that he made numerous requests to use the telephone, all of which were denied. He also testified that after one such request Officer Krach approached him and told him to "be quiet or I will have you unhandcuffed and have the boys have a go around with you around back." After Abshire responded indignantly, Krach said "lets strip search him." Abshire was then unhandcuffed and escorted to a utility room, where he was forced to disrobe and subject himself to a strip search by Officers Walls and Queen. Abshire testified that a number of other officers were also present in the room and observed the search. After the search, Abshire was placed in a cell until he was released on his own recognizance following a bail hearing later that day.

Abshire, 830 F.2d at 1278-79 (footnotes omitted).

Abshire was decided 23 years ago and, accordingly, the sums involved should be adjusted for inflation. Moreover, the $7,000 total award on the strip search claim was not one of the issues raised on appeal and thus was not, contrary to defendants' assertion, "approved" by the Circuit. Accordingly, its usefulness for present purposes is marginal.

McCabe v. Mais is a 2008 case from the Northern District of Iowa.  Plaintiffs McCabe and Nelson, two retired schoolteachers, were subjected to "illegal strip searches and visual body cavity searches . . . of plaintiffs' vaginas and anuses."  580 F. Supp. 2d at 820.  The verdict returned by the jury totaled $750,000; $250,000 for McCabe and $500,000 for Nelson.  In response to defendants' motion for a new trial, the trial court, while recognizing that "courts have uniformly recognized that strip searches and the VBC [Visual Body Cavity] searches are humiliating and degrading," stated "that many of [those] same courts have held that, in the garden-variety illegal strip search or VBC search case where no aggravating facts are present [that such victims] are only entitled to nominal damages."  Id. at 835 (citing Hunter and also McBean which will be discussed momentarily).  Having said that, however, the McCabe Court concluded that the matter before him was not "on all fours with Hunter and therefore some award of compensatory damages is appropriate."  Id. at 836.  What separated the McCabe plaintiffs from their counterparts in Hunter was that in McCabe, "unlike . . . in Hunter, . . . plaintiffs testified specifically that they suffered emotional distress as a direct result of the strip searches and VBC searches."  Id.  However, that proof "was not strong" in that, inter alia, "no medical evidence of injury was presented."  Id.

at 837.  Indeed, "[o]nly Plaintiff Nelson offered evidence of
more than momentary emotional distress."  Id.

Based on the foregoing, and after reviewing
awards in other strip search cases, the McCabe Court "order[ed]
a remittitur in the amount of $25,000 with respect to Plaintiff
McCabe and $50,000 with respect to Plaintiff Nelson."  Id. at
837-38.  In some ways, McCabe is helpful to defendants in that
it utilized the Hunter rationale as a point of departure in
determining that the jury award of $750,000 shocked the
judicial conscience, warranting a direction that plaintiffs
either accept $75,000 or try the case again.[21]  But, on the
other hand, the remittitur amount is substantial given the
limited nature of the injuries sustained.  And, like the other
cases cited by the parties, the relevance of McCabe is diluted
in that the compensatory damage issue was not bifurcated into
general and special damages.

Defendants place considerable stock in McBean v.
City of New York in which a class of pretrial detainees sued
the City based on its policy of strip searching all arraigned
detainees charged with misdemeanor or lesser offenses,

---

[21]  After the conclusion of the briefing in the case at bar,
the Eighth Circuit affirmed in part and reversed in part the S.D.
Ohio's decision.  See McCabe v. Parker, 608 F.3d 1068 (8th Cir.
June 30, 2010).  Although upholding the district court decision
granting a new trial and offering remittitur, the Eighth Circuit
held that the remittitur amount was too low as it violated the
maximum recovery rule.

regardless of reasonable suspicion, upon entry to the correctional facility. 233 F.R.D. at 380-81. The parties reached a proposed pretrial settlement, which was ultimately approved by the district court under which, after "bonus or incentive awards" were paid to class representatives, the remaining class members were to "receive $750 if they were subjected to one qualifying strip search, and $1,000 if they were subjected to two or more qualifying strip searches." Id. at 381.

