UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GARDY AUGUSTIN, HEIDI KANE, MARY            **MEMORANDUM & ORDER**
KATHERINE PUGLIESE, GREGG WILLS, STEVEN
ROTH, OSCAR AVELAR, RALPH DILIELLO, et al,      CV 99-3126 (DRH) (ARL)
individually and on behalf of all others similarly situated,

                                   Plaintiffs,

v.

JOSEPH JABLONSKY, individually and as Nassau County
Sheriff, JOHN AND JANE DOES NO. 1-100, and
COUNTY OF NASSAU, a municipal corporation,

                                   Defendants.
-------------------------------------------------------------------X
FRANCIS O'DAY and STUART MOSKOWITZ,
individually and on behalf of all others similarly situated,      CV 99-2844 (DRH) (ARL)

                                   Plaintiffs,

v.

NASSAU COUNTY, NASSAU COUNTY SHERIFF'S
DEPARTMENT, DIVISION OF CORRECTION,
JOSEPH JABLONSKY, Nassau County Sheriff, and
JANE/JOHN DOES Nos. 1-200,

                                   Defendants.
-------------------------------------------------------------------X
JOHN IAFFALDANO, individually and on behalf of all
others similarly situated,      CV 99-4238 (DRH) (ARL)

                                   Plaintiff,

v.

THE COUNTY OF NASSAU, THE NASSAU COUNTY
SHERIFF'S DEPARTMENT, DIVISION OF
CORRECTIONS, and JOSEPH P. JABLONSKY, Sheriff
of Nassau County,

                                   Defendants.

-------------------------------------------------------------------X

**APPEARANCES:**

**For Plaintiffs:**
        Giskan Solotaroff Anderson & Stewart LLP
        11 Broadway, Suite 2150
        New York, New York 10004
        By:    Robert L. Herbst, Esq.
              Oren Giskan, Esq.

        Beldock Levine & Hoffman LLP
        99 Park Avenue, Suite 160
        New York, New York 10016
        By:    Vera M. Scanlon, Esq.

        Emery Celli Brinckerhoff & Abady LLP
        75 Rockefeller Plaza, 20th Floor
        New York, New York 10019
        By:    Matthew D. Brinckerhoff, Esq.
              Mariann Wang, Esq.

        Wolf Haldenstein Adler Freeman & Herz, LLP
        270 Madison Avenue
        New York, New York 10016
        By:    Jeffrey G. Smith, Esq.
              Martin Restituyo, Esq.

**For Defendants:**
        John Ciampoli
        Nassau County Attorney
        One West Street
        Mineola, New York 11501
        By:    Dennis J. Saffron, Esq.
              Liora Ben-Sorek, Esq.

**HURLEY, Senior District Judge:**

Presently before the Court is a motion by defendants seeking "to decertify the class going

forward now that the issue of common general damages upon which the Court based class

2

certification has been resolved." (Defs.' Mem. at 1.)[1]  Plaintiffs oppose the application, asserting

that the Court can (and should) compensate class members for damages stemming from "garden-

variety emotional distress, shame and humiliation that flow naturally from being unlawfully strip

searched," and that "these general damages for garden-variety emotional distress, shame and

humiliation should be determined and awarded on a class-wide basis in a single trial in this class

action as soon as possible." (Pls.' Opp'n at 5.)  For the reasons that follow, defendants'

application is granted.

## *BACKGROUND*

The background of this action is set forth in the prior decisions of this Court, familiarity

with which is presumed.  The Court will partially reiterate an abbreviated history in order to

provide context for the Court's analysis and rulings, *infra*.

### *Class Certification*

These consolidated actions were commenced in 1999 seeking damages due to the blanket

policy of the Nassau County Correctional Center of strip searching newly admitted individuals

arrested for misdemeanors or non-criminal offenses in Nassau County.  Extensive pretrial motion

practice ensued, including plaintiffs' numerous attempts to achieve class certification.  In

response thereto, defendants conceded liability.  Based on that concession, this Court deleted

liability from the certification analysis and denied class treatment.  On appeal, the Second Circuit

---

[1]     Defendants note, preliminarily, that "it is not at all clear that a formal decertification order would even be necessary to end this litigation now that the common damages issue has been resolved, because it is not at all clear that the current certification extends to special damages . . . Thus, it appears as if the Court would need to affirmatively certify a subclass or subclasses in order to continue the litigation, rather than [ ] formally decertify the class in order to bring it to a conclusion." (Defs.' Mem. at 2.)

reversed and directed this Court "to certify a class on the issue of liability . . . and consider anew whether to certify a class as to damages as well." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006).  Accordingly, the Court certified a class as to liability and entered summary judgment on liability in favor of the class and each of its members.  (Jan. 16, 2007 Order at 2.)  After the Court sought input from the parties concerning damages certification, plaintiffs filed an application to certify the class as to plaintiffs' entire claims, *i.e.*, to extend class certification to include damages.

***March 27, 2008 Memorandum and Order***

In a Memorandum and Order dated March 27, 2008, the Court addressed the question of whether a damages class could be certified pursuant to Rule 23(b)(3).  (Mar. 27, 2008 Mem. & Order at 4.)  Having previously determined that Rule 23(a)'s requirements of numerosity, commonality, typicality and adequacy had been met in this case, the Court considered whether plaintiffs sufficiently demonstrated both (1) that the damages questions of law or fact common to the members of the class predominated over any damages issues affecting only individual members; and (2) that a class action was superior to other available methods for the fair and efficient adjudication of the damages controversy.  (*Id.*)  Plaintiffs argued, and the Court agreed, that an injury to human dignity was necessarily entailed in being strip searched and thus was common to each member of the class as to its cause and the resulting general, or presumed – as distinct from the special – damages sustained.  (*Id.* at 6.)

Over the objection of defendants, the Court, relying heavily by analogy on the Second

Circuit's decision in *Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004),[2] found that the issue of general damages due to the asserted injury to human dignity predominated (Mar. 27, 2008 Mem. & Order at 7-11), and concluded that where, as here, "class members were aggrieved by a single, admittedly unlawful policy [resulting in] a strong commonality between the strip search violation and the harm," there was "no reason [to believe] that a jury . . . could not determine an amount of general damages awardable to each member of the class." (*Id.* at 12.) That comment, however, was coupled with the caveat that "care would have to be taken to ensure that the amount awarded for general damages *excludes all elements of special damages* that individual class member[s] might [later] pursue." (*Id.* at 12-13 (emphasis added).) The Court noted, in closing, that "Plaintiffs are not asking this Court to select a particular damages model or to certify any subclasses for *special damages* as to do so would be 'premature.'" (*Id.* at 13-14 (emphasis added).)

### March 16, 2009 Memorandum and Order

Subsequently, the Court held a conference in advance of the upcoming trial for general damages and, by Memorandum and Order dated March 16, 2009, addressed several issues that

---

[2]     In *Kerman*, a jury found that the plaintiff's Fourth Amendment rights were violated by his unjustified detention in a psychiatric hospital overnight, but awarded him only nominal damages. The Second Circuit found that he was entitled to a new trial with respect to his claim for damages due to his loss of liberty. The Circuit noted that a plaintiff is never automatically entitled to a substantial damages award simply because he has been deprived of a constitutional right. *See Kerman*, 374 F.3d at 122-23. But where, as in *Kerman*, a jury found that a constitutional violation unquestionably resulted in an injury to the plaintiff, that plaintiff was entitled to an award of "compensatory, not merely nominal, damages." *Id.* at 125. In its March 27, 2008 Memorandum & Order, this Court saw no dispute that the unconstitutional strip searches at issue "resulted in some injury to the class members." (Mar. 27, 2008 Mem. & Order at 10.) For the reasons set forth in *Kerman*, the Court found that "[a]t the very least, class members are entitled to general damages." (*Id.* at 11.)

5

arose during that conference.  In particular, the issue of whether the trial witnesses would be permitted to testify not only "as to the details of the strip search that he or she experienced[,] . . . but also any concomitant feelings of humiliation, embarrassment or other reaction experienced by the witness as a result of the process."  (Mar. 16, 2009 Mem. & Order at 2.)  The Court recognized that if trial witnesses "were permitted to testify concerning the humiliation and other effects" of the strip search that he or she individually experienced as distinct from those which may be presumed to have been inflicted on all persons so victimized, "the amount determined by the jury would be less likely to be representative of the general damage sustained by each member of the class."  (*Id.* at 5-6.)  The reason for that is, "if provided a choice, plaintiffs' counsel surely, and legitimately so, would call to the stand those plaintiffs among the 17,000 plus class members they believed to be the most severely impacted from being strip searched."  (*Id.* at 5-6.)  The Court reasoned that "excluding such specific impact evidence from this part of the proceeding" would "essentially eliminate[ ]" the "problem of a non-representative per plaintiff amount being returned by the jury."  (*Id.* at 6.)  Accordingly, each party was permitted to "call up to ten fact witnesses from the class . . . [to] testify solely concerning the details of the search without any information concerning the effect that the search had upon them" personally.  (*Id.*)

The Court continued that "[t]his line of demarcation as to the parameters of permissible testimony will not negatively effect any individual plaintiff because to the extent such individual did sustain humiliation, embarrassment or emotional distress [beyond those presumed from being unlawfully strip searched], those items may be pursued during the special damages portion of the proceeding which will be held before another jury."  (*Id.* at 7.)  The March 16, 2009 decision concluded with the observation that the Court had "thus far only addressed general damage class

6

certification; at the conclusion of this phase of the proceeding, the court and the parties will discuss what further damage subclasses should be certified, if any, and how the remainder of the case will be resolved."  (*Id.* at 7 n.2.)

