UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re NASSAU COUNTY                                        **MEMORANDUM & ORDER**
STRIP SEARCH CASES                                         99-CV-2844 (DRH)
-----------------------------------------------------X     99-CV-3126 (DRH)
                                                           99-CV-4238 (DRH)


**APPEARANCES**:

**For Plaintiffs**:
      Herbst Law PLLC
      420 Lexington Avenue, Suite 300
      New York, New York 10170
      By:    Robert L. Herbst, Esq.

      Giskan Solotaroff Anderson & Stewart LLP
      11 Broadway, Suite 2150
      New York, New York 10004
      By:    Iliana Konidaris, Esq.

      Beldock Levine & Hoffman LLP
      99 Park Avenue, Suite 160
      New York, New York 10016
      By:    Jonathan Moore, Esq.

      Emery Celli Brinckerhoff & Abady LLP
      75 Rockefeller Plaza, 20th Floor
      New York, New York 10019
      By:    Matthew D. Brinckerhoff, Esq.

      Wolf Haldenstein Adler Freeman & Herz, LLP
      270 Madison Avenue
      New York, New York 10016
      By:    Jeffrey G. Smith, Esq.

**For Defendants**:
      John Ciampoli
      Nassau County Attorney
      One West Street
      Mineola, New York 11501
      By:    Dennis J. Saffron, Esq.


**HURLEY, Senior District Judge**:

Presently before the Court is defendants' motion requesting that the Court "reconsider and vacate the portion of the Court's [January 16, 2007] order granting plaintiffs summary judgment on liability, and to instead dismiss these consolidated actions, based on the intervening change in controlling law brought about by the recent decision of the United States Supreme Court in *Florence v. Board of Chosen Freeholders*, 132 S. Ct. 1510 (2012)."  (Defs.' Mem. in Supp. at 1.)  Plaintiffs have opposed defendants' application.  For the reasons set forth below, defendants' motion is granted in part and denied in part.

*BACKGROUND*

The background of this action is set forth in the prior decisions of this Court, familiarity with which is presumed.  The Court will partially reiterate an abbreviated history in order to provide context for the Court's analysis and rulings, *infra*.

Class Certification

In 1999, a district court within this District found that the blanket policy of the Nassau County Correctional Center ("NCCC") of strip searching newly admitted individuals arrested for misdemeanors or non-criminal offenses in Nassau County violated the Fourth Amendment.  *See Shain v. Ellison*, 53 F. Supp. 2d 564 (E.D.N.Y. 1999), *aff'd*, 273 F.3d 56 (2d Cir. 2001).  These consolidated actions were commenced shortly after the District Court's decision in *Shain* in 1999, and sought damages plaintiffs suffered as a result of the NCCC's blanket strip search policy.  Extensive pretrial motion practice ensued, including plaintiffs' numerous attempts to achieve class certification pursuant to Federal Rule of Civil Procedure ("Rule") 23.

In January 2003, in the midst of the class certification motion practice, plaintiffs moved for class certification as to liability only.  In response thereto, defendants conceded their liability.

2

As the Second Circuit later summarized, "defendants conceded 'the one common issue' that in their view 'might be appropriate for class certification . . . namely, whether the NCCC's strip search policy during the class period was constitutional.' [ ] Specifically, defendants recognized that they 'are bound by *Shain* under the doctrine of collateral estoppel.'" *In re Nassau County Strip Search Cases*, 461 F.3d 219, 224 (2d Cir. 2006).

Based on defendants' concession, this Court deleted liability from the certification analysis and denied class treatment. On appeal, the Second Circuit reversed and directed this Court "to certify a class on the issue of liability . . . [and] consider anew whether to certify a class as to damages as well." *Id.* at 231. In accordance with this direction, "and in light of defendants' concession of liability to all class members," the Court certified a class as to liability and entered "summary judgment on liability for all strip searches upon admission to the [NCCC]."[1] (Jan. 16, 2007 Order at 2.)

*The Supreme Court's Subsequent Decision in* Florence

In 2012, the Supreme Court confronted "the question of what rules, or limitations, the Constitution imposes on searches of arrested persons who are to be held in jail while their cases

---

[1] Subsequently, plaintiffs moved to extend class certification to include damages. By Memorandum & Order dated March 27, 2008, the Court found that the issue of general damages due to the asserted injury to human dignity predominated, and concluded that there was "no reason [to believe] that a jury . . . could not determine an amount of general damages awardable to each member of the class." (Mar. 27, 2008 Order at 7-12.) The parties waived the right to a jury trial and submitted the issue of a general damages determination to the Court. After an eleven-day bench trial, the Court awarded general damages in the amount of $500 per strip search. (Sept. 22, 2010 Order at 65-66.) By Memorandum & Order dated October 19, 2011, the Court held that it would not extend class certification to permit plaintiffs to pursue a class-wide award for "garden-variety" emotional distress damages, and concluded that emotional distress damages beyond those which are inseparable from the injury to human dignity may be awarded only on an individual, case-by-case basis. (Oct. 19, 2011 Order at 13-20, 38.)

are being processed." *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 132 S.Ct. 1510, 1513 (2012). "[I]n broad terms, the controversy [before the Court] concern[ed] whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed." *Id.*

