UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

                              MEMORANDUM AND ORDER
                                99-CV-3126(DRH)
In re NASSAU COUNTY STRIP        99-CV-2844(DRH)
SEARCH CASES                     99-CV-4238(DRH)

------------------------------X
A P P E A R A N C E S:


For Plaintiffs:
     Herbst Law PLLC
     420 Lexington Avenue - Suite 300
     New York, New York 10170
       By: Robert L. Herbst, Esq.

     Giskan Solotaroff Anderson & Stewart LLP
     11 Broadway Suite 2150
     New York, New York 10004
       By: Iliana Konidaris, Esq.

     Beldock Levine & Hoffman LLP
     99 Park Avenue, Suite 1600
     New York, New York 10016
       By: Jonathan C. Moore, Esq.

     Emery Celli Brinckerhoff & Abady LLP
     75 Rockefeller Plaza, 20th Floor
     New York, New York 10019
       By: Matthew D. Brinckerhoff, Esq.

     Wolf Haldenstein Adler Freeman & Herz, LLP
     270 Madison Avenue
     New York, New York 10016
       By: Jeffrey G. Smith, Esq.

For Defendants:
     Nassau County Attorney's Office
     Carnell T. Foskey
     Acting County Attorney
     One West Street
     Mineola, New York 11501
       By:  Liora M. Ben-Sorek, Esq.

HURLEY, Senior District Judge

Pending before the Court is plaintiffs' motion, made pursuant to Federal Rules of Civil Procedure 23(h) and 54(d)(2) for counsel fees in the amount of $5,754,000, plus costs and expenses of $182,030.25, for a total of $5,936,030.25. In addition, plaintiffs seek to recover service awards for those class members who were deposed during pretrial discovery and/or testified at trial.

Defendants oppose plaintiffs' applications, arguing (1) the fees sought are excessive, (2) counsels' time records are inadequate, (3) the proposed hourly rates are excessive, (4) service awards are unavailable under New York State law, and (5) that "because plaintiffs' federal claims were dismissed and the only remaining claims are pendent state law claims, the class definition and applicable class period must be redefined." (Defs.' Br. in Opp'n at i (the "TABLE OF CONTENTS )(original all in upper case).)

## BACKGROUND

The plaintiffs' class consists of 17,000 individuals who were strip searched during the class period[1] upon their admission to the Nassau County Correctional Center ("NCCC") for misdemeanor or lesser offenses absent reasonable suspicion that

_____

[1] The class period extends from May 20, 1996 until and including June 1, 1999.

they harbored contraband.  Some of those individuals were arrested and admitted to the NCCC more than once so that the total of the subject strip searches exceeds the number of class members.

The case has been hotly contested for over thirteen years.  The particularly salient portions of its extended history are accurately synopsized by plaintiffs thusly:

> These consolidated lawsuits were brought by 10 named plaintiffs and class representatives who were all strip searched upon admission at the Nassau County Correctional Center ["NCCC" or "Jail"] without reasonable suspicion and without even a reasonable suspicion inquiry.  The actions were brought after the undersigned had obtained a decision from another judge of this Court that the blanket strip search policy at the NCCC was unconstitutional.  See Shain v. Ellison, 53 F. Supp. 2d 564 (E.D.N.Y. 1999).  For years thereafter, defendants took the position that Shain was wrongly decided, and vigorously pressed their appeal through the Second Circuit, which several years later affirmed by a divided panel.  Shain v. Ellison, 273 F.3d 56 (2d Cir. N.Y. 2001).  Defendants' petition for certiorari was denied.  Nassau County v. Shain, 573 U.S. 1083 (2002).
>
> Meanwhile, plaintiffs here were seeking class certification in the District Court.  Ultimately, there were three unsuccessful motions for class certification in the District Court, and two unsuccessful interlocutory appeals to the Second Circuit.  After Shain was confirmed on appeal, defendants unequivocally conceded

liability[2] to the class as [an arguable] stratagem to avoid class certification and succeeded in obtaining another denial of class certification.  Finally, in July 2005, after settling the individual claims of the 10 named plaintiffs for a total of $350,000, plaintiffs had a final judgment appealable as of right.  The Second Circuit reversed and ordered class certification on liability and reconsideration of class certification on damages.  Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461 F.3d 219 (2d Cir. 2006).

   With the class now certified as to liability, plaintiffs obtained summary judgment on liability in favor of the class and each of its members, again on consent of the defendants without caveat or conditions, reservations or qualifications.  Plaintiffs then sought certification on damages.  In response to the Court's concerns that a common damages issue was lacking, plaintiffs argued and ultimately persuaded the Court that an unconstitutional strip search necessarily entailed an injury to human dignity, and that this injury was common to the class with respect to both causation and some of the resulting damages sustained. Accordingly, in a March 27, 2008 decision, the Court certified the class for damages.

(Pls.' Mem. in Supp. at 5-6.)

   After the March 27, 2008 decision, further efforts to settle the case were pursued, additional discovery was conducted, and various motions were made by parties concerning such issues

_____

   [2]  In defendants' November 4, 2003 concession letter, defendants conceded liability "for all purposes in this action against all remaining defendants."  (Case No. 99 CV 3126, Docket No. 43.)  As a result, summary judgment as to liability was entered against defendants on behalf of the "class and each and every member thereof."  (Case No. 99 CV 2844, Docket No. 122.)

as the rules and procedures to be employed during this apparently

unprecedented general, as distinct from special, damages segment

of the class action proceeding.

Returning to the history of the case as provided by

plaintiffs:

> On the eve of trial, the parties agreed to
> waive a jury, and the trial proceeded before
> the Court, over 11 trial days. [Proposed
> f]indings of fact and conclusions of law and
> post-trial briefing were all completed by
> April 2010.  In a . . . decision on September
> 22, 2010, the Court issued findings of fact
> and conclusions of law and awarded class
> members $500 in human dignity damages for
> each unlawful strip search he or she
> sustained.  In re Nassau County Strip Search
> Cases, 742 F. Supp. 2d 304 (E.D.N.Y. 2010).
>
> Extensive . . . briefing followed on how
> to handle the second damages phase of the
> case, and whether those damages could be
> handled and resolved on a class-wide basis.
> On October 19, 2011, the Court determined
> that it would subsequently enter a judgment
> decertifying the class for [special damages
> purposes], leaving it to each class member
> individually to pursue emotional distress and
> economic loss damages, by using the summary
> judgment on liability obtained for the class
> to commence their own lawsuits for such
> damages.  Augustin v. Jablonsky, 2011 U.S.
> Dist. LEXIS 121000 (E.D.N.Y. Oct. 19, 2011).

(Pls'. Mem. in Supp. at 7.)

