Case 0:99-cv-02844-DRH-AYS   Document 480   Filed 06/16/16   Page 1 of 6 PageID #: 4778

**MANDATE**

14-1388-cv (L)
*In re Nassau Cty. Strip Search Cases*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1. When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of February, two thousand sixteen.

PRESENT:  JOSÉ A. CABRANES,
          ROSEMARY S. POOLER,
          DENNY CHIN,
                    *Circuit Judges.*

---

IN RE NASSAU COUNTY STRIP SEARCH CASES

GARDY AUGUSTIN, HEIDI KANE, MARY KATHERINE PUGLIESE, GREGG WILLS, STEVEN ROTH, OSCAR AVELAR, RALPH DILIELLO, JOHN IAFFALDANO, FRANCIS O'DAY, AND STUART MOSKOWITZ, ON BEHALF OF THEMSELVES AND OTHER SIMILARLY SITUATED,

        *Plaintiffs-Appellees-Cross-Appellants,*

    v.           Nos. 14-1388-cv (Lead), 14-1437-cv (XAP)

NASSAU COUNTY SHERIFF'S DEPARTMENT, DIVISION OF CORRECTION, NASSAU COUNTY, AND JOSEPH JABLONSKY, NASSAU COUNTY SHERIFF,

        *Defendants-Appellants-Cross-Appellees.*

---

**FOR PLAINTIFFS-APPELLEES:**    ROBERT L. HERBST, Herbst Law PLLC, New York, NY.

1

MANDATE ISSUED ON 06/16/2016

                                                  Jeffrey G. Smith, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY.

                                                  Matthew D. Brinckerhoff, Emery Celli Brinckerhoff & Abady LLP, New York, NY.

                                                  Jonathan C. Moore, Beldock Levine & Hoffman LLP, New York, NY.

**FOR DEFENDANTS-APPELLANTS:**      ROBERT F. VAN DER WAAG *for* Carnell T. Foskey, Nassau County Attorney, Mineola, NY.

      Appeal from a judgment of the United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*).

      **UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED**.

      Plaintiffs are a class of persons "arrested on misdemeanor charges unrelated to weapons or drugs and thereafter strip searched, without individualized suspicion," at the Nassau County Correctional Center (the "NCCC"), in accordance with a "blanket policy" in effect at NCCC prior to 1999. *See In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 222–23 (2d Cir. 2006). In *Shain v. Ellison*, 53 F. Supp. 2d 564 (E.D.N.Y. 1999), a district court in the Eastern District of New York held that this policy violated clearly established Fourth Amendment law. We affirmed, explaining "that persons charged with a misdemeanor and remanded to a local correctional facility like NCCC have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons." *See Shain v. Ellison*, 273 F.3d 56, 66 (2d Cir. 2001).

      In the wake of *Shain*, plaintiffs brought the instant action, in which they alleged that their strip searches violated 42 U.S.C. § 1983, the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 1, Section 12 of the New York State Constitution. *See In re Nassau Cty. Strip Search Cases*, 461 F.3d at 222. In response to a class-certification motion that plaintiffs filed in 2003, defendants "conceded the one common issue that in their view might be appropriate for class certification[—]namely, whether the NCCC's strip search policy during the class period was constitutional. Specifically, defendants recognized that they are bound by *Shain* under the doctrine of collateral estoppel." *Id.* at 224 (alterations and internal quotation marks omitted). The District Court thereafter certified a class as to liability, and—"in light of defendants' concession of liability to all class members"—"entered summary judgment on liability for all strip searches upon admission to the NCCC" with respect to plaintiffs' federal and state claims. *In re*

*Nassau Cty. Strip Search Cases*, 958 F. Supp. 2d 339, 341 (E.D.N.Y. 2013) (alteration and internal quotation marks omitted).

Almost five-and-a-half years after the District Court entered judgment, however, the Supreme Court decided *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510 (2012), in which it considered "whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from [strip searches] absent reasonable suspicion of a concealed weapon or other contraband." *Id*. at 1518. The Court answered that question in the negative. *See id.* at 1523 (holding that the challenged search procedures "struck a reasonable balance between inmate privacy and the needs of the institutions").