In determining the reasonableness of the proposed settlement, the district court discussed and largely distinguished the major cases cited by the objectors,[22] and noted, in an excerpt underscored by defendants, that "[t]he parties have provided the Court with numerous examples of individual plaintiffs who have, at trial, proven liability on a strip search claim, only to be awarded nominal damages." 233 F.R.D. at 387.

The background information and accompanying analysis in McBean has proven helpful to the Court; nonetheless, its relevance beyond that is marginal at best in that in McBean (1) "[i]ndividual class members [dissatisfied

---

[22] One of those cases was Tyson v. City of New York, No. 97 Civ. 3762 (JSM) in which "a class of pre-arraignment detainees [reached a settlement with the City under which] individual awards . . . averag[ed] . . . approximately $3,800 per person," 233 F.R.D. at 389.

with the settlement amount could]" "opt out and pursue their own claims" pursuant to the terms of the settlement agreement, id. at 388, an option not available to the members of the present class in the post-trial context, (2) the liability issue was unresolved whereas here liability has been conceded, and (3) the settlement presented to the court, by its very nature was a product of compromise, unlike here where my role is to fashion a fair general damages award which fully compensates each class member, independent of any special damages they may seek to assert as a result of being unlawfully strip searched.

Before proceeding to discuss Cobb v. City of Columbus, another case cited by defendants, two more comments concerning McBean are warranted. Firstly, as noted by plaintiffs, the district court in that case "did not endorse the proposition that only nominal damages would be appropriate for a strip search unlawfully conducted pursuant to an unconstitutional policy." (Pls.' Comments at 54, n.22.) Rather, its observation that sometimes plaintiffs who established liability only received nominal damages was made by the district court in assessing the "Grinnell[23] factor[]" pertaining to "the risks of establishing damages" should the

---

[23] City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974).

action proceed to trial.  233 F.R.D. at 386.  And that takes us to the second additional comment concerning pivotal distinctions between McBean and the instant case, to wit, "the risk of establishing liability."  Id. at 385. That "Grinnell factor[]," id., was the subject of the following comments in McBean:

> [U]nder the law of this Circuit a blanket strip-search policy such as the one to which plaintiffs were subjected is clearly unconstitutional.  Therefore, the risks of establishing liability at this time are minimal, if not nonexistent.  However, the duty of this Court is not merely to determine the risks of establishing liability at this time.  Rather, the Court must determine the risks of establishing liability should the settlement be rejected and the case go to trial at some future date.  As discussed in [McBean v. City of New York, 228 F.R.D. 487 (S.D.N.Y. 2005)("McBean I")] the case law in this area is far from stable.  228 F.R.D. at 498.  Shain v. Ellison, the case invalidating a policy similar to the one at issue here, was decided by a divided panel of our Court of Appeals . . . and it may well be in the interests of the class to obtain "a quick resolution[] while the law is in their favor."  McBean I, 228 F.R.D. at 498.  The question of whether an en banc Court of Appeals, or, for that matter, the Supreme Court, will upset the holding of Shain takes this Court into the realm of speculation.  It is enough to observe, however, that there are no guaranties in life, and while it appears likely that plaintiffs would be able to establish liability at trial, things change.

233 F.R.D. at 387 (emphasis in original).

Here, of course, liability has been conceded so

the concerns addressed in the above excerpt do not come into play.  In sum, McBean is distinguishable to the point of providing scant guidance.