### *The Award of General Damages*

The parties subsequently waived the right to a jury trial and submitted the issue of a general damages determination to the Court.  A bench trial was held over eleven days, ending on December 16, 2009, with all post-trial submissions being filed by April 14, 2010.  By decision dated September 22, 2010, general damages in the amount of $500 per strip search were awarded,[3] coupled with the observation that "the special damages sustained by class members is a subject for another day."  (Sept. 22, 2010 Mem. & Order at 66.)

On October 2, 2010, a status conference was held to discuss, *inter alia*, "how to handle the second phase of the case, the special damages."  (Tr. of Oct. 1, 2010 Status Conf. ("Tr.") at 21.)  Specifically, the Court sought input from the parties regarding "whether the special damage part of the case should be bifurcated between what the attorneys call garden-variety . . . [and] some heightened type of special damage."  (*Id.*)  Plaintiffs expressed their view that for the "second phase" "there ought to be a single trial, either before a Judge or a jury, to try to fix an aggregate class award for the garden-variety emotional distress damage."  (*Id.* at 34.)  Plaintiffs contended that "[w]e have been defining special damages as those subjective feeling damages that are different from the general human dignity damages . . . And everybody in the [c]lass has those, or those can be determined on a class-wide basis for those."  (*Id.* at 50-51.)  After the

---

[3]	Class membership is approximately 17,000; some class members were strip searched more than once, resulting in approximately 22,000 strip searches of class members during the class period.

status conference, the parties were directed to submit further briefing regarding, *inter alia,* whether a common trial for "garden-variety"[4] special damages may be held.  (Oct. 8, 2010 Order at 1-2.)  After reviewing the defendants' briefs submitted on the common special damages issue, the Court issued an Electronic Order dated January 25, 2011 stating that "Defendants have asked for leave to move to decertify now that the issue of general damages has been resolved," and set a briefing schedule for that motion.  (Elec. Order, Jan. 25, 2011.)

## DISCUSSION

### I.    The Parties' Contentions

Defendants assert that "there is no substantive justification for continuing class litigation of any remaining individual special damage claims now that the common class damages issue has been resolved."  (Defs.' Mem. at 4.)  Preliminarily, defendants contend that "while the Court and the parties have come to speak of a 'Phase 2' special damages proceeding as if it were a given, in its formal rulings the Court has held in abeyance the question of whether to litigate such damages in the present class action . . . Thus, it appears as if the Court would need to affirmatively certify a subclass or subclasses in order to continue the litigation, rather than need to formally decertify the class in order to bring it to a conclusion."  (*Id.* at 3.)  In any event, defendants argue that the Court should decline to certify (or decertify, as the case may be) any special damages subclasses because, as noted in this Court's previous decisions denying class certification, special damages are "too inherently individualized and variable to be tried on a class basis."  (*Id.* at 4.)

---

[4]      "Garden-variety," as used herein, is plaintiffs' term – not the Court's.  Plaintiffs use the term to suggest a form of damages that have a certain degree of commonality, such that individualized proof would not be necessary.  In repeating plaintiffs' "garden-variety" term in this Memorandum & Order, the Court does not adopt or attempt to reconvey such a suggested meaning.

Defendants assert that the resolution of the "sole predominant common issue" – the common injury to human dignity – leaves the litigation "without a sufficiently common injury to support class certification under Rule 23(b)(3)."  (*Id.* at 1.)

In opposition, plaintiffs contend that this Court decided "to certify the damages class without limitation," and that the Second Circuit's opinion in *In re Nassau County Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006) "made no mention of bifurcating the damages class, or certifying the class for only some damages."  (Pls.' Opp'n at 3.)  Plaintiffs assert that the "Court's holding that class-wide damages may be determined and awarded for dignitary damages is also applicable to other general damages such as emotional distress damages."  (*Id.* at 4.) According to plaintiffs:

> While the Court has [ ] on occasion expressed the view that "special damages" may be excluded and pursued by individual plaintiffs, we continue to contend that such "special damages" do not include the garden-variety emotional distress which may be presumed to have been experienced from the unlawful strip searches in this case . . . but rather, that they refer to the more serious psychiatric injury that may be claimed by a minority of class members who, for example, may have required mental health treatment for psychological sequellae and symptoms which go beyond garden-variety emotional distress, shame and humiliation that flow naturally from being unlawfully strip searched.

(*Id.* at 5.)  Plaintiffs maintain that class members' emotional distress that was "necessarily produce[d]" by the "unlawful involuntary strip searches" performed in this case, "is compensable in general damages on a class-wide basis."  (*Id.* at 8.)

## II. The Court Does not Consider Damages for So-Called "Garden-Variety" Emotional Distress to be General Damages

Plaintiffs incorporate by reference numerous prior submissions in support of their

9

position on the present application.  (*See* Pls.' Opp'n at 1.)  Among them is plaintiffs' May 28,

2010 letter, which was submitted following a May 17, 2010 conference in order to "further

amplify our views" on the following two issues: "(1) whether the Court could treat the class

garden variety emotional damages within the rubric of general damages, and (2) whether garden

variety emotional damages are susceptible to resolution on a class basis without selecting

representative plaintiffs on a random sampling statistical basis."  (Pls.' May 28, 2010 Letter at 1.)

With respect to the first issue, plaintiffs agreed with defendants "that garden variety emotional

distress damages *actually* suffered by the class *should not be treated within the rubric of general*

*damages*."  (*Id.* (emphases added).)  Accordingly, plaintiffs requested that the Court "enter its

general damages verdict and that we should then proceed to phase 2 to determine what additional

award should be made to the class for garden-variety emotional distress damages."  (*Id.*)

       Plaintiffs, however, clarified their view that "the 'humiliation and mental suffering'

component . . . is an appropriate part of the general damages verdict upon which the Court [was

then] deliberating."  (*Id.*)  Relying on *Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004),

plaintiffs asserted that:

> [E]motional damages (garden-variety or otherwise) *actually suffered*
> by an individual plaintiff is separate from general damages.  But (and
> here is the confusing part) "humiliation and mental suffering" and
> other emotional damages *actually suffered* by the individual is
> different from the "humiliation and mental suffering" that may be
> inferred from the loss of liberty inherent in the false imprisonment
> itself, and it is the latter "humiliation and mental suffering" which
> <u>Kerman</u> held is a legitimate part of general damages.

(Pls.' May 28, 2010 Letter at 2 (emphases in the original).)  According to plaintiffs, therefore:

> Garden variety emotional damages actually suffered by an individual
> class member forced to endure the unlawful strip search at the Nassau

10

> County Jail may not be treated within the rubric of general damages.
> But the humiliation and mental suffering that may be presumed to
> arise in a reasonable person subjected to such strip search is an
> integral component of general damages which may be awarded
> without proof.

(*Id.* at 4 (emphases omitted).)

To the extent that plaintiffs maintain that a general damages award should include an

element of "'humiliation and mental suffering' that may be inferred from the loss of liberty

inherent in the false imprisonment itself" (Pls.' May 28, 2010 Letter at 2), the Court has already

considered and taken into account this claim in rendering the $500 per strip search award.  The

above-quoted section of plaintiffs' May 28, 2010 letter suggests that they are of the impression

that the damages trial dealt solely with compensating class members for the "loss of liberty"

inherent in each strip search.  As the Court made clear in its September 22, 2010 decision,

however, such a loss of liberty, while implicated, was not the primary thrust of the wrong for

which damages were awarded.  Rather, the Court found that "[e]ach class member suffered the

same injury to human dignity inherent in the loss of the right to determine which individual or

individuals may visually inspect that member['s] naked body, particularly his or her sexual

organs, and under what circumstances."  (Sept. 22, 2010 Mem. & Order at 39; *see also* Mar. 27,

2008 Mem. & Order at 10-11 (noting class members are entitled to general damages to

compensate for "serious intrusion" and "impairment of privacy" caused by unlawful strip search)

(internal quotation marks omitted).)  Thus, the $500 per strip search award necessarily included

compensation for this form of presumed emotional distress damages.  Plaintiffs cannot recover a

second time for the same injury.  Individuals claiming to have sustained emotional distress

beyond those which have been presumed and, as such, included within the general damages

11

award, may seek special damages but not, as plaintiffs urge, a duplicate award under a further

subset of general damages. Simply put, the Court rejects the proposition that there is a

meaningful distinction between plaintiffs' presumed "garden-variety" emotional distress on the

one hand, and the shared emotional injuries presumed to flow from the affront to human dignity

necessarily caused by being strip searched on the other. For present purposes, the concepts are

essentially the same.

In urging a contrary conclusion, viz. that the scope of general damages should be enlarged

to include the "garden-variety" emotional distress, shame, and humiliation that flow naturally

from being unlawfully strip searched (*see* Pls.' Opp'n at 1, 5), plaintiffs cite the following

passage of the Court's March 27, 2008 Memorandum & Order extending class certification to

include general damages:

> The Second Circuit has recognized, for example, that class-wide
> rather than individual assessments of monetary relief may sometimes
> be appropriate in class discrimination cases. *See Robinson v. Metro-
> North*, 267 F.3d 147, 161 n.6 (2d Cir. 2001). *See also Berger v. Iron
> Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111, 1138 (D.C.
> Cir. 1999) (holding that it was appropriate to presume that as a result
> of race discrimination those class members who were experienced
> rodmen suffered emotional distress by having to subject themselves
> to an unnecessary training program for up to two years before being
> permitted to take union entrance exam and therefore damages award
> was supported and appropriate).