At issue before the Court in *Florence* were the "search process[es]" experienced by the petitioner at two separate jails. *Id.* at 1514. In the Burlington County Detention Center, the petitioner was required to shower with a delousing agent and then submit to a corrections officer's close visual inspection, during which the petitioner was instructed "to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals." *Id.* The petitioner "shared a cell with at least one other person and interacted with other inmates following his admission to the jail." *Id.* Six days later, the petitioner was transferred to Essex County Correctional Facility, which was the "largest county jail in New Jersey" and "admit[ted] more than 25,000 inmates each year." *Id.* Upon his arrival, the petitioner was required to pass through a metal detector and then wait "in a group holding cell for a more thorough search."[2] *Id.* Once that search was completed, the petitioner submitted to a "mandatory shower, during which his clothes were inspected," and was "admitted to the facility." *Id.*

The petitioner brought suit seeking relief pursuant to Section 1983 for violations of his Fourth and Fourteenth Amendment rights. The *Florence* case "proceed[ed] on the understanding that the officers [at each facility] searched detainees prior to their admission to the general

---

[2] The petitioner and other detainees were instructed to remove their clothing while a corrections officer "looked at their ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits, and other body openings." *Florence*, 132 S.Ct. at 1514. The petitioner alleged that "he was required to lift his genitals, turn around, and cough in a squatting position as part of the process." *Id.*

population." *Id.* at 1515.

As part of its analysis, the Court stated that "[t]he admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself," and that "[t]here is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population." *Id.* at 1518, 1520.  Overall, the Court concluded that "the search procedures at the Burlington County Detention Center and the Essex County Correctional Facility struck a reasonable balance between inmate privacy and the needs of the institutions," and did not violate the petitioner's Fourth or Fourteenth Amendment rights.  *Id.* at 1523.

### *The Present Motion to Vacate Defendants' Concession of Liability in Light of* Florence

Defendants assert that pursuant to Rule 54(b), "every order short of a final decree is subject to reopening at the discretion of the district judge."  (Defs.' Mem. in Supp. at 1 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 & n.14, 103 S. Ct. 927, 74 L. Ed. 765 (1983)).)  Defendants assert that the Supreme Court's decision in *Florence* represents an intervening change of controlling law that should lead the Court "to vacate [its] prior order granting summary judgment for plaintiffs on the issue of liability and to instead enter summary judgment for defendants dismissing the case."  (*Id.* at 2.)

In opposition, plaintiffs argue (1) that *Florence* does not constitute an intervening change of controlling law "because [it] does not apply to the plaintiff class here" (Pls.' Opp'n at 2), (2) that "defendants should not be relieved of their unlimited and unreserved liability concession nine years ago, [which was] made to gain strategic advantage in the litigation" (*id.*), and (3) that

"*Florence* does not constitute an intervening change in controlling state law, and [, accordingly,] defendants' liability concession and judgment on the independent New York State constitutional claims should not be disturbed."  (Pls.' Opp'n at 17 (the first letter of each word in the quoted excerpt from plaintiffs' brief, unlike the foregoing quote, is capitalized).)

*DISCUSSION*

## I.    Legal Standard

Defendants frame their application as a request made pursuant to Rule 54(b), which provides, in relevant part: "[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. Pr. 54(b).  As the Second Circuit has made clear, however, "[e]ven if Rule 54(b) allows parties to request district courts to revisit earlier rulings, the moving party must do so within the strictures of the law of the case doctrine."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).

"Under the law of the case doctrine, a decision on an issue made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."  *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991).  This doctrine "is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."  *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255.  However, the Second Circuit has "repeatedly stated [that it] will not depart from the law of the case absent cogent or compelling reasons."  *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996) (internal quotation marks and alteration

6

omitted).  "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255 (internal quotation marks omitted).  As noted above, Defendants urge the Court to grant reconsideration of its January 16, 2007 Order granting Plaintiffs summary judgment as to liability because *Florence* constitutes an intervening change of controlling law.

The Second Circuit has made clear that "if, before a case in a district court has proceeded to final judgment, a decision of the Supreme Court demonstrates that a ruling on which the judgment would depend was in error, no principle of the law of the case would warrant a failure on our part to correct the ruling."  *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 951 (2d Cir. 1964) (internal quotation marks omitted)).  "It is not enough," however, that the party moving for reconsideration "could now make a more persuasive argument" based on the newly-decided Supreme Court case.  *See id.*  Rather, "[t]he law of the case will be disregarded only when the court has 'a clear conviction of error' with respect to a point of law on which its previous decision was predicated."  *Id.* (quoting *Zdanok*, 327 F.2d at 953).  "[M]ere doubt . . . is not enough to open [a] point for full reconsideration."  *Id.* (internal quotation marks omitted).

II.    The Impact of Defendants' Concession of Liability

In defining the rationale behind the law of the case doctrine, the Second Circuit has noted that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255.  Here, plaintiffs argue, defendants "did not 'battle for this court's decision' nine years ago;

instead, they conceded liability 'for all purposes.'"  (Pls.' Opp'n at 21.)  Plaintiffs assert that

there is no case law or other legal authority that would support granting defendants' request that

the Court "relieve [them] of their concession, and of the liability judgment to which they agreed,

know[ingly], voluntarily, unreservedly, and for strategic advantage, in a money damages case."

(*Id.*)

Defendants counter that plaintiffs have offered no legal support for their argument that

"had [defendants] continued to contest liability after *Shain*, and thus had summary judgment

imposed upon us in a litigated order, we would now be relieved of that liability under *Florence*,

but because we responsibly and necessarily conceded the issue under *Shain* we are forever bound

by, and [are] subject to damages under, that now discredited case."  (Defs.' Mem. in Supp. at 12-

13.)