Following plaintiffs' current post-trial application

for counsel fees and other items of relief being filed, the

Supreme Court issued its decision in Florence v. Bd. of Chosen

Freeholders of Cnty. of Burlington, 132 S. Ct. 1510 (2012) which

held that the strip searching of a detainee charged with a misdemeanor or lesser offense as part of the standard intake procedure at a correctional facility, even absent reasonable suspicion to believe that he or she harbors contraband, is not violative of the Fourth or Fourteenth Amendment.

Based on the holding and rationale in Florence, defendants moved to (1) vacate their earlier unconditional concession of liability and the resulting Court orders, and (2) dismiss the entire suit, i.e. both the federal and state constitutional claims.

By Memorandum and Order dated July 18, 2013, defendants' Florence-based application was granted to the extent that the portion of the January 16, 2007 Order granting summary judgment as to liability on plaintiffs' § 1983 claim was vacated and the underlying federal claim dismissed. However, their motion was denied as to the cause of action based on Article 1, § 12 of the New York State Constitution. The viability of that claim is not dictated by Florence contrary to the position urged by defendants. See In re Nassau Cnty. Strip Search Cases, 958 F. Supp.2d 339, 354 (E.D.N.Y. 2013).

It may be that the New York Court of Appeals will at some point be asked by the Second Circuit via a Rule 27.2 certification request to answer questions about such matters as the effect of Florence, if any, upon the legality of the type of

strip searches under discussion under Article I, Section 12 of the New York State Constitution.  Of course, it is not a foregone conclusion that the position of the State's highest court will mirror that of their counterparts in Washington even though the language of the federal and state constitutional provisions are the same.  See generally 31 Carmody-Wait 2d § 173:254 ("Although the language of the Fourth Amendment is identical to words found in the Bill of Rights of the New York State Constitution, judicial interpretation of these words by the United States Supreme Court and the New York Court of Appeals have begun to diverge significantly on important search and seizure issues.")(internal citations omitted).  However, the possible need for certification does not warrant abandoning the supplemental jurisdiction exercised by this Court over these many years in view of the advanced stage of the proceeding.  See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004).

Given that I have retained jurisdiction, the award of $500 per strip search, inter alia, remains intact.

APPLICATION FOR ATTORNEYS' FEES AND
FOR REIMBURSEMENT FOR COSTS AND EXPENSES

I.  Applicable Legal Principles Concerning Legal Fees
    in Common Fund Class Actions

As explained by the Second Circuit in Goldberger v. Integrated Res., Inc.:

From time immemorial it has been the rule

in this country that litigants are expected
to pay their own expenses, including their
own attorneys' fees, to prosecute or defend a
lawsuit.  There is a salient exception to
this general rule that applies where an
attorney succeeds in creating a common fund
from which members of a class are compensated
for a common injury inflicted on the class.
In that situation, the attorneys whose
efforts created the fund are entitled to a
reasonable fee – set by the court – to be
taken from the fund.  The rationale for the
doctrine is an equitable one: it prevents
unjust enrichment of those benefitting from a
lawsuit without contributing to its cost.
Courts have used two distinct methods to
determine what is a reasonable attorneys'
fee.

The first is the lodestar, under which the
district court scrutinizes the fee petition
to ascertain the number of hours reasonably
billed to the class and then multiplies that
figure by an appropriate hourly rate.  Once
that initial computation has been made, the
district court may, in its discretion,
increase the lodestar by applying a
multiplier based on "other less objective
factors," such as the risk of the litigation
and the performance of the attorneys.  Id.
(internal quotation marks omitted).

The second method is simpler.  The court
sets some percentage of the recovery as a
fee.  In determining what percentage to
award, courts have looked to the same "less
objective" factors that are used to determine
the multiplier for the lodestar.

209 F.3d 43, 47 (2d Cir. 2000)(internal citations omitted).

Either approach may be utilized in calculating

attorneys' fees, <u>id.</u> at 50,[3] although "[t]he trend in this Circuit is toward the percentage method" in that it avoids the "tempt[ation of] lawyers to run up their hours," lessens the need for "district courts to engage in a gimlet-eyed review of line-item fee audits," and "directly aligns the interests of the class and its counsel." <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96, 121 (2d Cir. 2005)(citation and quotation marks omitted).

"It bears emphasis [, however,] that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." <u>Goldberger</u>, 209 F.3d at 47. As a guide to assist district courts in making that overriding determination, the Circuit has identified the following factors for consideration: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the [recovery achieved]; and

---

[3]  The same two methods are also utilized under the law of the State of New York.  <u>See, e.g.,</u> <u>Flemming v. Barnwell Nursing Home and Health Facilities, Inc.,</u> 56 A.D.3d 162, 165 (3d Dep't 2008),<u>aff'd,</u> 15 N.Y.3d 375 (2010); <u>Fiala v. Metro. Life Ins. Co.,</u> 27 Misc. 3d 599, 611 (Sup. Ct. N.Y. Co. 2010).  Parenthetically, <u>Flemming</u> was partially overruled on another ground by a 2011 amendment to CPLR Rule 909, as indicated in the practice commentaries to that Rule.  <u>See</u> Alexander, Practice Commentaries, McKinney's CPLR Rule 909.

(6) public policy considerations."  Id. at 50 (citation and
quotation marks omitted).  Henceforth, these factors will be
referred to collectively as the "Goldberger factors."

II.  Calculation Method Requested by Plaintiffs
     and Utilized by Court

        Plaintiffs request that counsel fees be awarded based
on a percentage of the common fund created for the benefit of the
class with a lodestar cross-check to assure reasonableness.  An
appropriate percentage, plaintiffs posit, would be "50% of the .
. . aggregate class damages award."  (Pls.' Mem. in Supp. at 3.)

        Defendants recognize that plaintiffs' proffered
methodology is appropriate as a general matter.  (Defs.' Br. in
Opp'n at 2 ("On July 18, 2013, . . . this Court . . . dismissed
the class Plaintiffs' Federal law claims. . . .  By reason
thereof, § 1988 is inapplicable and no attorneys' fees may be
awarded to Class Counsel under the fee-shifting statute.  What
remains, then, is an analysis of attorneys' fees under either the
'presumptively reasonable fee' (i.e. modified lodestar) method,
or the 'percentage of the fund' method.").)

        The Court will use plaintiffs' suggested method.  Since
that method implicates both the percentage approach, as well as
the lodestar method, albeit only as a cross-check, both warrant
further discussion.

III.  Additional General Observations About Percentage
      Method With Lodestar Cross-Check Enhanced by Multiplier

A.  Percentage Based on Total Amount Recovered

The percentage method, as already defined, is largely self-explanatory.  However, it is important to note that the percentage is applied to the total amount recovered on behalf of the class (i.e. the "common fund"), not to the lesser sum that in all probability will be claimed by members of the class from that fund.  Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980)("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); see also Velez v. Novartis Pharm. Corp., 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010)("[T]his Circuit has ruled that '[a]n allocation of fees by percentage should therefore be awarded on the basis of total funds made available **whether claimed or not.**'") (emphasis in original)(quoting Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 437 (2d Cir. 2007)).  The amount of the common fund here is $11,508,000, derived from multiplying the number of subject strip searches, viz. 23,016, by the general damage award of $500 per strip search.