Following the Court's decision in *Florence*, defendants "assert[ed] that . . . *Florence* represents an intervening change of controlling law that should lead the [District] Court to vacate its prior order granting summary judgment for plaintiffs on the issue of liability and to instead enter summary judgment for defendants dismissing the case." *In re Nassau Cty. Strip Search Cases*, 958 F. Supp. 2d at 342 (alteration and internal quotation marks omitted). In support of this argument, defendants cited Rule 54(b) of the Federal Rules of Civil Procedure, which grants "a district court . . . authority to revise an interlocutory order . . . at any time before the entry of final judgment," *Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 288 (2d Cir. 2011), for "cogent and compelling reasons such as an intervening change of controlling law," *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 208 (2d Cir. 2013) (internal quotation marks omitted).

In a thorough and well-reasoned decision, the District Court found that *Florence* represented an intervening change of controlling law with respect to plaintiffs' federal-law claims, but not with respect to plaintiffs' state-law claims. *See In re Nassau Cty. Strip Search Cases*, 958 F. Supp. 2d at 354. We agree.

Turning first to the state-law question, the dispositive word from the Rule 54(b) framework described above is "controlling." We fail to see how *Florence*—in which the *United States* Supreme Court interpreted the Fourth Amendment to the *United States* Constitution—could possibly control the meaning of Article I, Section 12 of the *New York State* Constitution. Indeed, we fail to see how a Supreme Court decision interpreting any federal constitutional provision could ever control the meaning of an analogous state constitutional provision, at least absent extraordinary circumstances not presented here. *See California v. Greenwood*, 486 U.S. 35, 43 (1988) ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."); *McGrath v. Toys "R" Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) ("State courts are not bound to interpret state laws in accordance with federal court interpretations of analogous federal statutes . . . ."); *People v. Harris*, 570 N.E.2d 1051, 1053 (N.Y. 1991) ("Our federalist system of government necessarily provides a double source of protection and State courts, when asked to do so, are bound to apply their own Constitutions notwithstanding the holdings of the United States Supreme Court." (citation omitted)).

Such circumstances might include, for example, a ruling by a state's highest court that state courts interpreting a particular state constitutional provision were bound by the Supreme Court's interpretation of an analogous federal constitutional provision. As the District Court in this case correctly observed, however, the New York Court of Appeals has not so ruled. To the contrary, "on many occasions[, it has] interpreted [the New York State] Constitution to provide greater protections when circumstances warrant and ha[s] developed an independent body of state law in the area of search and seizure," especially "when doing so promotes predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of [New York State's] citizens." *People v. Weaver*, 909 N.E.2d 1195, 1202 (N.Y. 2009) (internal quotation marks omitted).

Turning next to the federal-law question, we begin by noting that the questions presented in *Shain* and *Florence* were virtually identical. *Compare Shain*, 273 F.3d at 59 ("This appeal requires us to determine whether it [is] clearly established . . . that corrections officers in a local correctional facility [cannot] perform a strip search including a non-intrusive examination of body cavities on an individual arraigned on misdemeanor charges unless the officers had reasonable suspicion that the individual possessed contraband or weapons."), *with Florence*, 132 S. Ct. at 1518 ("The question here is whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband."). The fact that the Supreme Court reached a conclusion opposite to ours in response to that question demonstrates in and of itself that *Florence* represents an intervening change of controlling law with respect to plaintiffs' federal-law claims. *Cf. Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013) ("*Shain* is likely no longer good law in light of *Florence* . . . ."). But certain of *Florence*'s features also buttress our determination in this regard.