In Cobb v. City of Columbus, the court awarded a plaintiff subjected to an illegal pat-down search $500 for "humiliation, mental suffering and the intangible loss of his Fourth Amendment rights."  205 F. Supp. 2d at 834 (internal quotation marks and citation omitted).  Defendants argue that "the damages for 'intangible loss' in Cobb seem analogous to the presumed damages for dignity harm here . . ., and that the plaintiff's total compensation, including both these damages and damages for emotional injury were only $500."  (Defs.' Prop. Findings at 27 (emphases in original).)  The $500 award in Cobb was made in 2001.  Thus, to the extent it is germane, an upward adjustment to reflect inflation is required.  But its core relevance is virtually nonexistent.  The district court in Cobb set the damage award for a "pat-down [that] was light and of short duration," and which caused plaintiff "'a little' embarrassment."  Cobb, 205 F. Supp. at 834.  Under such circumstances, the $500 award appears appropriate.  However, I find myself unable to draw a meaningful comparison between the pat-down described in Cobb and the unlawful visual body cavity searches of the members of the instant class.

In Kelleher v. Fearon, plaintiff brought suit

-60-

under 42 U.S.C. § 1983 against a New York State trooper, alleging that he was illegally strip searched.  90 F. Supp. 2d at 356.  The jury returned a verdict for plaintiff and awarded $125,000 in compensatory damages.  Defendant moved for judgment as a matter of law, or in the alternative, for a new trial or remittitur.  After declining to disturb the jury's liability determination, the court addressed the compensatory damages award.  It began its analysis thusly: "[a]t no point in the trial did Plaintiff produce any evidence of medical treatment or other professional expenses related to his claim of emotional distress."  Id. at 363.  Given the absence of any proof beyond his own testimony as to "the headaches, sleeplessness and the general emotional distress he claimed to have suffered" as a result of having been strip searched, the court concluded that plaintiff "simply failed to prove an injury."  Id.  In the court's view, that delinquency did "not mean that [he] must throw out the damages altogether."  Id.

The Kelleher court, after noting that (1) "an unlawful strip search, in and of itself, is an egregious violation of Plaintiff's constitutional right to be free from unwarranted government intrusion of his person," and (2) plaintiff testified that the defendant trooper touched him during the strip searched process in violation of State Police policy, ordered remittitur in the amount of $25,000.  Id. at

364.

        If anything, <u>Kelleher</u> though cited by defendants in their discussion of <u>McBean</u>, seems to favor plaintiffs', not defendants' position in that the district court's reference to plaintiff proving "no injury," stated against the backdrop of the observation that a strip search represents "an egregious violation of Plaintiff's constitutional right to be free from unwarranted government intrusion of his person" suggests, as posited by plaintiffs, that the $25,000 remittitur amount may have "been made primarily for the privacy violation and dignity harm rather than for emotional distress." (Pls.' Comments at 53.)

        <u>Smith v. Montgomery County</u> is a 1986 class action strip search decision in which a district court in Maryland held that "[f]or all members of the class whose Fourth Amendment rights were violated, the Court will enter an award of nominal damages in the amount of $200." 643 F. Supp. at 443. The bulk of the decision is devoted to establishing "broad guidelines and procedures to determine membership in the class," coupled with the observation that "[a]rticulating the reasonable suspicion standard is easier than applying it." <u>Id.</u> at 437. Only one paragraph of the decision, six lines in length, is devoted to the damages question. The nature and extent of the proof submitted on damages may not be gleaned

from the decision, nor the court's rationale, if any, beyond
the statement that the amount awarded per aggrieved individual
is likely to "deter defendants from future violations."  Id. at
443.  Under the circumstances, including the age of the case,
Smith sheds little light on the issue at hand.

Another case mentioned by defendants warrants
discussion,[24] that being Nolley v. County of Erie.  Nolley was
an inmate in a county correctional facility who sought
injunctive relief and damages for the county's practice of
identifying HIV positive inmates via its  "red sticker [on
their paperwork] and automatic segregation policies."  802 F.
Supp. at 901.  Plaintiff premised part of her claim to
compensatory damages on the doctrine of presumed damages,
arguing that "the reasons supporting an award of presumed
damages in defamation per se cases are equally valid with
respect to the privacy tort proven here."  Id. at 903.  That
argument was adopted by the district court, following its
review of various supportive treatises, law review articles,
and court decisions.  Specifically, the court, sitting non-jury
found:

> Based on the above, the court concludes
> that presumed damages are appropriate in a
> cause of action founded on the unwarranted

---

[24] I found that none of the six "European Court of Human
Rights" cases cited by defendants (see Defs.' Prop. Findings at
28-29) were of aid to the Court.

disclosure of a person's HIV status.  As
the court noted in [a prior decision in]
<u>Nolley</u>, "'it is difficult to argue that
information about this disease is not
information of the most personal kind. . .
.'"  <u>Nolley</u> [<u>v. County of Erie</u>], 776 F.
Supp. [715 (W.D.N.Y. 1991] at 731 (quoting
<u>Woods v. White</u>, 689 F. Supp. 874, 876
(W.D.Wis. 1998), <u>aff'd without opinion</u>, 899
F.2d 17 (7th Cir. 1990)).  Unwarranted
release of this information is virtually
certain to cause some injury, yet be the
type of injury that is very difficult to
prove.  It is also likely to cause mental
distress.  Presumed damages are an
expedient way to compensate plaintiff for
the injuries she no doubt suffered from
defendants' red sticker alert and
segregation policies.  It must be
remembered in this regard that defendants'
red sticker policy, which was in effect
throughout plaintiff's three confinements,
indiscriminately exposed plaintiff's
sensitive condition to dozens of persons.
<u>Nolley</u>, 776 F. Supp. at 720.  Accordingly,
the court concludes that plaintiff is
entitled to presumed damages for the injury
to her interest in privacy.

802 F. Supp. at 904.

         In addition to Nolley's claim for presumed

damages based on the violation of her right to privacy as a

result of the county indiscriminately divulging her HIV

positive status to dozens of persons in the correction facility

during her periods of incarceration, she also sought special

damages for, inter alia, the associated emotional distress she

sustained.  The Court awarded her "$3,100.00 [for] presumed

damages" and "$6,200.00 [for her] emotional distress."  <u>Id.</u> at

912.

Defendants maintain that the _Nolley_ presumed damages award of $3,100 supports their position that the presumed, or general damages here should be minimal because "surely the violation in . . . _Nolley_ . . . was more serious" than the body cavity searches suffered by the plaintiff class members. (Defs.' Prop. Findings at 27.) Both of the violations, though involving vastly different conduct, are egregious. An effort to rank them by degree of severity, as defendants proffer, is problematic although the Court will be mindful of the $3,100 presumed damages award in _Nolley_ in fashioning its general damages award. In so doing, I will also consider, of course, that the award was made eighteen years ago, thus requiring an adjustment for inflation together with a countervailing recognition of the hysteria which surrounded a HIV positive diagnoses during the times Nolley was incarcerated in Erie County, i.e. intermittently from mid-1988 to early 1990.[25]

5.  Determining general damages in the present context represents largely uncharted territory. What minimal guidance there is has been gleaned from the cases and other sources cited by the parties and the Court's independent research. Based on those materials, viewed in conjunction with

---

[25] The periods of incarceration are provided in an earlier _Nolley_ decision viz. _Nolley v. County of Erie_, 776 F. Supp. 715, 717 (W.D.N.Y. 1991).

the trial evidence and the arguments of counsel, plaintiffs are hereby awarded general damages of $500 per strip search.

## CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.

As noted earlier, the number of qualifying searches during the class period appears to be in excess of 20,000. However, until the number of "Book and Bail" inmates, if any, is determined, see footnote 3 supra, the total amount of the general damages verdict against defendants may not be determined. And also, as explained earlier, the special damages sustained by class members is a subject for another day. In that regard, the parties are directed to appear before me on Friday, October 1, 2010 at 3:00 p.m. to discuss that next phase of the proceeding.

SO ORDERED.

Date: Central Islip, New York
      September 22, 2010

_____
DENIS R. HURLEY, U.S.D.J.