(Pls.' Opp'n at 4 (citing Mar. 27, 2008 Mem. & Order at 11-12).) Plaintiffs contend that "[b]y

citing *Robinson* and *Berger*'s holding that emotional distress damages could be presumed when

class members were forced to endure racial discrimination, this Court effectively recognized that

general damages for emotional distress could be awarded on a class-wide basis." (*Id.*)

The Court's citation to *Robinson*[5] and it brief parenthetical description of *Berger*[6] are not, plaintiffs' protestations to the contrary, incompatible with the Court's rejection of plaintiffs' arguments.  The remainder of the passage from the March 27, 2008 Memorandum & Order, partially cited by plaintiffs, reads as follows:

> Here, class members were aggrieved by a single, admittedly unlawful policy and there is a strong commonality between the strip search violation and the harm.  There is no reason that a jury in this case, hearing the procedures used by Defendants for strip searches together with the testimony of a number of class members as to the circumstances of actual searches, could not determine an amount of general damages awardable to each member of the class.

---

[5]     *Robinson* involved a motion for Rule 23(b)(2) class certification of a claim "seeking both injunctive relief and non-incidental monetary damages."  267 F.3d at 164.  When discussing plaintiffs' Title VII disparate impact claims, the Second Circuit stated that if the plaintiffs established a statutory violation, "the court may order prospective class-wide injunctive relief."  *Id.* at 161.  The Circuit continued: "Still, in order for an employee to obtain individual relief (e.g., back or front pay), an inquiry similar to the remedial stage of a pattern-or-practice disparate treatment claim is generally required."  *Id.*  In its March 27, 2008 Memorandum & Order, this Court cited to a footnote in *Robinson* in which the Second Circuit stated: "Both parties correctly note that some cases may require class-wide, rather than individualized assessments of monetary relief."  *Id.* at 161 n.6 (collecting cases, none of which issued a class-wide award for emotional distress damages).  The Second Circuit further noted, however, "this is the exception, not the rule: Where possible, 'there should be . . . a determination on an individual basis as to which class members are entitled to [recovery] and the amount of such recovery."  *Id.* (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 318 (5th Cir. 1993)).

[6]     In *Berger*, a class of African-American ironworkers brought a race discrimination action under § 1981 and Title VII against their local and international unions.  The trial court bifurcated liability and damages, and plaintiffs succeeded in proving liability at trial.  *Berger*, 170 F.3d at 1116.  The case was then referred to a Special Master who held individual trials for each class member and then issued a report recommending, *inter alia*, compensatory damages awards to the 18 remaining class members who had not already settled with the defendants.  *Id.* at 1117, 1138.  The court found that "courts may properly infer emotional distress from factual circumstances – and award damages to compensate for that distress – but may not presume damages from a bare violation of a statutory or constitutional right."  *Id.* at 1138.  The court then found that the "awards in the instant case are supported by the proper kind of inference."  *Id.* Importantly, those awards were rendered after individual trials held for each class member – *not* on a class-wide basis.  *See id.* (noting the awards ranged from $2,500 to $25,000).

13

> *Concededly, care would have to be taken to ensure that the amount awarded for general damages excludes all elements of special damages that individual class members might then pursue.*  But the task, albeit difficult, is doable.

(Mar. 27, 2008 Mem. & Order at 12-13 (emphasis added).)  The Court has always considered "special damages" to include emotional distress damages beyond those that are inseparable from the injury to human dignity, as well as more severe psychological damage, which might require expert testimony to prove.

Plaintiffs further contend that although "Defendants argue that emotional distress is a special damage, [ ] this is not correct in the context of an unconstitutional strip search."  (Pls.' Opp'n at 6.)  Plaintiffs cite a line of cases, purportedly in which "courts have repeatedly recognized that general damages are appropriately awarded in tort cases in which emotional distress is a foreseeable harm of the wrongful act."  (*Id.* (collecting cases).)  While, as a general proposition, that may be true, not one of the cases cited in plaintiffs' legal memorandum involves either a class action or an unconstitutional strip search, and the cases are not otherwise instructive for present purposes.  (*See id.* at 6-7.)

### III.  *Damages for Emotional Distress Beyond That Which is Inseparable From the Injury to Human Dignity Must be Proven by Each Individual Claiming Them and Cannot be Awarded to the Class as a Whole*

Defendants assert that "[t]he class should be decertified going forward now that the common general damages upon which the Court based class certification have been determined."  (Defs.' Mem. at 2 (citing Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants . . . class certification may be altered or amended before final judgment.")).)  Plaintiffs oppose this request and contend that decertification "is contrary to the purpose the class action mechanism, which aggregates

claims so that it is as a practical matter reasonable to bring these claims for which the recovery is likely to be modest." (Pls.' Opp'n at 13.)

### A. Class Certification was Never Extended to the Issue of Special Damages, Including Emotional Distress Damages Beyond Those Which are Inseparable From the Injury to Human Dignity

As an initial matter, as defendants point out, the record of this Court's written decisions does not establish that class certification extends to special damages. (*See* Defs.' Mem. at 2.) In its March 27, 2008 Memorandum & Order, the Court noted in its conclusion that "Plaintiffs are not asking this Court to select a particular damages model *or to certify any subclasses for special damages* as to do so would be 'premature.' Thus, the Court has neither selected nor foreclosed any particular damages model; nor has it gone beyond determining that the predominancy of general damages warrants extending class certification from solely liability to liability and [general] damages." (Mar. 27, 2008 Mem. & Order at 13-14 (emphasis added).) Approximately one year later, this Court noted that "consistent with the parties' presentations, [it] has thus far only addressed general damage class certification; at the conclusion of this phase of the proceeding, the court and the parties will discuss what further damage subclasses should be certified, *if any*, and how the remainder of the case will be resolved." (Mar. 16, 2009 Mem. & Order at 7 n.2 (emphasis added).)

As is clear from the above-cited Memoranda & Orders, the Court has not extended class certification beyond liability and general damages. At this point, as discussed below, having established defendants' liability and awarded general damages on a class-wide basis, and cognizant that the only claims remaining in this action are for class members' emotional distress beyond that which is inseparable from the injury to human dignity (or more severe psychological

15

injuries), the Court finds that questions of law or fact common to the class no longer predominate over questions affecting only individual class members.

### B. Emotional Distress Damages Beyond Those Which are Inseparable From the Injury to Human Dignity may not be Awarded on a Class-Wide Basis

The crux of plaintiffs' argument is set forth in the following portion of plaintiffs' memorandum in opposition to the pending motion:

> Although defendants cite to strip search cases in which the courts said that damages may need to be, or should be, considered on an individual basis per class member, those cases are properly viewed as the decidedly minority view.  More recently than most of the cases cited by defendants, courts have had no difficulty certifying strip search class actions without any limitations regarding the damages.

(Pls.' Opp'n at 9 (internal citation omitted).)

The fundamental flaw in plaintiffs' argument is their apparent equation of (1) courts' unwillingness to deny class certification when questions of fact common to the class predominate over individualized damages issue with (2) the notion that those courts have held that emotional distress damages can be awarded on a class-wide basis.  The case law cited by plaintiffs, however, does not permit the Court to make the same inferential leap.  In many of the cases cited by plaintiffs, discussed *infra*, courts did indeed grant class certification motions despite the presence of individualized issues regarding damages.  In none of those cases, however, did courts hold – or even imply – that when they reached the damages phase of the proceedings they intended to award damages for class members' emotional distress claims on a class-wide basis.

For instance, plaintiffs rely heavily on *McBean v. City of New York*, 260 F.R.D. 120 (S.D.N.Y. 2009) as an example of a court refusing to deny class certification despite "the presence of emotional distress damages claims."  (Pls.' Opp'n at 9.)  Plaintiffs are indeed correct

in this assessment.  In *McBean*, a putative class action was commenced against defendants for

"federal civil rights violations arising from" defendants' blanket strip search policy.  *McBean*,

260 F.R.D. at 123.  The parties' settlement negotiations "yielded a proposed settlement class that

differed from the one suggested in plaintiffs' amended complaint" in that it "specifically

excluded" a certain group of pre-trial detainees who were arraigned on narcotics- and weapons-

related charges.  *See id.* at 125.  Intervenor-plaintiffs then sought to certify as a class those

plaintiffs who were excluded from the settlement class.  *Id.* at 123-24.  After noting that "[o]n

occasion, courts have declined to certify broad classes of individuals subject to blanket strip-

search policies because of the role the particular circumstances of each search might play,

whether as to liability, class membership, or individual damages claims," the court noted that

"the availability of individual defenses as to liability is substantially limited because . . . the

defendants do not dispute that the searches at issue took place pursuant to a policy that required

every detainee to be searched irrespective of any particular factor . . . ."  *Id.* at 138.  Thus, "[t]he

predominance of the central legal and factual issues common to all class members [ ] is in no

way threatened by the possibility of hypothetical defenses."  *Id.*  The court granted the motion,

and certified the class under Rule 23(b)(3).  *Id.* at 138-39.

After a lengthy recitation of a portion of the court's analysis in *McBean*, plaintiffs assert

that "defendants' argument that legal precedent 'strongly supports' their argument that the

general emotional distress damages claims cannot be tried on a class action basis is simply

wrong."  (Pls.' Opp'n at 10 (internal citation omitted).)  The Court does not believe that this

conclusion logically flows from the holding in *McBean*.  Importantly, in that case, there was

absolutely no discussion by the court of the existence of class members' emotional distress

damages, or the manner in which the court intended to deal with class members' claims for such damages. The focus of the court's decision was on the limited availability of individual defenses to liability and the fact that "no evidentiary hearings will be required to determine class membership in the first instance" – not the presence or absence of individual issues with respect to damages. *McBean* 260 F.R.D. at 138. The fact that the court in *McBean* granted class certification under Rule 23(b)(3) without discussing the impact of emotional distress claims does not mean that the court held (or even contemplated) that an award of damages for emotional distress was ultimately going to be made on a class-wide basis.[7]

Plaintiffs also cite numerous cases for the proposition that "[m]ost courts within this Circuit have certified strip search class actions without any limitation on the damages class, and without subsequent decertification." (Pls.' Opp'n at 9.) The Court has reviewed the docket sheets for each of the cited cases, however, and none of those cases ever arrived at the procedural posture faced by this Court, and thus never addressed the issue of individual damages. In *Mitchell v. County of Clinton*, 2007 WL 1988716 (N.D.N.Y. July 5, 2007), for example, the court granted plaintiffs' motion for class certification and found that "[t]he questions of whether the alleged [blanket strip search] policy and practice existed, whether they were unconstitutional, and whether defendants are liable are subject to generalized proof and are common to all potential class members." *Id.* at *4. The court further noted that "[a]n argument may be made that the class should be certified only on the issue of liability, because the issue of damages is likely to

---

[7]     According to the docket sheet in *McBean v. City of New York*, 02 CV 5426 (S.D.N.Y.), a stipulation of settlement was submitted for court approval a few months after the August 2009 decision cited above, and that settlement was approved by the court by Order dated October 22, 2010.

involve individualized evidence." *Id.* at *5.  The court then cited the Second Circuit's statement

that various "management tools" are available to enable a district court to "address any

individualized damages issues that might arise in a class action," including:

> (1) bifurcating liability and damages trials with the same or different
> juries; (2) appointing a magistrate judge or special master to preside
> over individual damages proceedings; (3) decertifying the class after
> the liability trial and providing notice to class members concerning
> how they may proceed to prove damages; (4) creating subclasses; or
> (5) altering or amending the class.

*Id.* (quoting *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001)).

The court concluded that because it "has the flexibility to deal with management issues as they

arise, . . . denial of certification regarding damages or other issues is not warranted." *Id.*

According to the Northern District of New York docket sheet, however, the case subsequently

settled before liability was even determined.  Clearly, then, the *Mitchell* court never needed to

determine how to "deal with management issues" regarding class members' individual claims for

emotional distress damages, and is of little assistance here.

Likewise, in *Pritchard v. County of Erie*, 269 F.R.D. 213, 219 (W.D.N.Y. 2010), the

court granted plaintiffs' Rule 23(b)(3) motion for certification, "concluding that the questions . . .

regarding the existence of the alleged strip search policies . . ., the constitutionality of those

practices and policies, and the ultimate liability of the County . . ., are common to all potential

class members and are subject to generalized, class-wide proof."  The court did not discuss how

it intended to handle any issues subject to "individualized proof," *see id.*, and a review of the

Western District of New York docket sheet shows that, as of the date of this Order, the case has

yet to proceed to the trial phase.

19

Finally, in *Williams v. County of Niagra*, 2008 WL 4501918, at *4 (W.D.N.Y. Sept. 29, 2008), the court granted a motion for class certification under Rule 23(b)(3) because the existence of the alleged strip search policy, the question of the policy's constitutionality, and the defendants' liability were "subject to generalized proof and are common to all potential class members." The court found, without any specific discussion about individual claims for emotional distress damages, that "[t]hese issues predominate over those issues that are subject to individualized proof." *Id.* As of the date of this Order, summary judgment motions on the issue of liability remained pending before the district court.

Thus, as is clear from the authorities cited above, plaintiffs are correct that several courts within this Circuit have certified Rule 23(b)(3) classes in strip search cases despite the presence of individualized issues regarding damages. Indeed, in this case the Court certified the class action for liability purposes as well as general damages. Ultimately, however, the Court does not find that any of the cases cited by plaintiffs support their request for emotional distress damages to be awarded on a class-wide basis. As described below, such claims require individualized proof that must be presented by each class member separately.

**C.**   ***Class Members' Remaining Claims for Emotional Distress Damages Must be Tried on an Individual Basis***

**1.**   **The Relevant Case Law Does not Support a Class-Wide Award**

To partially reiterate, plaintiffs do not cite any cases that directly deal with the issue now confronting this Court: liability has been established, general damages have been awarded on a class-wide basis, and all that remains are individual class members' claims for special damages. (*See generally* Pls.' Opp'n at 11-12.) As defendants have noted, however, in several cases within

20

this Circuit trial courts have indicated that, should they reach this late stage of a strip search class litigation, class members wishing to pursue claims for emotional distress damages would have to proceed on their own in individual hearings.  In particular, the Court finds two cases decided in the Southern District of New York by Judge Colleen McMahon to be helpful on this point.

In *Dodge v. County of Orange*, 226 F.R.D. 177 (S.D.N.Y. 2005), two "consolidated actions, brought as class actions, challenged the admissions procedures for newly-arrived inmates at the Orange County Correctional Facility."[8]  *Id.* at 179.  Plaintiffs moved to certify a class pursuant to Rule 23(b)(3) and defendants opposed, contending that the case "bristle[d]" with "individual issues."  *Id.* at 182.  Judge McMahon found, however, that none of those individual issues went to defendants' liability; rather, an issue common to the class was the existence of a blanket strip search policy.  *See id.* at 180.  When the court turned to damages, however, it found it "clear that individual issues predominate" since "not all arriving inmates will have suffered in the same way or to the same extent."  *Id.* at 182.  Ultimately, the court determined that "[b]ecause common questions predominate on the issues of liability but [ ] individualized issues underlie any award of damages to class members, I am bifurcating the liability and remedy phases of these actions and I certify classes only on the issue of liability . . . ."  *Id.* at 184.  The *Dodge* court made clear its intention that "the issue of damages, if it cannot be settled, will be litigated before a judge and a jury on a case-by-case basis, and [ ] different members of the class may receive

---

8      "The *Dodge* plaintiffs [sought] to represent a class consisting of all persons accused of misdemeanors who were strip searched upon their initial arrival at OCCF from January 31, 1999 through August 6, 2002.  The *Rango* plaintiffs [sought] to represent a class consisting of all persons accused of felonies who were strip searched upon their arrival at OCCF during the same period."  *Dodge*, 226 F.R.D. at 179.

21

different amounts of damages as a result." *Id.* at 186.[9]

In *Maneely v. City of Newburgh*, 208 F.R.D. 69, 71 (S.D.N.Y. 2002), plaintiffs challenged a strip-search policy and moved for class certification under Rule 23(b)(3).   Judge McMahon found that there was "a common issue at the core of this case – whether defendants maintained an unconstitutional blanket strip search policy during the class period," and although "in this case each plaintiff has a unique situation with relation to damages issues," the court found "it would be improper to let manageability concerns overwhelm the predominance decision." *Id.* at 77-78.  Therefore, the court certified a class as to the issue of liability only and stated that if the class prevailed on liability "then individual plaintiffs can come forward to litigate, in individual suits, the issue of whether their rights were violated and whether they suffered damages." *Id.* at 79.[10]

Although Judge McMahon did not squarely address the issues currently faced by this Court, her analyses in *Dodge* and *Maneely* are particularly helpful with respect to this Court's determination of the appropriate manner in which to proceed now that it is faced solely with the question of whether and how to determine class members' individual damages for emotional distress beyond those which are inseparable from the injury to human dignity.  Plaintiffs note that these cases "involve the views of one judge, Judge McMahon, who ruled in each of the cases and encouraged the minority view that emotional distress damages precluded damages class

---

[9]    According to the docket sheet in *Dodge v. County of Orange*, 02 CV 769 (S.D.N.Y.), the parties in both the *Dodge* and *Rango* actions reached settlement shortly after the class certification decision was issued.

[10]    According to the docket sheet for *Maneely v. City of Newburgh*, 01 CV 2600 (S.D.N.Y.), the case settled and was dismissed before any determination as to liability was made.

certification." (Pls.' Opp'n at 17.) The Court does not find the fact that these decisions were both issued by Judge McMahon to have much bearing, one way or another, on the assistance they provide for present purposes. The Court concludes, after reviewing each of these cases, that the rationale set forth therein is sound. Moreover, plaintiffs base their claim that these cases espouse the "minority view that emotional distress damages preclude[] class certification" solely on their reading of *McBean*. (*See id.*) As discussed above, however, that case does not ultimately support plaintiffs' advocacy of a class-wide award for emotional distress damages.

Several district courts outside of our Circuit, in certifying classes of plaintiffs challenging the constitutionality of various strip search policies, have also addressed the manner in which they intend to deal with the individualized damages issues that may arise. Importantly, while each of these cases stand for the proposition that the presence of such individualized damages issues will not preclude class certification, none of the courts involved unconditionally extended certification of these classes to cover class members' claims for individual damages. In fact, most courts put off the question, citing the various "management issues" at their disposal, including potential decertification. *See, e.g.*, *Wilson v. Cnty. of Gloucester*, 256 F.R.D. 479, 489 & n.15 (D.N.J. 2009) (certifying Rule 23(b)(3) class challenging defendant's strip search policy and rejecting defendant's argument that because "thousands of damages mini-trials would be necessary if Defendants are found liable[,] . . . individual damages issues would predominate"; noting the existence of "a number of management tools available to a district court to address any individualized damages issues"); *Florence v. Bd. of Chosen Freeholders of Cnty of Burlington*, 2008 WL 800970, at *13 (D.N.J. Mar. 20, 2008) (certifying class of plaintiffs challenging constitutionality of defendant's strip search policy "notwithstanding the possibility that an

23

individualized calculation of damages may be necessary," and noting "several ways of dealing with possible individualized damages issues" including "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages"); *Johns v. DeLeonandis*, 145 F.R.D. 480, 484-85 (N.D.Ill. 1992) (certifying Rule 23(b)(3) class and subclass of plaintiffs seeking money damages for alleged constitutional violations stemming from unlawful strip search; "[t]hough the members of the subclass may have different damages due to the varying injury done to them during the strip search, the extent of damages is not an issue *at this stage of the proceeding*") (emphasis added).

2. **Class Members' Remaining Claims for Emotional Distress Damages are Inherently Individualized and Must be Proven on a Case-by-Case Basis**

As the Sixth Circuit has aptly stated, "[a]lthough many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988) (noting that, in mass tort context, class action procedure allowed the court to determine the defendants' liability "without regard to the individual components of each plaintiff's injuries," but ultimately, "it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages" were caused by the defendants' conduct). This is true both with respect to establishing a causal link between defendants' conduct and the alleged personal emotional distress injury, *see id.* at 1206 ("[D]amages for mental distress generally are not recoverable where the connection between the anxiety and the existing injury is either too remote or tenuous."), and proving the nature, extent, severity and duration of the alleged emotional distress suffered by the individual class member, *see In re Three Mile Island Litig.*, 87 F.R.D.

433, 441, 442 n.16 (M.D.Pa. 1980) ("[C]laims for emotional distress and resulting physical injury are diverse and personal . . . [Additionally,] the idiosyncratic nature of emotional distress claims makes them as unsuitable for class certification as the physical injury/emotional distress claims discussed herein.")

As noted by Judge McMahon in *Dodge*, the damages suffered by members of a class subjected to unlawful strip searches are inherently individualized:

> Even if the plaintiff class members were strip searched illegally pursuant to a uniform policy, not all arriving inmates will have suffered in the same way or to the same extent. Some may have suffered physical damages as a result of a strip search. Some may have been severely psychologically damages. Some, perhaps many, will not have found the experience terribly degrading.

*Dodge*, 226 F.R.D. at 182-83. The Court agrees with this assessment. For example, a modest grandmother who had never before been subjected to the undoubtedly humiliating experience of being forced to expose her naked body to a corrections officer during a strip search would likely have suffered a more significant degree of emotional distress than a "repeat offender" who, as no stranger to the correctional system, may have been strip searched hundreds of times in the past and did not find the procedure or attendant exposure of various body parts to strangers to be "terribly degrading." *See id.*

### 3. Damages for any Remaining Claims for Emotional Distress Cannot be Awarded to the Class Pursuant to any Sampling Method

During the October 1, 2010 status conference, the Court raised the possibility of determining individual special damages by using testimony and/or evidence taken from a representative sample of class members who would "be selected by [a] methodology which has some type of scientific acceptance." (*See* Tr. at 47.) In response, as detailed below, plaintiffs

advocate the use of some type of sampling method, but oppose random sampling or sampling based on any other methodology that would produce a representative result from the statistical universe.  (Tr. at 34-35, 37.)

        *a.*       *Plaintiffs' Proposal of a Presumptive Common Pain and Suffering Award for Each Class Member*

First, Plaintiffs assert that *Langley v. Coughlin*, 715 F. Supp. 522 (S.D.N.Y. 1989) "teaches that the Court clearly can (and we submit, should) determine garden-variety emotional distress damages on a class basis in a phase 2 trial, and add that award to the general damages award, before any claim forms are distributed."  (Pls.' May 28, 2010 Letter at 6.)  According to plaintiffs, "[i]n determining the class's garden variety emotional distress damages, the Court has wide discretion to fashion an award that, while imprecise, does substantial justice."  (*Id.* at 7.) Plaintiffs assert that "based on [the testimony of] a sample of class members," the Court can establish "a presumptive common pain and suffering award for each class member 'and then permit both plaintiffs and defendants to seek a variation – either up of down – for specific class members based upon a showing of unique individual circumstances.'"  (*Id.* at 6 (quoting *Langley*, 715 F. Supp. at 558).)

In *Langley*, Judge Leonard B. Sand adopted a report and recommendation issued by Magistrate Judge Michael H. Dolinger and granted the plaintiffs' motion for class certification. 715 F. Supp. at 530 ("[W]e are satisfied that plaintiffs would prevail on the class certification issue even if it were entirely their burden to sustain such certification *de novo*.")  In that case, the plaintiffs challenged the constitutionality of the conditions and practices in defendants' correctional facility.  In his report and recommendation, Judge Dolinger found there were

"'questions of law or fact common to the class,' and indeed to each of the subclasses" regarding the plaintiffs' "conditions-of-confinement claims" as well as their claims that the defendants failed to properly treat inmates with serious mental ailments.  *Id.* at 555.  The defendants argued against class certification, asserting that "damages for conditions of confinement must be based on the emotional or other injury to the individual as a result of the conditions, and that this necessitates an individualized inmate-by-inmate inquiry concerning the extent of injury resulting from any given set of unconstitutional conditions."  *Id.* at 557.  Judge Dolinger was not persuaded by this argument and reasoned that the "type of proof of the nature and severity of conditions [at the facility] over an extended period is obviously best done in a single proceeding."  *Id.* at 558.

In discussing the "task of damage determination," Judge Dolinger stated that "it bears emphasis that courts have been perfectly willing, *based simply on proof of objective conditions* in a prison, to award *per diem* damages to an inmate unconstitutionally confined.  There is no reason to conclude that a similar procedure cannot be used here based upon the Court's class-wide findings that conditions [in the facility] for specified time periods (a) violated constitutional norms and (b) were of such severity as to merit the inference that inmates confined on those particular days were injured to an extent equivalent to a specific sum for each such day."  *Id.* at 558 (internal citations omitted, emphasis added).  The Court notes parenthetically that, at this point, it has already awarded general damages in a similar manner; based on the objective evidence set forth regarding the strip search procedures conducted pursuant to defendants' blanket strip search policy, it has awarded $500 per strip search.

Judge Dolinger suggested an approach the trial court might employ to award damages:

27

"establishing a presumptive *per diem* award . . . and then permitting both plaintiffs and defendants to seek a variation – either up or down – for specific class members based upon a showing of unique individual circumstances." *Id.* Judge Dolinger opined that few claimants would seek a variation and that "in any event separate damage proceedings are not inconsistent with class certification when the bulk of the issues, at least insofar as they concern liability, can be addressed in a single joint proceeding." *Id.* at 558-59.

Plaintiffs emphasize the following passage from *Langley:*

> It is true that such an approach involves a degree of inexactitude, but that is entirely defensible. Compensation for pain and suffering – whether physical or emotional – inevitably involves substantial inexactitude, and thus it is not surprising that the federal courts have countenanced the use of arbitrary but efficient across-the-board measures of such suffering, even in non-class cases. *See, e.g., Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 587 (2d Cir. 1961), *cert denied*, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962) (assessing pain-and-suffering damages for eleven crewmen of capsized ship at $150.00 per hour regardless of individual circumstances and cause of death (if any), which varied from shark bit to exposure to drowning). In class cases, the courts have found still further justification for accepting some degree of imprecision in damages awards, even for economic loss, if substantial justice is done.

*Id.* at 558 (collecting cases).[11] In the above-quoted passage, Judge Dolinger simply observed that "federal courts have countenanced the use of [arguably] arbitrary but efficient across-the-board measures" to award damages. *See id.* Overall, the Court does not find that the suggestions in

---

[11]    The cases collected by *Langley* dealt with awards of backpay – not emotional distress damages. "[C]alculating the amount of backpay lost by members of the class because of the employer's discriminatory employment practices does not require individualized proof because the aggregate amount of backpay does not depend on the individual circumstances of any class member." *United States v. City of New York*, 2011 WL 2680474 at *16 (E.D.N.Y. July 8, 2011).

Judge Dolinger's report and recommendation to be persuasive as to the appropriateness of establishing a presumptive common special damages award for each class member in this case. The Court notes that plaintiffs have not cited any case, including *Langley*, that actually proceeded in the manner currently suggested by plaintiffs.

Plaintiffs also cited *Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583 (2d Cir. 1961) during the October 1, 2010 status conference, and stated that in that case "damages were fixed at $150 per hour of emotional distress damage, no matter what the circumstances were. There was no random sampling in that case. It was just done on that basis." (Tr. at 36.) In *Moore-McCormack*, a non-class action case, the Second Circuit reviewed an appeal from the trial court's award of damages for seven personal injury claims and four wrongful death claims stemming from the sinking of defendants' vessel. 295 F.2d at 587. As compensation for pain and suffering, the trial court awarded each claimant $300 for each hour that he was in the water before his rescue or death. *Id.* While ultimately reducing the hourly figure from $300 to $150, the Second Circuit did not disturb the trial court's decision to award an hourly rate for emotional distress damages. The dilemma facing the trial court in *Moore-McCormack* was that some of the claimants died as a result of the ship's sinking and so, obviously, the court did not have the benefit of their individual testimony with respect to the pain and suffering they endured before their deaths. Thus, the court used the individual testimony of each of the survivors to determine a common award for pain and suffering for each hour between the time of the ship sank and the time of each claimant's demise or rescue.[12] *See id.* ("We agree with the trial judge that there is

---

[12]     The trial court noted that "although the time when each [of the deceased claimants] was last seen alive is known with reasonable certainty," there was no evidence in the record as to the exact time of their deaths. *In re Moore-McCormack Lines, Inc.*, 184 F. Supp.

no way of differentiating between the suffering of any deceased or survivor and [so] the award should be assessed on the same basis as to all.").

Plaintiffs assert that *Moore-McCormack* supports the proposition that the testimony of a sample of class members can be used to fashion a presumptive emotional distress damages award for each class member, which may then be adjusted based on individual circumstances.  This assertion, however, is undercut by the profound factual distinctions between this case and *Moore-McCormack*.  *Moore-McCormack* did not involve a class certified under Rule 23(b)(3) and the hourly rate for pre-death or pre-rescue pain and suffering was based not on the testimony of a sample of class members, but on the testimony of each surviving claimant.  Moreover, the court in *Moore-McCormack* made every effort to individualize each claimant's award of emotional distress damages.  For instance, the application of the common hourly award was individualized based on the number of hours each claimant was in the water before his death or rescue.  Moreover, when assessing pain and suffering awards to the survivors for the period that followed their rescue, the lower court did not employ the hourly rate but awarded each claimant a different amount based upon his testimony.  *See id.* at 590, 591.

Overall, the Court does not find that *Langley* or *Moore-McCormack* support plaintiffs' proposal that a fixed emotional distress damages award be awarded to each class member "based upon the [non-randomly selected] sample of class members already selected by plaintiffs and defendants."  (*See* Pls.' May 28, 2010 Letter at 8.)

_____

585, 590 (S.D.N.Y. 1960).  Accordingly, the trial court's "estimate [of] the time of death . . . is that each deceased died one hour after he was last seen alive . . . ."  *Id.*

b.      *Plaintiffs' Proposal of Non-Random Sampling*

Plaintiffs also suggested that the Court select a sample of class members by permitting both plaintiffs and defendants to identify a certain number of class members that would be most favorable to their respective positions, which would result in a "mix" of class members that would purportedly be "representative of the whole." (Tr. at 38.) Plaintiffs cite to the procedure employed by the trial court in *Young v. County of Cook*, 06 CV 552 (N.D.Ill.), which is, according to plaintiffs, "the only strip search class action case in which, to our knowledge, garden-variety strip search damages have actually been tried." (Pls.' May 28, 2010 Letter at 8.) Plaintiffs assert that in *Young*, "no random sampling method was used, plaintiffs were permitted to call whom they wished in three jury trials of eight class plaintiffs, subject to the proviso that if a class member had testified at the liability trial, that class member should also testify in the damages trial." (*Id.*) The Court has reviewed the docket sheet for *Young v. County of Cook*, and does not agree with plaintiffs' characterization of the procedures employed in that matter.

In *Young*, the court certified two classes under Rule 23(b)(3): "(1) all males who were subjected to a strip search and/or a visual body cavity search as new detainees at the Cook County Jail on or after January 30, 2004 [Class I]; and (2) all persons charged only with misdemeanor or lesser offenses not involving drugs or weapons who were subjected to a strip search and/or a visual body cavity search as new detainees at the Cook County Jail on or after January 30, 2004 [Class II]." (Mem. & Order, dated Apr. 25, 2007, *Young* Docket No. 92.)[13]

---

[13]     "*Young* Docket No. __" refers to docket entries on the electronic docket sheet for *Young v. County of Cook*, 06 CV 552 (N.D.Ill.).

Subsequently, the defendants[14] moved for summary judgment and the plaintiffs cross-moved for partial summary judgment on the issue of liability.  (*See* Mem. & Order, dated Apr. 2, 2009, *Young* Docket No. 298.)  These motions were each granted in part and denied in part; the court granted "plaintiffs' motion for summary judgment with respect to the claims by the Class II members and the Fourth and Fourteenth Amendment claims of the Class I members for searches that occurred prior to the installation of privacy screens . . . but otherwise denie[d] the motion." (*Id.* at 38.)  A jury trial was held on the remaining liability issues and the jury returned a verdict in favor of plaintiffs and against defendants.  (*See* Minute Entry, dated Aug. 13, 2009, *Young* Docket No. 426.)

The plaintiffs then moved for the appointment of a special master to oversee discovery in the "damages phase of the proceedings."  (Pls.' Mot. to Appoint Special Master at 1, dated Nov. 16, 2009, *Young* Docket No. 493.)  The plaintiffs asserted that such discovery was necessary "to begin the process needed to assess class-wide damages using statistical sampling – a process which could avoid the need for individual damages adjudications."  (*Id.*)  The plaintiffs noted that "[g]iven the enormous transaction costs to make individual damages determinations in a class of over 400,000 claims, Plaintiffs believe that using statistics is the most sensible approach."  (*Id.* at 1 n.1.)  The plaintiffs contended that a special master's "oversight" was necessary to enable the parties "to develop an acceptable statistical method," otherwise the parties faced the "highly undesirable result" of "a class wide judgment for liability only, followed by the filing of from tens to hundreds of thousands of individual damages cases."  (*Id.* at 2

---

[14]      Cook County as well as Cook County Sheriff Michael Sheahan and Sheriff employees (collectively, "Sheriff defendants") were named as defendants in *Young*.  Cook County and the Sheriff defendants each moved separately for summary judgment.

32

(noting that special masters have "been used successfully in the class action context" and citing *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767 (9th Cir. 1996)).)

After hearing the defendants' objections, District Judge Matthew F. Kennelly denied the plaintiffs' motion without prejudice and set a date for a jury trial – apparently, the first of several to be scheduled.  (*See* Minute Entry, dated Dec. 3, 2009, *Young* Docket No. 499.)  In a subsequent order, Judge Kennelly clarified that the upcoming damages trials were not set "in order to ascertain the damages of the class."  (Minute Entry, dated Dec. 11, 2009, *Young* Docket No. 503.)  Rather, "the purpose of the damages trials is to decide the damages of the *individual class members whose damages will be tried*, to facilitate the entry of a final judgment on less than all claims under Rule 54(b)."  (*Id.* (emphasis added).)  To that end, the court directed the plaintiffs to "identify the plaintiffs whose damages cases will be tried," and that such group "should include" the "named members of the classes or portions of classes in whose favor liability was determined via the summary judgment ruling," as well as any class members who testified during the liability trial.  (*Id.*)  After those damages cases were tried to verdict, the court entered judgment on those individual claims that were "severed from the claims of the remainder of the classes that have been certified in this case."  (Minute Entry, dated July 16, 2010, *Young* Docket No. 606.)  The case subsequently settled, and an order was issued granting final approval of the class action settlement and final judgment on March 4, 2011.  (*See Young* Docket No. 650.)

Based on this extensive review of the procedures used by the Northern District of Illinois district court in *Young*, the Court finds that *Young* does not support plaintiffs' position that the Court should "conduct phase 2 proceedings to fix classwide damages for garden variety

33

emotional distress . . . based on the sample of class members already selected by plaintiffs and defendants." (Pls.' May 28, 2010 Letter at 8.)  Indeed, that was not the method employed by the court in *Young*.  Rather, Judge Kennelly severed the claims of several individual class members from the rest of the class and tried their damages claims on an individual basis.[15]  Moreover, the Court rejects plaintiffs' request for non-statistical sampling as simply unsound: the Court cannot fathom how the parties' hand-selection of ten or twenty individuals would produce testimony that is meaningfully representative or reflective of the experience of each individual member of a 17,000 member class.[16]

---

[15]     The Court notes that this approach would appear to have the attendant benefit of facilitating settlement, in that it would give each party an idea of the verdict amounts possible.  Should both parties be interested in utilizing a similar approach with an aim at achieving settlement of the entire matter, they should inform the Court within forty-five (45) days of the date of this Order.  To determine the viability of that approach, counsel for the parties are directed to meet and confer within fifteen days of the date of this Order to see if such an approach is likely to promote a settlement.  The initial contact for this purpose shall be made by Attorney Robert L. Herbst.

[16]     The Court has considered *sua sponte* whether some type of statistically significant random sampling method could be utilized to determine emotional distress damages for individual class members.  Such an approach does not appear viable.  The main support for such an approach would stem from the Ninth Circuit's decision in *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767, 771 (9th Cir. 1996), which involved a class action seeking damages based upon human rights abuses committed by the Philippine military.  In the compensatory damages phase of the litigation, a statistically significant sample of the 9,541 claims were randomly selected and information about the individual sample claims was used to determine compensatory awards to the sub-classes of remaining class members.  *See id.* at 783.  The Ninth Circuit ultimately held the "district court's methodology" was "unorthodox" but was "justified by the extraordinarily unusual nature of this case."  *Id.* at 786.

In a strong dissent, Circuit Judge Rymer disagreed, emphasizing that "[e]ven in the context of a class action, individual causation and individual damages must still be proved individually."  *Id*.  Several courts have raised serious questions about the Ninth Circuit's conclusions in *Hilao*, and have agreed instead with the sentiments expressed in Judge Rymer's dissenting opinion.  *See, e.g.*, *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319 (5th Cir. 1998) ("Finally, we find ourselves in agreement with the thrust of the dissenting opinion [in *Hilao*].");  *In re Fireboard Corporation*, 893 F.2d 706, 707 (5th Cir. 1990) (expressing a "profound

4.      **Despite Practical Litigation Concerns, Relevant Case Law Supports Resolving Emotional Distress Claims on an Individual Basis**

The Court's research has uncovered a plethora of authority – in the context of mass tort litigation, toxic tort litigation, and products liability actions – that supports its conclusion that claims for class members' emotional distress damages must be disposed of an individual basis. "Class certification decisions in mass tort cases offer additional guidance in analyzing the predominance of common questions over individual issues in a case in which class members have suffered physical injuries," *Presbyterian Church of Sudan*, 226 F.R.D. at 474, and the Court finds those cases helpful here.  *See, e.g.*, *Mejdrech v. Met-Coil Sys Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop *while leaving the remaining, claimant-specific issues to individual follow-up proceedings*.") (emphasis added); *Sterling*, 855 F.2d at 1197 (affirming class certification in mass toxic tort case when "single major issue distinguishing the class members is the nature and amount of damages," but noting that "individual members of the class still will be required to submit evidence concerning their particularized damage claims in subsequent proceedings"); *Presbyterian Church of Sudan*, 226 F.R.D. at 485 (declining to certify class of plaintiffs alleging they were victims of genocide and crimes against humanity when the "core question" of "whether

_____

disquiet" with trial court's approach in managing litigation of 3,031 asbestos cases, when only "certain representative cases" would be tried on the issues of liability and damages to a jury); *The Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456 (S.D.N.Y. 2005) ("The dissent in *Hilao* was the better reasoned decision and identified the very problems that infect this application for certification.").

the suffering endured by each putative class member can be attributed to the defendants . . . is fundamentally an individual question."); *In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718, 724 (E.D.N.Y. 1983) (finding issues of "general" causation could be determined on a class-wide basis, while "specific" causation could be determined in subsequent individual trials), *aff'd*, 818 F.2d 145 (2d Cir. 1987); *In re Three Mile Island Litig.*, 87 F.R.D. 433, 441-42 (M.D.Pa. 1980) (declining to certify class claiming damages for "emotional distress and resulting physical injury" following nuclear reactor incident because "damages will have to be assessed on a plaintiff-by-plaintiff basis, so too will the causes of the injuries alleged").

In *Watson v. Shell Oil Company*, 979 F.2d 1014 (5th Cir. 1992), for example, the Fifth Circuit affirmed certification of a class of 18,000 plaintiffs suing defendants in connection with an explosion at an oil refinery which caused "extensive damages both on the plant and in the surrounding communities." *Id.* at 1016-17. The Circuit also affirmed the trial plan, which called for trial to proceed in four phases, with a jury to determine "common issues of liability" in phase one. *Id.* at 1018. Of particular relevance here is phase three, which called for a different jury to "resolve issues unique to each plaintiff's compensatory damage claims, *e.g.* injury, causation, and quantum." *Id.* Phase three "call[ed] for trials in waves of five" and the trial court anticipated that several waves of trials would result in a "reasonable judgment value for each category of claims" that would "facilitate settlement." *Id.* at 1018. The Circuit affirmed this trial plan, with the proviso that the phase three trials could not proceed in a manner that "altered or diminished" federal rules of evidence or procedure. *Id.*

Plaintiffs argue that any failure to certify class members for the purpose of seeking special damages is simply impractical: "If the class were decertified, and only several hundred

36

rather than a few thousand class members brought their emotional distress claims to Your Honor

for trial as related cases, what else would this Court be available to do for the next 11 years?"

(Pls.' Opp'n at 14.)  Plaintiffs' concern, while not ill-founded, is also not new – countless courts

faced with the task of determining individual damages claims in the context of complex mass

litigation scenarios have faced similar dilemmas.  The Fifth Circuit, in recognizing the strain that

asbestos mass litigation placed on the federal courts, made the following comments:

> We are told that Phase II [involving trying a sample of individual claims and then extrapolating a class-wide compensatory damages award] is the only realistic way of trying these cases; that the difficulties faced by the courts as well as the rights of the class members to have their cases tried cry powerfully for innovation and judicial creativity.  The arguments are compelling, but they are better addressed to the representative branches – Congress and the State Legislature.  The Judicial Branch can offer the trial of lawsuits.  It has no power or competence to do more.  We are persuaded on reflection that the procedures here called for comprise something other than a trial within our authority.

*In re Fireboard*, 893 F.2d at 712; *see also Watson*, 979 F.2d at 1018 (noting that the litigation,

"involving claims by more than 18,000 plaintiffs, starkly presents the nearly insurmountable

problems of balancing procedural fairness with judicial efficiency in the management of mass

tort litigation").

The Court has carefully considered the direction this case must take, largely unaided by

any case law or other legal authority directly on point – a testament to the fact that we are

traversing largely uncharted waters.  On the one hand, the Court could exercise its discretion to

hold (or appoint one or more Special Masters to hold) a series of "mini-trials" to determine the

emotional distress damages suffered by each individual strip search victim.  This would arguably

benefit those individuals by permitting them to litigate their special  damages claims without

having to pay a filing fee to commence their own action in federal court, and would protect the District from a potential inundation of individual claims.  On the other hand, the Court is doubtful that the process of holding potentially hundreds if not thousands of mini-trials, or appointing one or more Special Masters to do so, would be any more efficient than requiring former class members to commence their own individual actions should they elect to pursue claims for special damages.[17]  Indeed, any strip search victim seeking special damages would have the benefit of a finding of liability on the part of the County and would need only present evidence as to their emotional distress damages.  Plaintiffs' counsel has represented that the majority of these individuals suffered only from what plaintiffs refer to as "garden-variety" emotional distress, for which expert testimony is generally not necessary to establish.

## IV.    Remaining Issues

There remain a number of "loose ends" that must be resolved before a final judgment can be entered.  This Memorandum & Order contains the Court's decision, as set forth at length above, that it will not extend class certification to permit plaintiffs to pursue a class-wide award to compensate for what plaintiffs refer to as "garden-variety" emotional distress damages.  The remainder of this Memorandum & Order delineates the manner in which the Court intends to proceed.  Any objections to the following must be submitted to the Court, in writing, within forty-five (45) days of the date of this Order.  Additionally, the parties are directed to bring to the Court's attention any issues that, in their view, remain unresolved, in writing, within forty-five

---

[17]    Plaintiffs have consistently referred to special damages as encompassing claims for varying levels of emotional distress damages.  While the Court recognizes that special damages could potentially include those outside the realm of emotional distress damages, plaintiffs have never raised such claims.

(45) days of the date of this Order.[18]

    **A.**    ***Distribution of General Damages Award***

    The Court has reviewed the parties' briefing regarding the "cy pres" issue.  (*See* Docket Nos. 374, 380, 381.)  As an initial matter, the Court must determine the amount that the defendants will be required to allocate into a fund to distribute to class members as compensation for their general damages.  Defendants submit that the Court has "two options" in this regard.  First, the Court could "allow a reasonably liberal claims period for the Class Administrator to locate and solicit all potential claimants, and then enter a general damages judgment for the number of qualifying strip searches actually claimed times the $500 per search dignity damages award."  (Defs.' Reply at 6.)  In connection with this option, defendants have offered to undertake an obligation to "pay in perpetuity any valid future claims."  (Defs.' Mem. at 7 n.2 (citing *Van Gemert v. Boeing Co.*, 739 F.3d 730, 731, 733 (2d Cir. 1984)).)

    Second, defendants assert that the Court could "enter an aggregate judgment of approximately $11.5 million based upon the total number of eligible searches time $500, with the unclaimed portion of this judgment reverting to the County at the end of the claims period."  (Defs.' Reply at 6.)  Plaintiffs endorse defendants' proposed second approach (i.e., entering an "aggregate class judgment" in the amount "fixed by multiplying the number of qualifying strip searches by $500") with an important distinction: "any unclaimed funds [would] be distributed

---

[18]    In the most recent round of briefing, counsel referred the Court to arguments made as part of prior written submissions.  In future written submissions, the parties may not simply incorporate past arguments by reference, but must restate those arguments so as to properly focus the Court on the legal points they wish to make.

pro rata to those class members making claims." (Pls. Opp'n at 3.)[19]

The Court will adopt defendants' second proposal, i.e., a judgment will be entered against defendants in an aggregate amount based upon the total number of eligible searches performed, multiplied by $500.  The Court has further determined, contrary to plaintiffs' request, that – no matter the amount of money that defendants are required to advance into a fund for distribution of general damages – any unclaimed funds will revert back to defendants.  The Court declines to adopt plaintiffs' suggestion to distribute unclaimed funds to those individuals who make claims; such a procedure would result in those class members receiving a windfall from the public fisc and is inconsistent with the general legal tenant that compensatory damages should do no more than compensate a victim for their injury.  *Accord* 3 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 10:5 n.3 (4th ed. 2002) ("[I]t is now clear that the Second Circuit condemns fluid recovery which is defined as a distribution of an aggregate class recovery or an unclaimed portion thereof under cy pres principles to the next best class of persons.") (citing *Eisen v. Carlisle & Jacquelin*, 479 F.3d 1005 (2d Cir. 1973), *cert granted*, 414 U.S. 908 (1973), *judgment vacated on other grounds*, 417 U.S. 156 (1974)).

### B.   *Notice and Claims Forms*

The Court finds that each member of the class is entitled to notice of: (1) the finding of liability against the defendants, (2) the general damages award previously rendered in the amount of $500 per strip search, (3) the Court's decision not to continue class certification so as to permit special damages to be decided on a classwide basis, and (4) the right of each class member to

---

[19]   Interestingly, should the Court adopt plaintiffs' "modest proposal," "plaintiffs would agree to forego any further trial(s) or proceedings with respect to emotional damages and end the case now."  (Pls.' Opp'n at 3.)

commence an individual action seeking damages for his or her emotional distress – whether it be emotional distress beyond that which is inseparable from the injury to human dignity or other items of special damages, including more severe emotional distress.  Plaintiffs' counsel is directed to prepare such notice and submit it for the Court's approval within forty-five (45) days of the date of this Order.  The notice shall include specific instructions as to how class members can file a claim for general damages (i.e., $500 per strip search).  The notice should also include information as to the statute of limitations for individual actions for emotional distress damages.  Because today's Memorandum & Order is not a "final decision" with respect to these issues, the Court does not believe that the statute of limitations will begin to run until a final order (embodying all of the "loose ends" discussed herein) is entered.[20]  Finally, the notice should address the length of the claims period remaining to those former class members seeking to pursue special damages.

In addition, class counsel is directed to prepare a proposed Claim Form which will inform each member of the class about the general damages award, and will inform them that they will have a full and fair opportunity to submit a claim for such an award.  In addition, to partially reiterate, the Claim Form must also fairly, accurately, and reasonably inform each member of the class of the expiration date for the claims period and strongly encourage them to file their claims

---

[20]     *See Crown, Cork & Seal Co., Inc.*, 462 U.S. 345, 353-54 (1983) ("We conclude . . . that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.  Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.  At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action.") (internal citations and quotation marks omitted); *see also* Defs.' Mem. at 12 n.5 (citing 5 *Moore's Fed. Practice – Civil* § 23.65[1][a]).

in a timely manner.

### C.     Pre- and Post-Judgment Interest

#### 1.     <u>Pre-Judgment Interest</u>

Plaintiffs contend that they are entitled to pre-judgment interest on their award.  (Pls.'

Nov. 19, 2010 Letter at 1.)[21]  Although Section 1983 does not explicitly provide for pre-judgment

interest, "[i]n a suit to enforce a federal right, the question of whether or not to award

prejudgment interest is ordinarily left to the discretion of the district court."  *Gierlinger v.*

*Gleason*, 160 F.3d 858, 873 (2d Cir. 1998).  In exercising such discretion, the Court should

consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii)

considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the

statute involved, and/or (iv) such other general principles as are deemed relevant by the court."

*Id.*  Additionally, "[t]he speculative nature of the damages in question will always be relevant to

a sound decision on a consideration of whether prejudgment interest should be awarded."

*Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955

F.2d 831, 836 (2d Cir. 1992).  "The Court must also bear in mind that '[t]he underlying purpose

of prejudgment interest . . . is the need to fully compensate the wronged party for the actual

damages suffered, i.e., to make him whole.'" *Sulkowska v. City of New York*, 170 F. Supp. 2d

359 (S.D.N.Y. 2001) (quoting *Thomas v. City of Mt. Vernon*, 1992 WL 84560, at *3 (S.D.N.Y.

Apr. 10, 1992)) (alterations in the original).

---

[21]     Plaintiffs assert that the "class plaintiffs" are entitled to pre-judgment interest running "from the date of the strip search, or, alternatively, the entire class is entitled to pre-judgment interest from some middle ground date during the class period (<u>e.g.</u>, December 1, 1997), until the entry of judgment, at the New York State statutory rate of nine percent per year." (Pls.' Nov. 19, 2010 Letter at 1.)

Applying this legal framework, courts within this Circuit routinely allow recovery of pre-judgment interest on awards of back pay and lost wages. *See, e.g., Gierlinger*, 160 F.3d at 873 ("To the extent, however, that the damages awarded to the plaintiff represent compensation for lost wages, 'it is ordinarily an abuse of discretion *not* to include pre-judgment interest.'") (quoting *Salpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993)) (emphasis in the original); *Mohan v. La Rue Distribs., Inc.*, 2008 WL 4822266, at **2-3 (E.D.N.Y. Oct. 27, 2008) (finding that pre-judgment interest "is mandatory" with respect to jury's award for lost wages and fringe benefits). Contrary to plaintiffs' assertions, however, courts generally decline to permit recovery of pre-judgment interest on Section 1983 compensatory damages awards that are "based exclusively on the emotional injuries that [the] plaintiff sustained" as a result of the constitutional violation. *Sulkowska*, 170 F. Supp. 2d at 371 (internal quotation marks omitted, alteration added) (declining to permit recovery of pre-judgment interest on compensatory damages award based upon plaintiff's Section 1983 claims for false arrest, assault and battery, and malicious prosecution); *see also McDow v. Rosado*, 2009 WL 3103778, at *2 (S.D.N.Y. Sept. 29, 2009) (amending judgment and striking pre-judgment interest on award that "was approximate in nature . . . and fully compensated plaintiff for his mental suffering related to false arrest and excessive force"); *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 214 (S.D.N.Y. 2001) (finding plaintiff not entitled to pre-judgment interest on award for emotional pain and suffering as a result of, *inter alia*, unlawful strip search).

Here, there has been no claim that plaintiffs suffered any economic injuries, such as lost wages, or any other form of monetary deprivation as a result of the unlawful strip searches. *See Sulkowska*, 170 F. Supp. 2d at 371. In addition, as the extensive analysis performed by the Court

43

in connection with its September 22, 2010 award of general damages makes clear, the amount of damages attributable to plaintiffs' injuries "[were] not ascertainable with any precision either at the time of the wrongdoing or at the time of trial." *See id.* In selecting $500 per strip search as the general damages award the Court "intended to fully compensate" plaintiffs for their injuries and, "[u]nder such circumstances, an award of prejudgment interest would not be compensatory, but punitive, which is an improper purpose." *See id.* at 371-72.[22]

Accordingly, plaintiffs' request for recovery of pre-judgment interest is denied.

### 2.   Post-Judgment Interest

Plaintiffs contend that they are entitled to an award of post-judgment interest "at the rate of nine percent per year, from the entry of judgment until such time as defendants pay the judgment." (Pls.' Nov. 19, 2010 Letter at 1.)  Plaintiffs further assert that they are entitled to a second, separate but "non-duplicative" award of post-judgment interest "at the rate of nine percent per year, from the date of defendants' concession of liability (September 23, 2003) through the payment of judgment, or at least from the entry of judgment of liability (January 12, 2007) through the payment of judgment." (*Id.*)

Pursuant to 28 U.S.C. § 1961(a): "Interest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  Plaintiffs contend that "it is in the judge's discretion to determine the appropriate rate of interest to apply, [and] judges generally

---

[22]      Plaintiffs assert that in *Green v. Torres*, 98 CV 8700, a "federal civil rights action against a municipality with both federal constitutional and state law claims as here," following a jury verdict and award of $58,508 to plaintiff, Judge Rakoff "supplemented the jury's award . . . with $12,594.44 in pre-judgment interest . . . ." (Pls.' Nov. 19, 2010 Letter at 2.)  Plaintiffs, however, have failed to furnish a copy of that judgment or otherwise demonstrate that the plaintiff in *Green* was permitted to recover pre-judgment interest on an award for exclusively emotional distress damages, as opposed to an award of back pay or lost wages.

44

look to state law for guidance in this regard." (Pls.' Nov. 19, 2010 Letter at 2 (citing N.Y.

C.P.L.R. § 5004 and N.Y. Gen. Mun. Law § 3-a (prescribing 9 percent as interest rate to be paid

on judgments against municipal corporations)).) Plaintiffs assertions to the contrary, however,

the plain language of Section 1961(a) sets forth the applicable rate for post-judgment interest as:

"a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the

Board of Governors of the Federal Reserve System, for the calendar week preceding the date of

the judgment." 28 U.S.C. § 1961(a). The cases cited by plaintiffs, which largely discuss rates for

awards of pre-judgment interest, do not require a different result. (*See* Pls.' Nov. 19, 2010 Letter

at 2 (citing *Velez v. Puerto Rico Marine Mgmt., Inc.*, 957 F.2d 933, 941 (1st Cir. 1992) (noting

that Section 1961 "provides a rate for post-judgment interest but is silent as to pre-judgment

interest," and finding it appropriate to look to "state law in setting the pre-judgment interest

rate"); *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 983-85 (5th Cir. 1991) (discussing appropriate

rate of pre-judgment interest); *Green v. Torres*, 290 F. Supp. 2d 427, 431 (S.D.N.Y. 2003)

(calculating post-judgment interest on attorneys' fees award)).) Accordingly, any post-judgment

interest award will be at the rate prescribed in 28 U.S.C. § 1961(a).

      Furthermore, Section 1961(a) also makes clear that post-judgment interest begins to run

"from the date of the entry of judgment." 28 U.S.C. § 1961(a). The Second Circuit has

consistently held that post-judgment interest does not run from the date of a party's concession of

liability or a jury's verdict and finding of liability. *See, e.g.*, *New England Ins. Co. v. Healthcare

Underwriters Mut. Ins. Co.*, 352 F.3d 599, 605 (2d Cir. 2003) (finding that Section 1961(a)

"requires the starting date for the calculation of federal interest to be the date of entry of the

JMOL, not the date of the jury verdict or the date the court imagines the jury verdict would have

been entered but for the delay caused by the defendant's motion for JMOL"); *Magee v. United States Lines, Inc.*, 976 F.2d 821, 823-24 (2d Cir. 1992) (concluding that "postjudgment interest properly runs from the date of the entry of judgment," and disapproving of district court's "device of creating a make-believe date of entry whose sole purpose was to avoid the clear intent of section 1961"); *Brady v. Wal-Mart Stores, Inc.*, 2010 WL 4392566, at *11 (E.D.N.Y. Oct. 29, 2010); *see also Andrulonis v. United States*, 26 F.3d 1224, 1230 (2d Cir. 1994) ("Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment.")

Thus, plaintiffs will be awarded post-judgment interest at a rate to be calculated pursuant to the explicit terms of Section 1961, running from the date of the entry of judgment.

### D.     "Book and Bail"

The most recent correspondence the Court received regarding the "book and bail" issue is dated November 2010.  The parties are directed to update the Court, within forty-five (45) days of the date of this Order regarding the status of this issue.

### E.     Counsel Fees

By Order dated October 8, 2010, plaintiffs were granted leave to file an application for an interim fee award but never did so and, therefore, the issue of attorneys' fees is not currently ripe. The Court, however, finds it prudent to inform the parties as to its preliminary inclination on the subject prior to receiving the benefit of briefing from counsel, although the Court remains open to the parties' input.  To the extent the total amount of general damages awarded by the Court is germane to the calculation of attorneys' fees, the Court intends to consider the entire amount awarded (i.e., $500 multiplied by the entire number of strip searches that occurred), not just the

portion of the amount that is claimed.  Once the "book and bail" issue is decided, the Court can

determine the entire amount to be awarded, and judgement will be entered.  Thereafter, the case

will remain open pending a determination of attorneys' fees.




**SO ORDERED.**

Dated:   Central Islip, New York
         October 19, 2011

                                        /s/
                                        Denis R. Hurley
                                        United States District Judge