Although case law addressing this particular issue is admittedly sparse, there does appear

to be some legal support for the proposition that defendants' concession of liability does not, in

and of itself, prevent this Court from reviewing its summary judgment ruling, which has

admittedly become the law of the case.  The Ninth Circuit's decision in *United States v. Miller*,

822 F.2d 828 (9th Cir. 1987) ("*Miller II*"), is instructive on this issue.  In that case, the defendant

had been convicted of possession of cocaine in violation of 21 U.S.C. § 841(a)(1).  At issue was

the legality of searches of his luggage in two separate airports:  DEA agents had conducted a

warrantless search of his luggage in Atlanta, and then – based in part on evidence garnered from

that warrantless search – a warrant was obtained to search other pieces of his luggage in San

Francisco.  Early on in the case, the government conceded "that the legality of the warrantless

search in Atlanta was conclusive as to the legality of the later search with a warrant in San

8

Francisco." *Id.* at 829. The district court refused to suppress the evidence uncovered in San Francisco, but the Ninth Circuit reversed, relying on the government's concession when it concluded:

> As a result of the unlawful search [in Atlanta], DEA agents obtained tangible evidence that was used as the basis for Miller's arrest and for a warrant to search his other luggage [in San Francisco]. . . . The evidence obtained was thus probative of the crime for which Miller was charged. . . . The fruits of the illegal search must therefore be suppressed.

*Id.* (citing *United States v. Miller*, 769 F.2d 554, 560 (9th Cir. 1985) ("*Miller I*")). This statement and the Circuit's mandate became law of the case. *See id.* The case was then remanded to the district court.

On remand, the government sought to vacate its concession and the district court permitted it to do so "on the ground that *United States v. Leon* had been decided [by the Supreme Court] on July 5, 1984, making a change in the law governing searches based on warrants obtained in good faith." *Id.* at 829 (citation omitted). The district court concluded that the evidence found as a result of the San Francisco search should not be suppressed.

On appeal, the Ninth Circuit determined that "the information actually used to get the warrant in San Francisco was independent of [the illegal Atlanta search and, therefore,] [t]here is no reason to suppress the evidence secured on the basis of the [San Francisco] warrant." *Id.* at 831. The Circuit continued, however: "But are we precluded from reaching this result by the concession that the government first made that the legality of the warrantless search in Atlanta was conclusive as to the legality of [the] San Francisco search?" *Id.* That concession, moreover, "was built upon by [the Circuit] in its first treatment of this case," when it ruled in *Miller I* that "[a]s a result of the unlawful search [in Atlanta], DEA agents obtained tangible evidence that

9

was used as the basis for . . . a warrant to search his other luggage [in San Francisco]."  *Id.* at

832.  That statement, as noted above, "constituted the law of the case."  *Id.*  Nevertheless, the

Circuit answered its own query in the negative by concluding that it was not bound by the law of

the case.

The Ninth Circuit noted that "[t]he difference between the law of the case and *res*

*judicata* is that 'one directs discretion, the other supersedes it and compels judgment.'"  *Id.* at 832

(quoting *Southern Ry. Co. v. Clift*, 260 U.S. 316, 319, 43 S. Ct. 126. 67 L. Ed. 283 (1922)).

According to the Circuit, the question of whether to reconsider the law of the case in order to

prevent a "manifest injustice" was "a matter of discretion."  *Id.*  Overall, the Circuit found that

law of the case doctrine "should not be applied woodenly in a way inconsistent with substantial

justice."  *Id.*  The Circuit concluded that "[t]he concession made by the government, [and] by the

issuance of the mandate in *Miller I*, became the law of the case, but the procedural posture of this

case affords us the opportunity to correct the substantial injustice that would be done were we to

bind the government to its concession."  *Id.* at 833.  After considering the record, the Circuit

decided that it "should not reverse the defendant's conviction because the government made a

mistake in its presentation of a legal argument."  *Id.*

The Eighth Circuit's decision in *Morris v. American National Can Corporation*, 988 F.2d

50 (8th Cir. 1993), is also relevant here.  In that case, a plaintiff who had prevailed on her Title

VII claim appealed the district court's refusal to enhance her attorneys' fee award "based on the

contingency fee arrangement she had with her attorney, and the associated risk that her attorney

would receive no compensation."  *Id.* at 51.  In defending against the plaintiff's appeal, the

defendant argued that the lower court had properly applied the prevailing law at the time, i.e.,

10

Justice O'Connor's concurring opinion in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S. Ct. 3078, 97 L. Ed. 2d 585 (1987) ("*Delaware Valley II*").  *Id.* The defendant did not, however, assert any argument that Title VII's attorneys' fee provision precluded enhancements based on the risks associated with a contingency fee arrangement. *Id.* Because defendant effectively waived that argument, the Circuit declined to address the issue. *Id.*

The Eighth Circuit held "based on prior precedent in this circuit, that Justice O'Connor's opinion was the 'current legal standard for awarding contingency enhancements.'" *Id.* at 52 (internal quotation marks omitted).  The Circuit reversed the district court, however, and remanded the issue for further proceedings.  *Morris v. Am. Nat'l Can Corp.*, 952 F.2d 200, 207 (8th Cir. 1991) ("*Morris II*").  After conducting those proceedings, the district court enhanced the plaintiff's attorneys' fee award by 50% to reflect the contingency fee arrangement.  *Id.* Nineteen days later, however, the Supreme Court issued its decision in *City of Burlington v. Dague*, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992), which held that enhancements for contingency fees were not permitted under certain fee-shifting statutes.  Subsequently, the defendant appealed the district court's recent award of enhanced attorneys' fees, arguing that such enhancements were prohibited by the Supreme Court's intervening decision in *Dague*.

The plaintiff argued that the defendant should not be able to benefit from the intervening *Dague* decision because it had waived the argument upon which the *Dague* decision was based. As such, the plaintiff continued, the traditional exception to the law of the case doctrine, which permits a court to depart from the law of the case in the face of "an intervening decision from a superior tribunal [that] clearly demonstrates the law of the case is wrong," would be

inapplicable.  *See Morris*, 988 F.2d at 52.  The Circuit disagreed, however, concluding that the defendant's waiver was "meaningful only if there is a difference between a law of the case based on a waiver and a law of the case based on briefing and argument."  *Id.*  After noting that neither party had articulated any reasons for such a distinction, the Circuit stated that "no court has ever applied the exceptions to the law of the case doctrine differently when the law was based on a waived issue as opposed to an issue formally presented to the court."  *Id.*  Thus, the Circuit concluded, "the law of the case as a result of waiver is no different than a matter that becomes the law of the case as a result of argument."  *Id.*  The Circuit "appl[ied] the traditional exceptions to the law of the case doctrine," and "[i]n light of the intervening decision in *Dague*, [ ] reverse[d] the enhancement of attorney fees."  *Id.* at 53.

Here, after defendants conceded liability, the Court's January 16, 2007 Order – which granted summary judgment on liability against defendants based on that concession – became the law of the case.  After reviewing the case law described in detail above, the Court concludes that defendants' concession of liability does not, in and of itself, divest this Court of its discretion to reconsider its January 16, 2007 Order.  Although defendants may not have "battle[d] for this court's decision" before conceding liability (*see* Pls.' Opp'n at 21), plaintiffs have failed to cite to any case law standing for the proposition that the law of the case resulting from defendants' concession is any different from law of the case resulting from a "battle."[3]  Indeed, as the Eighth

---

[3]    Plaintiffs' citation to *Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999) is inapposite.  In that case, the Second Circuit dealt with the effect that the enactment of the Prison Litigation Reform Act of 1995 ("PLRA") had on earlier consent decrees entered into to resolve class actions brought by pretrial detainees against the City of New York.  The Circuit described the applicable legal framework as follows: "Under the separation of powers, Congress lacks the authority to alter a finally rendered judgment ordering the payment of money.  On the other hand, to the extent that a court's final judgment consists of an injunction, Congress may require

12

Circuit's decision in *Morris* suggests by way of analogy, there is no meaningful distinction between the two. *See Morris*, 988 F.2d at 52 ("[T]he law of the case as a result of waiver is no different than a matter that becomes the law of the case as a result of argument.").

Thus, the Court turns to the question of whether the Supreme Court's decision in *Florence* constitutes an intervening change in controlling law that justifies this Court's reconsideration of its January 16, 2007 Order.

III.   Defendants Have Demonstrated That *Florence* Constitutes an Intervening Change in Controlling Law

As noted above, the Second Circuit has recognized three circumstances under which a court can justifiably exercise its discretion to depart from the law of the case: (1) "an intervening change of controlling law," (2) "the availability of new evidence," or (3) "the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways*, 956 F.2d at 1255 (internal quotation marks omitted). Defendants assert that the Supreme Court's decision in *Florence* constitutes an intervening change of controlling law. (Defs.' Mem. in Supp. at 2.)

Justice Kennedy, writing for the majority in *Florence*, described the issue before the Court "in broad terms . . . whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed" as part of the correctional facility's intake process. *Florence* 132 S.Ct. at 1513. It was the "search process at each jail [i.e.

---

alteration or termination of its future effect if the law on which the injunction was predicated has been changed." *Benjamin*, 172 F.3d at 161. Plaintiffs argue that, pursuant to this distinction articulated in *Benjamin*, that "judgments in actions at law for damages[ ] are inherently final." (Pls.' Opp'n at 22.) Of course, there has been no "finally rendered judgment ordering the payment of money" in this case, *see Benjamin*, 172 F.3d at 161, nor is there any statutory or Congressional action involved. The cases cited by plaintiffs involving settlement agreements (*see* Pls.' Opp'n at 22-23) are similarly inapplicable.

the Burlington County Detention Center and the Essex County Correctional Facility] that [gave] rise to the claims before the Court."  *Id.* at 1514.

The central issue for present purposes is whether the Supreme Court's repeated use of the term "general population" renders *Florence* inapplicable to the plaintiff class in that the new admittees to the NCCC were initially housed for a period of 72 hours, albeit as a group, apart from other inmates for health assessment purposes.  It was prior to or at the beginning of that process that the class members were strip searched.

      (a)     <u>Positions of the Parties</u>

Plaintiffs contend that *Florence* is irrelevant to the plaintiff class here, all of whom were strip searched upon admissions and deliberately isolated from the general inmate population for 72 hours.  (Pl.'s Opp'n. at 8.)  Plaintiffs further posit that "[i]t is therefore clear  that Justice Alito was noting that *Florence* had no application to the case at bar where every one of the 17,000 class members were misdemeanor, petty offense or civil contempt arrestees housed in separate facilities and not admitted to the general inmate population for 72 hours."  *Id.* at 9.

Defendants' view as to the significance of the term general population as used in *Florence* differs markedly from plaintiffs' view.  Defendants maintain that "*Florence* makes clear that whether a detainee is in the 'general population' is not dependent upon the particular usage of that term at a particular facility, but rather means having contact with other inmates as opposed to being held in isolation."  (Defs.' Mem. in Supp. at 5.)

      (b)     <u>Breadth of Holding in *Florence*</u>

*Florence's* sanctioning of intake strip searches of individuals arrested for minor offenses, absent reasonable suspicion that the arrestees possess contraband, is, by its very nature, broad

14

based.  Indeed, its holding  – prescinding for the moment from the issue as to the meaning of the term "general population" as used in *Florence*  –  calls into question the continued viability of the class certified here as to liability, to wit: "all persons arrested for misdemeanors or non-criminal offenses in Nassau County who thereafter were strip searched at the Nassau County Correctional Center pursuant to defendants' blanket policy, practice and custom which required that all arrestees be strip-searched upon admission to the facility, from May 10, 1996 until and including June 1, 1999."  (*See* Court's Mem. & Order filed on Jan. 16, 2007 at 2.)  And *Florence*, again subject to the caveat concerning the meaning of general population, largely eviscerated the holding by the district court in *Shain*, 53 F. Supp. 2d 564, i.e. the decision upon which the present class action is seemingly predicated.

Although the holding in *Florence* is far-reaching, it falls short of being all encompassing. As Chief Justice Roberts explained in his concurring opinion: "The Court makes a persuasive case for the general applicability of the rule it announces.  The Court is nonetheless wise to leave open the possibility of exceptions, to ensure that we not embarrass the future."  *Florence*, 132 S.Ct. at 1523 (internal quotation marks omitted).

Justice Alito in his concurrence similarly counsels against applying the Court's holding indiscriminately noting "that the Court does not hold that it is *always* reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population."  *Id.* at 1524. Moreover, in Part IV of *Florence*, four of the five justices in the majority (viz. Chief Justice Roberts and Justices Alito, Kennedy and Scalia), explained that "[t]his case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example,

a detainee will be held without assignment to the general jail population and without substantial

contact with other detainees.  This describes the circumstances in *Atwater* [*v. City of Lago Vista

et al*, 532 U.S. 318, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001)]."  *Id.* at 1522-23.

In *Atwater*, a motorist brought a Section 1983 claim against the City, its police chief and

the arresting officer, contending that her Fourth Amendment right to be free from unreasonable

seizure was violated when she was arrested, handcuffed, and detained in jail for one hour for

failing to wear her seatbelt and failing to fasten her children in seatbelts.  532 U.S. at 324.  Her

claim was rejected at the district and circuit levels and, ultimately, by the Supreme Court.  The

Court, in *Atwater,* held that a warrantless arrest for a minor criminal offense, such as a

misdemeanor seatbelt violation punishable only by a fine, is not violative of the Fourth

Amendment.  *Id*. at 355.  The case's significance for present purposes is its being cited in

*Florence* as an example of an arrested individual held "without assignment to the general jail

population," *Florence*, 132 S.Ct. at 1522; Ms. Atwater's contact with the jail consisted of having

her mug shot taken, being "placed . . . alone, in a jail cell for about one hour," and then

appearing before a magistrate and released on bond.  *Id.* at 1523.

In sum, *Florence's* holding is of sufficient breadth to undermine both the common

questions of law and of fact upon which the present federal class certification is based *if*, as

defendants contend, the class members entered into the NCCC's "general population" consistent

with the Supreme Court's usage of that term.

(c)     <u>Meaning of the Term General Population</u>

Absent from *Florence* is a definition of the term general population, thus precluding a

simple answer to this pivotal question.  As a result, reference to the context in which the term is

16

used by the Supreme Court is necessary to determine its meaning.  To begin that analysis, an overview of the intake procedure at the NCCC during the class period is needed.

(i)   Declarations of Michael Golio

Defendants maintain that newly admitted detainees had sufficient contact with other inmates and facility staff to fall within the ambit of *Florence*, relying primarily on the Declaration of Michael Golio dated June 25, 2012 (the "Golio Declaration") as well as his Reply Declaration of Sept. 19, 2012 (the "Golio Reply Declaration").  Golio is an investigator Captain assigned to the Legal Unit of the Nassau County Sheriff's Department, which, in turn, operates the NCCC.  In his declaration, Golio describes the current processing procedures for new detainees, and outlines the contacts that new admittees have with each other and NCCC staff.  Based on his over 25 years of broad-based experience at the NCCC, Golio explains that the "procedures for new detainees now are substantially identical to those [in place] during the class period involved in the litigation."  (Golio Decl. ¶ 5.)

As Golio describes it, the contacts that newly admitted detainees have amongst themselves and with other inmates and staff "begins immediately upon [the detainees'] arrival at the jail, when detainees are kept in holding pens with up to twenty other new admittees while awaiting processing."[4]   (Defs.' Mem. in Supp. at 7; *see also* Golio Decl. ¶¶ 6, 7).  As they are processed, the detainees move from "station to station in the Operations Unit area unescorted and encounter other inmates, both new admits and others, throughout this movement."  (Defs.'

---

[4]  Parenthetically, during the general damages trial held during November and December 2009, class member Kevin Murray testified for plaintiffs that following his arrest on "March 27, 1997," he was placed in a "holding cell at NCCC" with "six to eight" other people.  (*See* Nov. 30, 2009 Trial Transcript ("Tr.") at 171.)

Mem. in Supp. at 7; *see also* Golio Decl. ¶¶ 7, 8.)   At both the clothing room and medical area

stations, the detainees are placed in holding pens with up to twenty other new admittees.  (Defs.'

Mem. in Supp. at 7; *see also* Golio Decl. ¶¶ 9, 10.)  After their medical evaluation, the detainees

"travel unescorted through a corridor to the new admission housing area located in another

building, typically encountering other inmates during this movement."  (Defs.' Mem. in Supp. at

7-8; *see also* Golio Decl. ¶ 11.)

New admission housing is a floor of the NCCC comprised of four tiers with twenty cells

per tier.  (Defs.' Mem. in Supp. at 8.)  Detainees must stay in new admission housing for at least

72 hours (during which time the NCCC obtains medical clearances and reviews inmate history

information) and/or until cleared by a NCCC's medical services provider.  (Golio Decl. ¶ 12)

"Generally, inmates [in new admission housing] are only secured in their [individual] cells

during the daytime at facility population count times, shift change, and during inmate meal

distribution and clean-up procedures."  (*Id.* ¶ 15.)  During the remainder of the day, inmates "are

permitted to congregate in the common area with other inmates housed on their tier [to] watch

the tier television" and engage in other permitted activities.  (*Id.* ¶ 14.)[5]

---

[5] Class members Michael Fanning and Mary Beth Paden submitted declarations in
opposition to the relief sought by defendants in which each estimated the time new admittees
were free to leave their cells [and, thus, free to intermingle with other new admittees] was
limited to one hour daily, rather than the more extensive periods recited in the Golio Declaration.
(*See* Sept. 28, 2012 Decl. of Fanning at ¶ 3 and Sept. 29, 2012 Decl. of Paden at ¶ 5.)  Two other
class members, viz. Heidi Kane and Gregg Wills, filed declarations stating that their respective
experiences upon entry to the NCCC were essentially devoid of contact with other inmates.  (*See*
Sept. 29, 2012 Decls. of Kane and Wills; *see generally*, the Sept. 29, 2012 Reply Decl. of Golio
¶¶ 9 and 10, detailing, inter alia, how the experiences recited by the four class member
declarants are  not representative of the approximately 17,000 class members, and is also at odds
with the then operative "official Policies & Procedures of the Sheriff's Department" which
mandated that "inmates housed in 'New Admit' housing areas are to be afforded six hours of time
out of their cells in their assigned housing area each day consistent with facility safety and

(ii)    <u>Plaintiffs' Opposition to Defendants' Reliance Upon, and the Court's Consideration of the Golio Declaration</u>

Plaintiffs, in their opposition papers, attack Golio's Declaration dated June 25, 2012 on multiple fronts, including its use by defendants in endeavoring to undo their concession of liability and as to its relevance.  As to the first argument, plaintiffs label the information provided by Golio as not "newly discovered" and, thus, an improper vehicle for reconsideration. (Pls.' Opp'n at 12-13.)  That argument is unavailing, however, given that the relevance of the subject information did not materialize until *Florence* was decided.

In questioning the Declaration's relevance, plaintiffs posit that it is "cast in language which purports to describe the present day rather than the class period many years ago."  *(Id.* at n.1.)  That deficiency – assuming its existence — has been remedied via the submission of Golio's Reply Declaration filed on September 29, 2012.  The explanations provided therein, based on his extensive experience at the NCCC before, during, and after the class period, easily satisfy relevancy requirements and, accordingly, the information in his Declarations will be considered by the Court in deciding defendants' motion.

(iii)    <u>Plaintiffs' Argument is Based on an Overly Restrictive Interpretation of *Florence*</u>

Plaintiffs essentially maintain that since NCCC draws a distinction between new admittees on the one hand, and inmates in what it calls its "general population" on the other, and

---

security concerns," citing Nassau County Sheriff's Department Policies & Procedures No. CD-08-01-02, eff. June 14, 1994 (attached as Ex. A), § X(B) at 6.)

Incidently both Fanning and Wills, after being strip searched sometime prior to, or during the first 72 hours of confinement, were placed in NCCC's general population, unlike Kane and Paden who were not.

given that the Supreme Court couched its holding in terms of certain detainees being strip searched prior to being admitted to a facility's "general population," it necessarily follows that *Florence* is irrelevant, i.e. "does not apply to this case and does not support, let alone require, vacating the liability judgment on, and dismissing, the federal claims." (Pls.' Opp'n at 3.) That argument is well articulated, straightforward, and certainly has considerable surface appeal. Yet, upon closer scrutiny, its flaws become manifest. To begin, it is out-of-sync, and irreconcilable with the rationale driving the decision in *Florence*, viz. the need to promote safety and security within the institution. Beyond that, the contention that *Florence* is not germane to defendants' motion fails to take into account that this is a class action and, as such, its very existence requires the presence, inter alia, of "questions of law or fact common to the class," Fed. R. of Civ. P. 23(a)(2), and a finding by the Court that such questions "predominate over any questions affecting only individual members." *Id.* at (b)(3).

These two problems with plaintiffs' argument will be discussed in turn.

### A. Equating the Supreme Court's Use of the Term "General Population" with NCCC's is Problematic

NCCC draws a distinction between new detainees segregated for the first 72 hours for health evaluation purposes (albeit as a group, or in groups), and those inmates who have already gone through that process. If that distinction is meaningful for *Florence* purposes as plaintiffs insist, it would mean that new admittees, arrested on minor matters, could not be strip searched upon their arrival at the NCCC absent reasonable suspicion to believe they harbored contraband. However, evidence proffered by *both* plaintiffs and defendants demonstrates that new admittees had, at a minimum, at least *some* non-incidental interaction with other inmates and staff during

20

that initial period.[6]  Under the circumstances, the proffered artificial line of demarcation urged by plaintiffs is inconsistent with safety concerns so clearly articulated in *Florence*.  *See, e.g., Florence*, 132 S.Ct. 1518-19 ("Jails and prisons . . . face grave threats posed by the increasing number of gang members who go through the intake process. . . . Fights among feuding gangs can be deadly, and the officers who must maintain order are put in harm's way. . . . These considerations provide a reasonable basis to justify a visual inspection for certain tattoos and other signs of gang affiliation as part of the intake process.  The identification and isolation of gang members before they are admitted protects everyone in the facility."); *id.* at 1520 ("Concealing contraband often takes little time and effort.  It might be done as an officer approaches a suspect's car or during a brief commotion in a group holding cell.  Something small might be tucked or taped under an armpit, behind an ear, between the buttocks, in the instep of a foot, or inside the mouth or some other body cavity"); *id.* ("The record provides evidence that the seriousness of an offense is a poor predictor of who has contraband. . . . People detained for minor offenses can turn out to be the most devious and dangerous criminals"); *id.* at 1521 ("It also may be difficult, as a practical matter, to classify inmates by their current and prior offenses before the intake search.  Jails can be even more dangerous than prisons because officials there

---

⁶ As plaintiffs, in endeavoring to downplay the significance of the Golio Declaration, state: "[T]he Golio Declaration does not really contravene the essential thrust of the Donahue, Gregg and Fanning Declarations and the testimony of Sheriff Jablonsky and Lt. Considine.  The fact that new admits are held in temporary cells for a short time upon entering the facility, and that when escorted to their own cells in the separate new admit housing facility, *they may congregate in a common area for some period of time* . . . does not [, Plaintiffs' argument continues,] amount to *substantial* contact, and hardly constitutes the sustained, prolonged and often unrestricted intermingled contact in general population to which *Florence's* holding is cabined."  (Pls.' Opp'n at 14 (emphasis added).)  As stated in the text, the Court disagrees with the final conclusion drawn by Plaintiffs.

know so little about the people they admit at the outset. . . . An arrestee may be carrying a false ID or lie about his identify.  The officers who conduct an initial search often do not have access to criminal history records.").

In sum, the Court finds plaintiffs' interpretation of *Florence* to be overly restrictive. Segments of the NCCC inmate population, as well as staff, were exposed to the same type of security, health and safety risks from new admittees before the health assessment process was completed as afterwards.  Accordingly, plaintiffs' efforts to establish a bright line separating the pre and post assessment periods is unavailing. If new admittees were typically isolated during the initial period, like Ms. Atwater in *Atwater*, 532 U.S. 318, the situation would be otherwise. But, as just noted, there is no material issue as to the pivotal fact that non-de minimis interaction between and among new admittees and others was commonplace at NCCC during the class period.  Whether the new admittees were, for example, free to intermingle outside their cells during the first 72 hours for only 1 hour daily as class members Fanning and Paden testified (*see* n.5, *supra*), or 6 hours daily as Golio averred and as the then applicable Sheriff's Department Policies mandated (*see* page 18 and n.5, both *supra*), is a matter of degree, not substance.  Under either scenarios, the type of perilous contacts underscored in *Florence* were present.

B.    Plaintiffs' Position That *Florence* is not an Intervening
      Change in the Law Fails to Recognize its Effect on the Presently
      Certified Class Action as to Liability

Juxtaposing of the class, as certified, with the holding in *Florence* indicates their incompatibility.  Indeed *Florence* removes the core of the class, i.e. persons who were strip searched absent reasonable suspicion upon their admission to the NCCC following their arrests for misdemeanors or lesser offenses.

22

To the extent plaintiffs, as well as defendants, make reference to Parts III and IV of the majority opinion and to Justice Alito's concurrence, the shared import of those portions of *Florence* is that some individuals, depending on the circumstance,[7] might have viable Fourth Amendment claims to the effect that they should not have been placed in the general population and thus in a position to interact with other inmates and staff, but rather should have been isolated thereby eliminating the need for strip searches to be conducted.  That issue was left undecided by the Supreme Court.  *Florence*, 132 S.Ct. at 1522-23 ("This case does not require the Court to rule on the type of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees.  This describes the circumstances in *Atwater*.")  But more importantly for present purposes, that issue is not articulated in plaintiffs' amended class action complaint as one of the grievances asserted against defendants.  Instead, the complaint speaks solely of "[d]efendants' policy, practice and custom of conducting strip/body cavity searches absent reasonable suspicion, . . . on a class of persons arrested for or charged with non-felony offenses who are admitted to the Nassau County Correctional Center in East Meadow (the 'County Jail')."  (Am. Class Action Compl. filed in *Gardy Augustin v. Jablonsky*, 99 Civ 3126, ¶ 2.)  Simply put, the present action is not framed to address the Ms. Atwater type of hypothetical claims.  But, if contrary to the fact, it was, such class members would be merely a subset of the approximately 17,000 class members.  And therein is the problem.  *Florence*, as noted, destroyed the commonality as to both law and fact which linked the class members together consistent with

---

[7] One such circumstances presumably would entail the space and staff available in the facility at the time of the arrestee's admission.

Second Circuit law prior to the Supreme Court's decision.  Maintenance of a class action – or, in this case, continuation of such an action – requires, inter alia, that there be at least one question of law or of fact common to all class members, *see D'Alauro v. G.S. Services Ltd. Partnership*, 168 F.R.D. 451, 455-56 (E.D.N.Y. 1996), and that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Given that *Florence* has, in essence, discredited the rationale embodied in such cases as *Shain v. Ellison*, 53 F. Supp. 2d 564, and, in the process, sanctioned the type of searches complained about in the instant amended class action complaint, plaintiffs are, at a minimum, no longer able to satisfy the predominance standard found in Rul 23(b)(3).

IV.    Defendants' Interpretation of *Florence* is Sound

Defendants maintain, correctly in my view, that the NCCC's usage of the term general population does not determine the applicability of *Florence*.  Instead, it is the contact between new admittees with other inmates and staff at the NCCC that is controlling.  As a result, and for the reasons already provided, I find that *Florence* constitutes an intervening change in the law, notwithstanding plaintiffs' well articulated, but unpersuasive protestations to the contrary.

The legitimacy of defendants' position is further reinforced by reference to the circumstances surrounding Florence being strip searched at the Burlington County Jail.  The Supreme Court explains that Florence "shared a cell with at least one other person and interacted with other inmates following his admission to jail."  *Florence*, 132 S.Ct. at 1514.  Later, the Court addressed his undergoing the same type of procedure at the Essex County Correctional

Facility.  However, it seems clear that "the search process at each jail" was considered

separately.  *Florence*, 132 S.Ct. at 1514.[8]

The purpose of citing Florence's experience at Burlington is that his interaction with

other inmates there was essentially the same as what occurred with respect to many, if not most

members of the present class.  And, of course, Florence's search at Burlington passed

constitutional muster.

V.    *Florence* Does Not Constitute an Intervening Change in Controlling New York State
       Law and, Accordingly, Defendants' Concession of Liability on the Independent New
York   State Constitutional Claims are Unaffected

In plaintiffs' amended complaint, both federal and state claims are asserted.  As to the

latter, plaintiffs allege that their strip searches at NCCC violated Article I, Section 12 of the New

York State Constitution.[9]  In their November 4, 2003 concession letter, defendants conceded

liability "for all purposes in this action against all remaining defendants."  (Case No. 99 CV

3126, Docket No. 43).  As a result, summary judgment as to liability was entered against

defendants on behalf of the "class and every member thereof."  (Case No. 99 CV 2849, Docket

No. 122).

Although *Florence* does constitute an intervening change in the law with respect to

plaintiffs' federal claim and, as a result, warrants vacatur of the County's concession of liability

---

[8]  Were the situation otherwise, perhaps it could be argued that the search at Burlington
was somehow legitimized as a precondition to his admission to the Essex County Correctional
Facility.

[9]  Article I, Section 12 of the New York State Constitution provides in pertinent part:
"The right of the people to be secure in their persons, houses, papers and effects, against
unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon
probable cause, supported by oath or affirmation, and particularly describing the place to be
searched, and the persons or things to be seized."

25

as to that claim, the same may not be said with respect to the state-based constitutional cause of action.

Counsel have not provided, nor am I personally aware of any New York case pertaining to strip searches conduced in a correctional facility challenged under Article 1, Section 12 or other provision of State law.  However, I have been provided with state decisions involving strip searches done by police officers.  Those decisions demonstrate that, at least in that type of situation, New York State Courts require reasonable suspicion as a precondition to strip searching an arrestee charged with a misdemeanor or lesser offense under Article I, Section 12 of the New York State Constitution.  *See People v. Motherwell*, 926 N.E.2d 1219 (2010) and cases cited therein.

How New York courts will decide a case factually analogous to the one at bar under Article I, Section 12 remains to be seen.  That they might not adopt the *Florence* rationale is certainly well within the realm of possibility.  The New York Court of Appeals has noted that:

> [w]e have on many occasions interpreted are own Constitution to provide greater protection when circumstances warrant and have developed an independent body of state law in the area of search and seizure . . . . We have adopted separate standards when doing so best promotes predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens."

*People v. Weaver*, 909 N.E.2d 1195, 1202 (2009) (internal quotation marks and citations deleted); *see also People v. Dunn*, 564 N.E.2d 1054 (1980).

For the reasons indicated, plaintiffs' present class action, insofar as it is based on a purported violation of the New York State Constitution remains viable notwithstanding *Florence*.  Therefore, defendants' application to withdraw its concession of liability as to this

state-based claim is denied.

### CONCLUSION

Defendants' motion to vacate the portion of the January 16, 2007 Order granting summary judgment to plaintiffs as to liability is granted as to the federally-based constitutional claim, and plaintiffs' "FIRST CLAIM FOR RELIEF," brought pursuant to "42 U.S.C. §1983," is dismissed with prejudice.  (Am. Compl. in *Augustin et al v. Jablonsky et al*, 99 Civ 3126(DRH)(ARL) at 25.)  However, plaintiffs' state-based constitutional claim, i.e. their "SECOND CLAIM FOR RELIEF," brought pursuant to "New York State Constitution Art. 1, § 12," *id.* at 26, is unaffected by *Florence;* accordingly, defendants' application to vacate the portion of previously identified summary judgment order with respect thereto and to dismiss the underlying cause of action, is denied.

SO ORDERED.


Central Islip, New York
Dated: July 18, 2013


_____/s/_____
DENIS R. HURLEY, U.S.D.J.