B.  Caveats Regarding Use of Percentage Method

Although utilization of the percentage method in setting counsel fees in common fund cases may be the "trend in [the] Circuit," the practice is not without pitfalls.  Wal-Mart

Stores, Inc., 396 F.3d at 121.  As mentioned in Goldberger:

> [E]ven a theoretical construct as flexible as
> a 'benchmark' seems to offer an all too
> tempting substitute for the searching
> assessment that should properly be performed
> in each case.  Starting an analysis with a
> benchmark could easily lead to routine
> windfalls where the recovered fund runs into
> the multi-millions.  Obviously, it is not ten
> times as difficult to prepare, and try or
> settle a 10 million dollar case as it is to
> try a 1 million dollar case.

209 F.3d at 52 (citation and internal quotation marks omitted).

   C.   Law Pertaining to Plaintiffs' Request for a
        Multiplier of the Lodestar Amount

        As earlier noted, the lodestar method requires "the
district court [to] scrutinize[] the fee petition to ascertain
the number of hours reasonably billed to the class and [to] then
multipl[y] that figure by an appropriate hourly rate."  Goldberg,
209 F.3d at 47.  To the resulting sum, "enhancements may be
awarded in rare and exceptional circumstances."  Perdue v. Kenny
A. ex rel. Winn, 559 U.S. 542, 552 (2010)(citations and internal
quotation marks omitted).  The lodestar may be increased, in the
Court's discretion, "based on factors such as the riskiness of
the litigation and the quality of the attorneys."  Wal-Mart
Stores, Inc., 396 F.3d at 121.

        Plaintiffs are requesting that the unadjusted lodestar
be enhanced by a 1.29 multiplier which, they argue

> [is] an extremely modest multiplier when
> considering the framework of multipliers

> commonly approved in this Circuit in other
> common fund percentage-of-recovery cases,
> where multipliers ranging from 2 to 5.5 and
> higher are acceptable and routinely awarded.
> [citing <u>Wal-Mart Stores v. Visa USA, Inc.</u>,
> 396 F.3d at 123.]

(Pls.' Mem. in Supp. at 3.)  That request will be addressed later

in the text.

IV.  May 20, 1999 is the Commencement Date for
     Computing Counsel Fees and Costs, not
     July 5, 2005 as Urged by Defendants

     As noted, plaintiffs seek counsel fees and expenses

incurred from May 1999 through January 13, 2012, explaining that

"[o]ne advantage of using the percentage-of-recovery method and a

positive multiplier to award an enhanced fee rather than [the]

lodestar might be to avoid the need to make successive fee

applications for this future work."  (Pls.' Mem. in Supp. at 8

n.4.)

     Defendants maintain that counsel fees and costs

incurred for the period from "May 20, 1999 through July 5, 2005"

may not exceed $125,000.00.  (Defs.' Br. in Opp'n at 7.)  The

proffered reason for their position is that the parties settled

the claims of the ten individual plaintiffs named in the then

consolidated actions on July 5, 2005, agreeing that the maximum

attorneys fees that could be collected for the period from the

commencement of the action until the date of settlement was

$125,000.  (<u>Id.</u>)  However, as plaintiffs aptly point out, "[t]he

$125,000 cap on attorneys fees was a negotiated term of the settlement <u>for the individual</u> <u>claims and only if the Second</u> <u>Circuit did not later grant class certification on appeal</u>." (Pls.' Reply at 3-4 (emphasis in original).)  That precondition to the cap did not occur, thus rendering the subject provision meaningless for present purposes.

To the extent defendants claim that the $125,000 figure constitutes some type of admission that "the reasonable value of attorneys' fees and costs" during that time frame was $125,000 or less, Defs.' Br. in Opp'n at 7, plaintiffs emphasize that defendants, and understandably so, presumably declined to factor into the settlement negotiations plaintiffs' then unsuccessful efforts to obtain class certification.  (Pls.' Reply at 4.) Indeed, although the class was not certified until years later, plaintiffs' counsel sought class certification from the outset of the litigation in May 1999.

In sum, defendants' position that counsel fees and costs should only be determined from July 5, 2005 lacks merit. Instead, the May 20, 1999 date will be used as the starting point for calculation purposes.

V.   <u>Defendants' Objections to Plaintiffs' Billing Records</u>

Defendants object to the general format of plaintiffs' billing records and also find fault with certain specific aspects of their submissions.  Although there is a significant overlap

between the two categories, an effort will be made to address each separately.

A. <u>General Objection to Billing Records</u>

Defendants contend that the billing records submitted by plaintiffs are as a general matter insufficiently detailed to permit an award of counsel fees.[4]  The legitimacy of that claim is largely dispelled by a perusal of the detailed billing records which provide adequate information for the Court to determine hourly rates for the various service providers consistent with the <u>Goldberger</u> criteria.  That is not to say that plaintiffs' materials are devoid of shortcomings.  Such is not the case.  For example, the "FEE SUMMARY" submitted by Emery Celli Brinckerhoff & Abady LLP, has eleven individuals listed under the "LAWYER" column as having worked on the case.  <u>See</u> Tab 5 to binder entitled "Time Records, In Camera Review."[5]  Reference to the March 19, 2012 Declaration of Matthew D. Brinckerhoff shows that

_____

[4]  The billing records consist of (1) the time records maintained by each of the five firms participating in the representation of the class, which records list the date, time expended, and nature of the service provided by each attorney or paralegal as the case may be who worked on the case ("service provider") (identified by his or her initials), and (2) the concomitant Declarations of Attorneys Herbst, Smith and Brinckerhoff which – subject to some notable exceptions to be discussed in the text, <u>infra</u> – provide the names, together with background information, of the individual service providers.

[5]  Notwithstanding the "in Camera Review" portion of the caption, the records were made available to defendants pursuant to a subsequent court order.

three of those service providers were "paralegals" for whom no
background or other pertinent information is provided.  More
importantly, background information is provided in the
Declaration for only two of the eight attorneys listed, viz. Mr.
Brinckerhoff and Ms. Wang.  However, that gap is not a major
problem since (1) the work of those two attorneys comprise
approximately 90% of that firm's attorney hours, and (2) of the
other six "LAWYER[S]," reference to the firm's website provided
in paragraph 4 of the Declaration gives the background and
partnership status of four, leaving only two lawyers
insufficiently identified to permit a full assessment of the
value attributable to their hours of service.  As to those two
lawyers, their billing rates suggest they are probably partners.
Nonetheless given absence of other information, each has been
treated as an associate. For the paralegals, the base hourly rate
of $70 for that classification has been assigned.[6]  To the extent
the billing submissions of other class counsel suffer from
similar insufficiencies, the same methodology of adjusting
billing rates will be applied.  Gagasoules v. MBF Leasing LLC,
2013 WL 1760134, at *4 (E.D.N.Y. Apr. 24, 2013); and Prot. One
Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC, 553 F.
Supp. 2d 201, 209 (E.D.N.Y. 2008)("Where the moving party fails

---

[6]  See p. 23, infra.

to provide information on the attorneys' and paralegals'
backgrounds and experience, courts have used their discretion to
award fees at a rate lower than requested.").

    B.  <u>Specific Objections to Billing Records</u>

        Defendants also maintain that plaintiffs' billing
records are inadequate in a number of particulars, including (1)
"[c]ounsels' fee application . . . do[es] not specify whether the
applied billing rate takes into consideration the levels of the
attorneys' experience over the course of the litigation," citing
<u>Williams v. N.Y.C. Hous. Auth.</u>, 975 F. Supp. 317 (S.D.N.Y. 1997),
(Defs.' Br. in Opp'n at 8), (2) the information provided in most
instances consists of the employees' names or initials, the total
hours worked, and the hourly rates, but is typically absent any
information as to "whether [a particular] employee was a junior
or senior partner, [or] junior or senior associate," <u>id.</u> at 9,
and (3) "whether an employee['s] change in title [if any, during
the course of the litigation] has been taken into account in
determining the appropriate fees charged."  <u>Id.</u> at 9-10.

        As a further particularized example of the billing
inadequacies charged to plaintiffs, defendants refer to the sums
assessed for travel time to and from the court.  Plaintiffs
object in that "it [is] not . . . possible to determine whether
the attorneys and paralegals distinguished the rates for travel
time from the full hourly rates."  <u>Id.</u> at 9.  In that regard,

defendants cite <u>Barfield v. N.Y.C. Health and Hosps. Corp.</u>, 537
F.3d 132, 139, 151 (2d Cir. 2008) for the proposition that travel
time, pursuant to local court custom, should be charged at half
of counsel's hourly rate rather than at the full rate.

    With respect to defendants' first-listed specific
objection, <u>supra</u>, concerning a lack of detail as to "the levels
of the attorneys' experience over the course of the litigation,"
the Court has perused the <u>Williams</u> case.  There the Court, in the
exercise of its discretion – after deciding to apply "current
rather than historic [hourly] rates" – held that it was not
prepared to employ the same methodology concerning counsels'
"level of experience."  <u>Williams</u>, 975 F. Supp. at 322.  "Instead,
their hourly rates should reflect the passage of time and the
corresponding development of each attorney's expertise."  <u>Id.</u>
Therefore, "rather than assign hourly rates based on each
attorney's current level of experience, the [<u>Williams</u>] Court . .
. determine[d] hourly rates based on the average of each
attorney's level of experience throughout the course of the
litigation."  <u>Id.</u> at 323.

    <u>Williams</u> was a Section 1983 class action seeking
injunctive relief against the New York City Housing Authority's
methods of terminating rent assistance.  <u>Id.</u> at 319.  Plaintiffs,
as the prevailing parties, sought counsel fees pursuant to 42
U.S.C. § 1988 based on a lodestar calculation.  <u>Id.</u> at 319, 321.

Here, in contrast, the lodestar method is being used merely as a cross-check against the percentage method. Under such circumstances, "the hours documented by counsel need not be exhaustively scrutinized by the district court." Goldberger, 209 F.3d at 50; see also In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 585-86 (S.D.N.Y. 2008); In re Elan Sec. Litig., 385 F. Supp. 2d 363, 373 (S.D.N.Y. 2005). Moreover, given that approximately twenty-five attorneys worked on the present class action at different points for over a decade, the Court, in the exercise of its discretion, declines the invitation to adopt the methodology used in Williams. Instead, I will use the current, unadjusted hourly rates charged by the various attorneys in determining counsel fees in recognition of the fact that counsel did not receive any interim payments during the course of the litigation. See, e.g., Grant v. Martinez, 973 F.2d 96, 100 (2d Cir. 1992); Velez, 2010 WL 4877852, at *23 ("The use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts as a means of accounting for the delay in payment inherent in class actions and for inflation.")(quoting In re Veeco Sec. Litig., 207 U.S. Dist. LEXIS 16922, at *9 n.7 (S.D.N.Y. 2007)).

As to defendants' complaint about the failure of plaintiffs' billing records to distinguish between senior and junior partners as well as junior and senior associates, that

purported inadequacy is partially cured by the resumes that have
been provided by movants.  However, given the exemplary caliber
of the legal services rendered to the class, I have assigned a
$300 per hour rate for the services of all associates with two
exceptions those being where the requested rate was below $300.
Similarly, for the same reason, the hourly rate assigned to all
partners is $450.

VI.  Calculation of Lodestar Cross-Check With Respect
     to Plaintiffs' Request for Counsel Fees

     A.  Eastern District Hourly Rates Apply

          Plaintiffs posit that the "hourly [rates] charged by
Mr. Herbst ($750) and other senior lawyers in this case are
reasonable."  (Pls' Mem. in Supp. at 17.)  That is so, counsel
explains, "because this is a case where higher Southern District
hourly rates may be applied."  (Id.)  For that proposition,
several cases are cited by plaintiffs, including Vilkhu v. City
of N.Y., 2009 U.S. Dist. LEXIS 73696 (E.D.N.Y. June 26,
2009)(using Southern District hourly rates in an Eastern District
case in establishing the lodestar fee in a non-class civil
action).

          However, as a preliminary matter, the Court notes that
Vilkhu was vacated on appeal on the very ground that the District
Court had "calculated the attorney's fees award by reference to
billing rates in the Southern District."  372 F. App'x. 222, 223-

24 (2d Cir. 2010).  The Second Circuit's decision to vacate the District Court's attorney's fees award was based upon its decision in Simmons v. N.Y.C. Transit Auth., 575 F.3d 170 (2d Cir. 2009), which is discussed infra.  See id.

"An attorney's hourly rate is considered reasonable when it is 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonable comparable skill, experience, and reputation.'"  Mawere v. Citco Fund Servs., (USA) Inc., 2011 WL 6779319, at *3 (S.D.N.Y. Sept. 16, 2011)(quoting Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)), report and recommendation adopted, 2011 WL 6780909 (S.D.N.Y. Dec. 27, 2011).  For present purposes, "the community" is the Eastern District, not the Southern District of New York as urged by plaintiffs.  As explained by the Second Circuit in Simmons:

> [W]hen faced with a request for an award of
> higher out-of-district rates, a district
> court must first apply a presumption in favor
> of application of the forum rule.  In order
> to overcome that presumption, a litigant must
> persuasively establish that a reasonable
> client would have selected out-of-district
> counsel because doing so would likely (not
> just possibly) produce a substantially better
> net result.  In determining whether a
> litigant has established such a likelihood,
> the district court must consider experience-
> based, objective factors.  Among the
> objective factors that may be pertinent is
> counsel's special expertise in litigating the
> particular type of case, if the case is of
> such nature as to benefit from special

> expertise.  A litigant cannot overcome the
> presumption through mere proximity of the
> districts, nor can a litigant overcome the
> presumption by relying on the prestige or
> "brand name" of her selected counsel. . . .
> [Instead,] the party seeking the award must
> make a particularized showing, not only that
> the selection of out-of-district counsel was
> predicated on experience-based, objective
> factors, but also of the likelihood that the
> use of in-district counsel would produce a
> substantially inferior result."

575 F.3d at 175-76.

Although plaintiffs' counsel are clearly highly skilled and knowledgeable members of our profession, movants have failed to demonstrate that, objectively viewed, the use of practitioners from this District would likely have produced a substantially inferior result.  The mere fact that Mr. Herbst, of the plaintiffs' team, was the attorney who handled the threshold litigation in <u>Shain</u>,[7] while significant, falls far short of being dispositive of the issue.  To begin with, <u>Shain</u> was not a class action.  Moreover, the legal principles implicated in that litigation are readily understandable, and thus easily transferrable to other strip search scenarios by competent counsel.

B.  Hourly Rates Sought by Class Counsel and
      <u>Reasonable Forum Rates for Comparable Services</u>

Plaintiffs have requested hourly rates from $400 to

_____

[7]  <u>See</u> history of the <u>Shain</u> litigation <u>supra</u> at pp. 3-4.

$790 for partners, between $285 and $475 for associates, from $125 to $290 for paralegals, and $100 for "interns and law students."[8] (Herbst Decl. at 8; Smith Decl.) However, as noted, forum rates apply here, not the generally higher rates found in the Southern District of New York where each of the five firms which have participated in the representation of the class are located. The question, then, is what are the prevailing market rates required in this community for similar legal services provided by attorneys and paralegals of comparable skill, experience and reputation given the totality of the circumstances, including the nature of the case and other relevant considerations. 1st Bridge LLC v. 682 Jamaica Ave., LLC, 2010 WL 4608326, at *5 (E.D.N.Y. Jul. 13, 2010), report and recommendation adopted, 2010 WL 4607409 (E.D.N.Y. Nov. 4, 2010). In making that determination, the court may "rely on the hourly rates awarded in comparable actions in Eastern District opinions and on its own knowledge of the prevailing rates in this district." Ferrari v. Prof. Pavers Corp., 2013 WL 1212816, at *5 (E.D.N.Y. Mar. 23, 2013).

The legal representation provided to the class has been first rate. To obtain such services locally would likely require the following hourly sums: $300 to $450 for a partner, $200 to

---

[8] Given the dearth of information about the "interns and students," an award for their services is not warranted.

$300 for an associate, and $70 to $90 for a paralegal.  See

Gagasoules v. MBF Leasing LLC, 2013 WL 1760134, at *3 (E.D.N.Y.

Apr. 24, 2013); see also Gesualdi v. Deland Contracting, Inc.,

2013 WL 4807080, at *5 (E.D.N.Y. Sept. 9, 2013); Pilitz v. Inc.

Vill. of Freeport, 2011 WL 5825138, at *4 (E.D.N.Y. Nov. 17,

2011).

    C.  Hours Expended

      As earlier discussed, defendants leveled a number of

complaints – both general and specific – against plaintiffs'

billing records.  However, it will be noted that those complaints

do not target the number of hours claimed per se.[9]

      The records submitted by plaintiffs demonstrate that

the five firms involved in representing the class devoted a total

of 8,588.83 hours to the task.  See supporting Declarations

submitted by (1) Robert L. Herbst (on behalf of Giskan,

Solotaroff Anderson & Stewart LLP, Beldock Levine & Hoffman LLP,

---

[9]  As noted earlier in the text, defendants maintain that it
is unclear whether plaintiffs are billing their full hourly rates
for travel to and from the courthouse rather than the customary
fifty percent of that rate.  That complaint is unaccompanied,
however, by the identity of the subject entries either by firm,
date, total sum involved, or otherwise.  The Court declines
defendants' implicit invitation to peruse the literally thousands
of billing entries to fill this specificity void in the
presentation of their argument since the lodestar is being
computed solely as a cross-check.

and Herbst & Greenwald LLP),[10] (2) by Jeffrey G. Smith (on behalf of Wolf Haldenstein Adler Freeman & Herz LLP), and (3) by Matthew D. Brinckerhoff (on behalf of Emery Celli Brinckerhoff & Abady LLP).

### D. Lodestar Calculations Based on Hours Expended and Adjusted Hourly Rates

By way of format, I have taken the billing charts submitted by each of the five class counsel law firms – listing such items as the names of the service providers, the hours devoted to the case, the requested hourly rates, and the corresponding total sums requested – and modified those charts (1) to indicate whether the attorney involved is a "partner," or an "associate" in those situations where that needed information is absent from a chart and is also decipherable from other materials provided such as resumes and firm websites, and (2) to provide the hourly rates established by the Court in lieu of the rates requested, along with the corresponding total sums.

**Gisken Solotaroff Anderson & Stewart LLP**

| Firm | Name | Position | Specific Position | Total Hours | Rate | Total |
|------|------|----------|-------------------|-------------|------|-------|
| GSAS | Robert L. Herbst | Attorney | Partner | 1,496.80 | $450.00 | $673,560.00 |

---

[10]  While Robert L. Herbst is presently Senior Counsel to the law firm of Giskan Solotaroff Anderson & Stewart LLP, prior to June 2009, he was a senior partner in the law firm of Beldock Levine & Hoffman LLP, and prior to October 28, 2002, he was a partner in the law firm of Herbst & Greenwald LLP.  (See Herbst Decl. at 1.)

| Firm | Name | Position | Specific Position | Total Hours | Rate | Total |
|------|------|----------|-------------------|-------------|------|-------|
| GSAS | Oren Giskan | Attorney | Partner | 67.70 | 450.00 | 30,465.00 |
| GSAS | O. Iliana Konidaris | Attorney | Associate | 42.40 | 200.00 | 8,480.00 |
| GSAS | Dustin Brockner | Paralegal | | 355.90 | 70.00 | 24,913.00 |
| GSAS | Shira Burton | Paralegal | | 610.30 | 70.00 | 42,721.00 |
| GSAS | TAC | Paralegal | | 38.40 | 70.00 | 2,688.00 |
| GSAS | Rahul D'Sa | Paralegal | | 15.70 | 70.00 | 1,099.00 |
| GSAS | LMG | Paralegal | | 40.60 | 70.00 | 2,842.00 |
| GSAS | Kate Redburn | Paralegal | | 30.20 | 70.00 | 2,114.00 |
| **TOTAL** | | | | 2,698.00 | | $788,882.00 |

### Beldock Levine & Hoffman LLP

| Firm | Name | Position | Specific Position | Total Hours | Rate | Total |
|------|------|----------|-------------------|-------------|------|-------|
| BLH | Robert Herbst | Attorney | Partner | 467.00 | $450.00 | $210,150.00 |
| BLH | Jonathan Moore | Attorney | Partner | 48.65 | 450.00 | 21,892.50 |
| BLH | Vera Scanlon | Attorney | Partner | 1,370.60 | 450.00 | 616,770.00 |
| BLH | Spencer Freedman | Attorney | Associate | 440.50 | 300.00 | 132,150.00 |
| BLH | Sofia Yakren | Attorney | Associate | 79.15 | 300.00 | 23,745.00 |
| BLH | Marc Cannan | Paralegal | | 13.80 | 70.00 | 966.00 |
| BLH | Julie Russell | Paralegal | | 136.90 | 70.00 | 9,583.00 |
| BLH | Joani Pattarozzi | Paralegal | | 22.95 | 70.00 | 1,606.50 |
| BLH | Interns & Law Students | | | 193.00 | | |
| **TOTAL** | | | | 2,772.55 | | $1,016,863.00 |

### Herbst & Greenwald LLP

| Firm | Name | Position | Specific Position | Total Hours | Rate | Total |
|------|------|----------|-------------------|-------------|------|-------|
| H&G | Robert Herbst | Attorney | Partner | 250.90 | $450.00 | $112,905.00 |
| H&G | Gayle Pollack | Attorney | Associate | 183.32 | 300.00 | 54,996.00 |
| H&G | Amanda Masters | Attorney | Associate | 18.00 | 300.00 | 5,400.00 |
| H&G | Tori Marie Angeli | Paralegal | | 17.50 | 70.00 | 1,225.00 |
| **TOTAL** | | | | 469.72 | | $174,526.00 |

### Emery Celli Brinckerhoff & Abady LLP

| Attorney | Specific Position[11] | Total Hours | Rate | Total |
|---|---|---|---|---|
| Matthew D. Brinckerhoff | Partner | 172.9 | $450.00 | $ 77,805.00 |
| Mariann Meier Wang | Partner | 561.14 | 450.00 | 252,513.00 |
| Nina Morrison | Associate | 52.7 | 300.00 | 15,810.00 |
| Richard D. Emery | Partner | 13.2 | 450.00 | 5,940.00 |
| Mary Kuder | Paralegal | 71.4 | 70.00 | 4,998.00 |
| Elizabeth Saylor | Partner | 11.3 | 450.00 | 5,085.00 |
| John R. Cuti | Associate | 5.3 | 300.00 | 1,590.00 |
| Scott Hoffer | Paralegal | 14.75 | 70.00 | 1,032.50 |
| Jonathan S. Abady | Partner | 2.1 | 450.00 | 945.00 |
| Katherine Rosenfeld | Partner | 3.0 | 450.00 | 1,350.00 |
| Kelly Stefanco | Paralegal | .8 | 70.00 | 56.00 |
| **TOTAL** | | 908.59 | | $367,124.50 |

### Wolf Haldenstein Adler Freeman & Herz, LLP

| Attorneys/Paraprofessionals/Others | Hours | Rate | Total |
|---|---|---|---|
| Daniel W. Krasner(P) | 34.60 | $450.00 | $ 15,570.00 |
| Jeffrey G. Smith(P) | 629.60 | 450.00 | 283,320.00 |
| Alan A.B. McDowell(OC) | 636.60 | 300.00 | 190,980.00 |
| John M. Cromwell(OC) | 32.68 | 275.00 | 8,987.00 |
| Martin E. Restituyo(A) | 718.55 | 300.00 | 215,565.00 |
| James A. Cirigliano(PL) | 24.00 | 70.00 | 1,680.00 |
| Joseph Weiss(PL) | 66.80 | 70.00 | 4,676.00 |
| Jillaine E. Gill(PL) | 44.60 | 70.00 | 3,122.00 |
| Kevin G. Cooper(PL) | 13.00 | 70.00 | 910.00 |
| **TOTAL** | 2,200.43 | | $724,810.00 |

---

[11]  From the materials submitted, Brinckeroff and Wang are listed above as "partners."  Moreover, reference to the websites provided in paragraph 4 of Brinckeroff's March 19, 2012 Declaration, shows that Emery, Saylor, Abady and Rosenfeld are partners as well.  Although the rates requested for the services of Morrison,  and Cuti suggest their partnership status, rates alone are insufficient to warrant that conclusion absent other information. Accordingly, the latter two attorneys are treated as "associates."

The total unadjusted lodestar amount for the five firms is $3,072,205.50

VII.  Plaintiffs' Request for a Lodestar Multiplier

A lodestar amount represents a "presumptive[ly] reasonab[le]" attorneys' fee.[12]  Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).  As such, it is subject to an upward or downward adjustment by the district court if deemed necessary to reach an appropriate award.

Plaintiffs seek a relatively modest upward adjustment via a 1.29 multiplier.  See Velez, 2010 WL 4877852, at *23 ("Class counsel has requested a multiplier of 2.4 times the hourly fees already incurred.  That multiplier falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit.").  As noted in Citigroup: "A multiplier is typically applied to the lodestar figure to represent the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors."  2013 WL 6697822, at *4 (emphasis added)(citation and internal quotation marks omitted).

"[L]itigation risk must be measured as of when the case

_____

[12] "[A] reasonable fee is an estimation of 'what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively.'" In re Citigroup Inc. Bond Litig., 2013 WL 6697822, at *4 (S.D.N.Y. Dec. 19, 2013)(quoting Simmons, 575 F.3d at 174).

is filed." <u>Goldberger</u>, 209 F.3d at 55. Although at that time, plaintiffs had the benefit of the district court decision in <u>Shain</u>, the County was in the process of trying to have that decision overturned, mounting an argument that clearly could not be dismissed as patently without merit. Had plaintiffs not ultimately prevailed, no monies would have been received by their counsel either by way of fees or, in all probability, reimbursement for expenses incurred. The skill level of counsel was impressive and, while the complexity of plaintiffs' liability approach was relatively straight forward, their pivotal general damages argument was not only sound in my judgment, but one that less capable attorneys may not have considered.

For the reasons indicated, the base lodestar figure of $3,072,205.50 has been enhanced by a multiplier of 1.29, resulting in an adjusted lodestar figure is $3,963,145.00.

VIII. Consideration of Factors Listed in <u>Goldberger</u> <u>v. Integrated Resources, Inc.</u> (the "<u>Goldberger</u> <u>factors</u>") in Awarding a Reasonable Counsel Fee

The <u>Goldberger</u> factors are:

1. "the time and labor expended,"

2. "the magnitude and complexities of the litigation,"

3. the risks involved in the litigation,

4. the quality of the representation,

5. the requested fee in relation to the recovery obtained, and

6. "public policy considerations."

Goldberger, 209 F.3d at 50.

The factors are applicable to reasonableness determinations, whether a percentage of the common fund or the lodestar approach is used. McDaniel v. Cnty. of Schenectady, 595 F.3d 411, 423 (2d Cir. 2010). They are also applicable to multiplier requests. See Steinberg v. Nationwide Mut. Ins. Co., 612 F. Supp. 2d 219, 222 (E.D.N.Y. 2009). Accordingly, all but two of the Goldberger factors have already been addressed with respect to the multiplier determination supra. As to the two remaining, i.e. factors 5 and 6, and proceeding in reverse order, the effort to spare arrestees charged with non-felony offenses from the gross indignity of being strip searched upon entry to a correctional facility, absent reasonable suspicion that he or she harbors contraband, is a laudable litigation goal implicating major public policy concerns. And as to the last factor – the multi-million dollar recovery obtained and the concession of liability which remains in place as to the former class members' potential claims for special damages – that also has been taken into account by the Court in awarding what it believes to be a reasonable fee.

IX. Letters From Class Members Submitted in Response to
    Plaintiffs' Request for Counsel Fees

Notices were sent in November 2013 to class members of

-30-

counsels' request for attorneys' fees in the amount of $5,754,000 and for $182,030.25 by way of reimbursement for costs and expenses incurred.  Responses from seven class members were received, with the common theme being the position that the amount sought was excessive.  Parenthetically, given the assumption voiced by counsel for plaintiffs and for defendants on a number of occasions that the expected claim rate by class members against the common fund will likely fall short of 50%, the funds paid to class counsel in all probability will not, as a practical matter, diminish the amount paid to individual class members.  Instead, those payments will probably be disbursed from the unclaimed portion of the $11,508,000 total award.  In any event, the Court has carefully considered the comments of each responding class member in fashioning its attorneys' fee award. However, the dollar amount of the award provided <u>infra</u>, and the reimbursement for costs and expenses, has not been effected.

X.  Plaintiffs are Awarded $3,836,000 in Counsel Fees,
    That Being a sum Equivalent to 33⅓% of the Total
    Amount Recovered on Behalf of the Class

        Based on the total amount recovered on behalf of the class, considered in conjunction with (1) each of the previously discussed <u>Goldberger</u> factors, (2) the adjusted lodestar cross-check amount $3,963,145.00 (i.e. $3,072,205.50 unadjusted lodestar x 1.29 multiplier), and (3) percentages awarded in other instructive common fund cases, I find that a counsel fees award

of $3,836,000 is reasonable.  Accordingly, that sum is awarded to the five firms which represented the class.  See, e.g., Cent. States Se. and Sw. Areas Health and Welfare Fund v. Cahn, 504 F.3d 229, 249 (2d Cir. 2007); In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig., 2014 WL 92465, at *6 (E.D.N.Y. Jan. 10, 2014); Velez, 2010 WL 4877852, at *21.

XI.  Plaintiffs' Application for Reimbursement of Costs and Expenses Incurred is Granted

Class counsel indicates that among the five firms representing the class, total fees and expenses of "$182,030.25" have been incurred.  (Pls.' Mem. in Supp. at 22.)  Neither the amount nor the items underlying that amount have been challenged, and the sums spent appear to have been necessary and reasonable.

"It is well-established that counsel who create a common fund . . . are entitled to the reimbursement of [all reasonable] litigation costs and expenses."  In re Marsh Erisa Litig., 265 F.R.D. 128, 150 (S.D.N.Y. 2010).  Accordingly, plaintiffs are awarded reimbursement in the amount requested, viz. $182,030.25.

XII.  Conclusion re Attorneys' Fees and Reimbursement for Costs and Expenses

Movants are awarded $3,836,000 in attorneys' fees and $182,030.25 for costs and expenses incurred for a total of $4,018,030.25.

## PLAINTIFFS' APPLICATION FOR SERVICE AWARDS

The subject of service awards was discussed on several occasions over the years during status conferences. Indeed, the Court voiced the view during one such conference that it thought that class members who were deposed should receive $2500, those who testified $5000, and those who did both, $7500. (Jan. 13, 2012 Tr. at 19.)

In response to my service award comments, two noteworthy events occurred. Firstly, plaintiffs' counsel referred to the July 5, 2005, Stipulation of Settlement resolving "the three consolidated cases" brought by "ten individual plaintiffs" based on the strip searches in issue. As part of that agreement, defendants stipulated that "if the denial of class certification [was] reversed on appeal," as it was, "defendants [would] not oppose plaintiffs' right to . . . (c) apply for compensation for their time and efforts as class representatives in an amount not to exceed $1,000 per class representative." (May 5, 2005 Stip. of Settlement at ¶ 7.)

The second happening of note was that defendants asked for, and were granted permission to brief the subject before my inclination materialized into an order. As a result, the Court received defendants' January 20, 2012 letter outlining their position that the sums mentioned by the Court were excessive, and plaintiffs' January 25, 2012 reply which concluded thusly: "[w]e

respectfully reiterate our original request for $5,000 and
$10,000 service incentive awards for deposed and testifying class
members who were not named plaintiffs; if the Court is unwilling
to grant them, there is certainly no legitimate reason to reduce
further the Court's stated inclination to grant $2,500 and $5,000
respectively."  (Pls.' Jan. 25, 2012 Ltr. at 5.)

As is evident from the foregoing, potential service
award recipients fall into two categories: (1) those of the ten
named plaintiffs who participated in the class action via being
deposed, testifying at trial, or both; and (2) other class
members who provided like services to the class.

At this juncture, a brief review of the applicable law
on service awards is required.  Service or "[i]ncentive awards
are typically awards to class representatives for their often
extensive involvement with a lawsuit."  <u>Hadix v. Johnson</u>, 322
F.3d 895, 897 (6th Cir. 2003).

Service awards are not uncommon in federal class
actions.  <u>See</u> <u>Bellifemine v. Sanofi-Aventis U.S. LLC</u>, 2010 WL
3119374, at *7 (S.D.N.Y. Aug. 6, 2010); <u>Flemming</u>, 56 A.D.3d at
166 (discussing federal service award cases).  The situation
appears to be otherwise, however, in New York.  <u>See</u> <u>Flemming</u>, 56
A.D.3d at 166-67 ("New York law does not authorize incentive
awards for named plaintiffs in class actions . . . The
Legislature did not statutorily provide for incentive awards when

enacting CPLR Article 9, and we decline to create new law,
leaving that policy determination within the purview of the
Legislature");[13] see also In re Metlife Demutualization Litig.,
689 F. Supp. 2d 297, 371 (E.D.N.Y. 2010); but see Fiala, 27
Misc. 3d at 611-12; Cox v. Microsoft Corp., 26 Misc. 3d 1220(A),
at *4 (Sup. Ct. N.Y. Co. 2007).

Here, of course, the federal class action no longer
exists as a result of this Court's Florence-based decision of
July 18, 2013.   Thus, state law on service awards controls.
That change in the legal landscape, inter alia, caused me to
rethink my initial, albeit tentative, view on the subject and to
advise counsel on January 29, 2014 that I was "reserv[ing]
decision" on plaintiffs' subject application.   (Jan. 29, 2014 Tr.
at 7:17-25.)   In any event, plaintiffs' request for service
awards for class members falling within categories "1" and "2"
supra, are denied for the following reasons:   (1) the dismissal
of the federal constitutional claim leaving solely the state-
based cause of action; (2) the apparent unavailability of such
awards under New York law; and (3) the absence of any information
from movants concerning the concomitant costs or consequences, if
any, to those class members who were deposed or testified at

---

[13]   To the extent service awards are unavailable in New York
for "named plaintiffs," they obviously are also unavailable for
the non-named plaintiff class members presently seeking such
awards from this Court.

trial, thereby precluding an appropriate evaluation of their

services.  See, e.g., Flemming, 56 A.D.3d at 166 ("New York law

does not authorize incentive awards for named plaintiffs in class

actions.  Federal Courts grant incentive awards where there are

special circumstances, such as personal risk incurred by the

plaintiff, exceptional time and effort expended in assisting

class counsel, advancement of litigation expenses and acceptance

of the risk of loss, or other similar burdens.")(internal

citations omitted); In re Payment Card Interchange Fee and Merch.

Disc. Antitrust Litig., 2014 WL 92465, at *9 (E.D.N.Y. Jan. 10,

2014)("Class Counsel are expected to provide, at a minimum,

documentation setting forth the approximate value of each Class

Plaintiff's claim and each one's proposed incentive award.")

> DEFENDANTS' ARGUMENT THAT THE CLASS PERIOD MUST
> BE REDEFINED GIVEN THE DISMISSAL OF THE FEDERAL
> CONSTITUTIONAL CLAIM LACKS MERIT

Defendants' argument as to the captioned subject is, in

toto, as follows:

> There is no Federal statute of limitations
> for § 1983 actions.  Instead, the Federal
> courts adopt the applicable State law
> limitations period for personal injuries.  In
> New York State, that statutory period is
> three years.  However, with the Federal
> claims being dismissed, this Court has
> determined that the only remaining claim is
> one for State law unlawful search and seizure
> – an intentional tort.  Therefore, the proper
> statutory period to bring a claim is one year
> and ninety days [(apparently referring to the
> time limitation set forth in New York General

Municipal Law 50-i(l))].

    Now, instead of a class period running
from May 20, 1996 through June 1, 1999, the
applicable statutory period should be from
February 20, 1998 through May 20, 1999.

(Defs.' Br. in Opp'n at 13.)

Plaintiffs' response is twofold: (1)" defendants have made no showing that the statute of limitations on New York State Constitutional claims under Article I, Section 12 are not subject either to the three year statute of limitations for personal injury under CPLR 214 – the limitations statute from which the federal statute of limitations for § 1983 cases was derived, or the residuary six year statute of limitations of CPLR 213(1) (Pls.' Reply at 9 (citations omitted)), and (2) "even if _arguendo_ defendants could show that the statute of limitations was less than three years, the statute of limitations defense is an affirmative defense that was waived, when defendants failed to raise it and conceded liability on the state law claim for the entire class 10 years ago." Id.

Plaintiffs' second point is dispositive and thus the identification of the applicable statute of limitation is purely academic and need not be resolved. As plaintiffs note, defendants conceded liability in early 2003. See, e.g., In re Nassau Cnty. Strip Search Cases, 461 F.3d at 224. That concession contained no limiting language or conditions. It

pertained to both the now dismissed first cause of action alleging a Fourth Amendment federal violation, as well as the second and sole remaining cause of action charging a violation of Article 1, Section 12 of the State Constitution.

In addition, a perusal of defendants' answer to the original complaint, as well as their later response to plaintiffs' amended complaint, discloses the total absence of any reference to General Municipal Law 50-i(1) or to any other state or federal statute of limitations. Simply put, that affirmative defense was never asserted.

Defendants' cryptic argument in support of the relief requested neglects to mention, no less address either (1) the 2003 concession of liability underscored by plaintiffs, or (2) the absence of a statute of limitation defense in their original or amended answer. Perhaps that is not surprising in that each of the two occurrences gave rise to a waiver of the affirmative defense, thereby derailing as a matter of law defendants' "eleventh hour" effort to reconfigure the temporal component of the class definition.

It is obvious that the 2003 concession of liability constitutes a waiver because by its very nature it disavows the defense of a time bar. And defendants' failure to include the subject affirmative defense either in a CPLR § 3211(a)(5) motion to dismiss or in their answer – instead broaching it post-

concession and after the general damages trial – similarly
constitutes a waiver. <u>Augenblick v. Town of Cortlandt</u>, 66 N.Y.2d
775, 777 (1985)("Respondents waived their statute of limitations
defense by failing to plead it in their answer or by appropriate
motion"); <u>see also</u> <u>Robinson v. Canniff</u>, 22 A.D.3d 219, 220 (1st
Dep't 2005); <u>Mendez v. Steen Trucking, Inc.</u>, 254 A.D.2d 715, 716
(4th Dep't 1998).[14]

In sum, defendants' claim that the class must be
redefined given the dismissal of the federal constitutional cause
of action is unconvincing. Defendants fail to explain how that
dismissal somehow affects the state law of waiver vis-a-vis
affirmative defenses. In the Court's view, the two subjects are
wholly distinct.

CONCLUSION

For the reason indicated: (1) the attorneys for the
plaintiff class are awarded $3,836,000 in counsel fees, plus
reimbursement for litigation expenses in the amount of
$182,030.25, for a total of $4,018,030.25 and (2) their

---

[14] Incidentally, the result would be the same under federal
law. <u>See</u> Federal Rule of Civil Procedure 8(c)(1); <u>see also</u> <u>Green
v. United States</u>, 260 F.3d 78, 85 (2d Cir. 2001); <u>Pino v. United
States</u>, 2004 WL 1320888, at *2 (S.D.N.Y. June 14, 2004); <u>Mei
Int'l, Inc. v. Schenkers Int'l Forwarders, Inc.</u>, 807 F. Supp.
979, 989 (S.D.N.Y. 1992).

application for service awards is denied.

Defendants' application to redefine the class is denied.

SO ORDERED.

Dated: April 2, 2014
       Central Islip, New York


_____
DENIS R. HURLEY, U.S.D.J.