For example, in describing the circuit split that led to its grant of certiorari, the Supreme Court observed that "[s]ome Federal Courts of Appeals have held that corrections officials may not conduct a strip search of" "offenders suspected of committing minor offenses" "absent reasonable suspicion of concealed contraband"—the position that the Court ultimately rejected—but that "[t]he Courts of Appeals to address this issue in the last decade . . . have come to the opposite conclusion"—the position that the Court ultimately adopted. *Florence*, 132 S. Ct. at 1518. For a description of the former category of cases, the Supreme Court cited the Third Circuit decision on review, which itself cited *Shain* as an example of the position it was rejecting. *See id.* (citing *Florence v. Bd. of Chosen Freeholders of City of Burlington*, 621 F.3d 296, 303–04 & n.4 (3d Cir. 2010)). This provides further evidence that *Florence* abrogated *Shain*.

Plaintiffs attempt to distinguish the present case on the ground that "*Florence*'s holding . . . was narrowly tailored to apply only to those who are committed to the general population of a jail." Pls.' Br. 18. They argue that *Florence* is inapplicable here because "[t]here was a

4

clear distinction between most of the Jail, in which the general population inmates were housed, and the separate new admit housing facilities, where all new admits were housed specifically to isolate them from the general inmate population." *Id.* at 17. But as the following passage from *Florence* demonstrates, plaintiffs' interpretation of the Supreme Court's use of the phrase "general population" is untenable:

> This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees. This describes the circumstances in *Atwater*. See 532 U.S., at 324, 121 S. Ct. 1536 ("Officers took Atwater's 'mug shot' and placed her, *alone*, in a jail cell for about one hour, after which she was taken before a magistrate and released on $310 bond"). The accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue. Cf. United States Brief 30 (discussing the segregation, and less invasive searches, of individuals held by the Federal Bureau of Prisons *for misdemeanors or civil contempt*).

132 S. Ct. at 1522–23 (emphasis supplied).

Thus, the Supreme Court indicated that categorically strip-searching the following two classes of detainees may not pass constitutional muster: (1) detainees charged with misdemeanors and segregated *alone* from the general population; and (2) detainees charged with misdemeanors and segregated *with other detainees charged with misdemeanors* from the general population. Plaintiffs here clearly do not fall into the first class, but they do not fall into the second either. As plaintiffs repeatedly acknowledge throughout their brief, *all* new arrestees, not just those charged with misdemeanors, were sent to the separate new-admit housing facilities. *See, e.g.*, Pls.' Br. 49 ("[E]*very* new arrestee admitted to the Jail and strip searched was isolated for 72 hours . . . ." (emphasis supplied) (internal quotation marks omitted)); *id.* at 50 ("[*A*]*ll* new admits [were held] out of the general population for a significant period of time . . . ." (emphasis supplied)). In other words, "[t]he new admits [were] not segregated by offense"—new admits charged with misdemeanors and new admits charged with felonies were segregated *together*. *Id.* at 49.

Also unpersuasive is plaintiffs' argument that *Florence* is inapplicable because the Supreme Court recognized that it had not been "presented [with] the opportunity to consider a narrow exception of the sort Justice Alito describe[d]" in his concurrence, "which might restrict whether an arrestee [(1)] whose detention has not yet been reviewed by a magistrate or other judicial officer, and [(2)] who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue." *Florence*, 132 S. Ct. at 1523; *see also* Pls.' Br. at 43. Assuming that plaintiffs can satisfy the second prong of this exception (which seems unlikely, as discussed in the preceding paragraph), they do not even claim that they can satisfy the first. Rather, they state only that "*many* class members had not had their detention reviewed by a judicial officer at the time they

5

were admitted to the Jail and strip searched." Pls.' Br. 43 (emphasis supplied). As support for this notion, plaintiffs cite the declarations of three class members—three, out of a class of 17,000. *Id.* This calls into grave doubt whether, as to plaintiffs' federal-law claims, "questions of law or fact common to class members predominate over . . . questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008) (holding that it is the plaintiff's burden to prove predominance by a preponderance of the evidence).

For all of these reasons, we agree with the District Court that *Florence* represents an intervening change of controlling law with respect to plaintiffs' federal-law claims.

## CONCLUSION

We have considered all of the parties' other arguments on appeal and found them to be without merit. Accordingly, we **AFFIRM** the District Court's judgment.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

6

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit